## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No.:  _____

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY and
GEICO CASUALTY CO.,

      Plaintiffs,

vs.

DG ESTHETIC AND THERAPY CENTER,
INC., DANIA LIMA, D. A. HEALTH CARE
ASSOCIATES, INC., DAMARYS ALFONSO,
ANA B. MEJIAS, BEACON HEALTHCARE
CENTER, INC., RAYXEL HERRERA,
MAIRA L. GUERRA,   and MICHAEL W.
FORMISANO, M.D.,

      Defendants.

_____/

**Jury Trial Demand**

## **COMPLAINT**

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue Defendants and allege as follows:

1.     This action seeks to recover more than $1,500,000.00 that Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants DG Esthetic and Therapy Center, Inc. ("DG Esthetic"), D.A. Health Care Associates, Inc. ("DA Health"), and Beacon Healthcare Center, Inc. ("Beacon"), relating to medically unnecessary, illusory, unlawful, and otherwise unreimbursable health care services, including initial

examinations, follow-up examinations, and physical therapy services (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies.

2. In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of pending, fraudulent no-fault insurance claims that Defendants have submitted or caused to be submitted through DG Esthetic, DA Health, and Beacon, because:

(i) at all relevant times, DG Esthetic, DA Health, and Beacon operated in violation of the licensing and operating requirements set forth in the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), rendering them ineligible to collect no-fault insurance benefits in the first instance, and rendering their no-fault insurance charges noncompensable and unenforceable;

(ii) the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii) in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were provided – to the extent that they were provided at all – by unsupervised massage therapists, and Florida law prohibits no-fault insurance reimbursement for massage or for services provided by unsupervised massage therapists;

(iv) in many cases, the Fraudulent Services never were provided in the first instance; and

(v) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

3. Defendants fall into the following categories:

(i) Defendants DG Esthetic, DA Health, and Beacon (collectively, the "Clinic Defendants"), through which the Fraudulent Services purportedly were performed and were billed to insurance companies, including GEICO, falsely purported to be properly-licensed health care clinics that operated in compliance with the licensing and operating requirements set forth in the Clinic Act.

2

(ii)      Defendants Dania Lima ("Lima"), Damarys Alfonso ("Alfonso"), and Rayxel Herrera ("Herrera") were the owners and sole shareholders of, respectively, DG Esthetic, DA Health, and Beacon.

(iii)      Defendant Michael W. Formisano, M.D. ("Formisano") is a physician licensed to practice medicine in Florida, falsely purported to serve as the medical director of the Clinic Defendants, and purported to perform many of the Fraudulent Services on behalf of the Clinic Defendants.

(iv)      Defendant Ana B. Mejias, LMT ("Mejias") is a massage therapist licensed to practice massage therapy in Florida, and purported to perform many of the Fraudulent Services on behalf of DG Esthetic and DA Health.

(v)      Defendants Maira L. Guerra, LMT ("Guerra") is a massage therapist licensed to practice massage therapy in Florida, and purported to perform many of the Fraudulent Services on behalf of Beacon.

4.      As set forth below, Defendants at all relevant times have known that:

(i)      the Clinic Defendants operated in violation of the licensing and operating requirements set forth in the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"), rendering them ineligible to collect no-fault insurance benefits in the first instance, and rendering their no-fault insurance charges noncompensable and unenforceable;

(ii)      the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)      in many cases, the Fraudulent Services were not reimbursable as a matter of Florida law, because they were provided – to the extent that they were provided at all – by unsupervised massage therapists, and Florida law prohibits no-fault insurance reimbursement for massage or for services provided by unsupervised massage therapists;

(iv)      in many cases, the Fraudulent Services never were provided in the first instance; and

(v)      the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

5.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through the Clinic Defendants.

6.      The charts attached as Exhibits "1", "2" and "3" to this Complaint set forth a large and representative sample of the fraudulent claims that have been identified to date that Defendants have submitted, or caused to be submitted, to GEICO.

7.      Defendants' interrelated fraudulent schemes began no later than 2013 and have continued uninterrupted since that time.  As a result of Defendants' fraudulent schemes, GEICO has incurred damages of more than $1,500,000.00.

8.      Defendants' interrelated fraudulent schemes are the latest in a long line of insurance fraud scams aimed at Florida consumers and insurers.  They are part of an insurance fraud epidemic that – in 2014-2015 alone – led to almost 1,200 convictions in Florida.  See Florida Department of Financial Services, Division of Insurance Fraud Annual Report for Fiscal Year 2014-2015.

**THE PARTIES**

**I.      Plaintiffs**

9.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Maryland corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

**II.     Defendants**

10.     Defendant DG Esthetic is a Florida corporation with its principal place of business on Miami, Florida.  At all relevant times, DG Esthetic falsely purported to be a

properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act.  DG Esthetic was incorporated in Florida on or about August 21, 2009, had Lima as its president, owner, and sole shareholder, falsely purported to have Formisano as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

11.     Defendant Lima resides in and is a citizen of Florida.  Lima was the president, owner, and sole shareholder of DG Esthetic, and used DG Esthetic as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.  Lima is not and never has been licensed as a physician.

12.     Defendant DA Health is a Florida corporation with its principal place of business in Miami, Florida.  At all relevant times, DA Health falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing requirements set forth in the Clinic Act.  DA Health was incorporated in Florida on or about April 3, 2006, had Alfonso as its president, owner, and sole shareholder, falsely purported to have Formisano as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

13.     Defendant Alfonso resides in and is a citizen of Florida.  Alfonso was the president, owner, and sole shareholder of DA Health, and used DA Health as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.  Alfonso is not and never has been licensed as a physician.

14.     Defendant Mejias resides in and is a citizen of Florida. Mejias was licensed to practice massage therapy in Florida on July 11, 2012, and purported to perform many of the Fraudulent Services on behalf of DA Health and DG Esthetic.

15.     Defendant Beacon is a Florida corporation with its principal place of business in Miami, Florida.  At all relevant times, Beacon falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act.  Beacon was incorporated in Florida on or about October 19, 2015, had Herrera as its president, owner, and sole shareholder, falsely purported to have Formisano as its medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.

16.     Defendant Herrera resides in and is a citizen of Florida. Herrera was the president, owner, and sole shareholder of Beacon, and used Beacon as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers.  Herrera is not and never has been licensed as a physician.

17.     Defendant Guerra resides in and is a citizen of Florida. Guerra was licensed to practice massage therapy in Florida on April 15, 2003, and purported to perform many of the Fraudulent Services on behalf of Beacon.

18.     Defendant Formisano resides in and is a citizen of Florida. Formisano was licensed to practice medicine in Florida on September 27, 2004, falsely purported to serve as medical director at DG Esthetic, DA Health, and Beacon, and purported to perform many of the Fraudulent Services on behalf of DG Esthetic, DA Health, and Beacon.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

20.    This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

21.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

22.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

## I.    An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

## A.    The Florida No-Fault Law

23.    Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Florida Motor Vehicle No-Fault Law (the "No-Fault Law", Fla. Stat. §§ 627.730-627.7405), which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to Insureds.

24.    Under the No Fault Law, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. See Fla. Stat. § 627.736. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form"). See id.

**B.      No-Fault Reimbursement and Compliance with Florida Law Governing Healthcare Practice**

25.      In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. <u>See</u> Fla. Stat. § 627.736.

26.      Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." <u>See</u> Fla. Stat. § 627.732.

27.      Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment. <u>See</u>, <u>e.g.</u>, <u>State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc.</u>, 145 F. Supp. 3d 1154, 1163 (S.D. Fla. 2015); <u>State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla.</u>, 103 F. Supp. 3d 1343, 1355 (S.D. Fla. 2015).

28.      By extension, insurers such as GEICO are not required to make any payments of PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

**C.      No-Fault Reimbursement and the Clinic Act**

29.      Subject to certain limited exceptions that are not applicable in this case, the Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider." <u>See</u> Fla. Stat. § 400.9905.

30.    Pursuant to the Clinic Act, clinics operating in Florida must – among other things – "appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for [certain enumerated] activities on behalf of the clinic." See Fla. Stat. § 400.9935(1).

31.    Among other things, a clinic medical director must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action." See Fla. Stat. § 400.9935(1).

32.    In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license", and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

33.    Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014." See Fla. Stat. § 400.9935(3).

34.    Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's medical director or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary

or actually provided. <u>See</u>, <u>e.g.</u>, <u>Allstate Ins. Co. v. Vizcay</u>, 826 F.3d 1326, 1330-1331 (11th Cir. 2015); <u>B&A Diagnostic, Inc.</u>, <u>supra</u>, 145 F. Supp. 3d at 1164-1165.

35.    By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics that operate in violation of the Clinic Act's medical director or other requirements, <u>whether or not the underlying health care services were medically necessary or actually provided. See</u>, <u>e.g.</u>, <u>Med. Serv. Ctr. of Fla.</u>, <u>supra</u>, 103 F. Supp. 3d at 1355 ("Florida law clearly states that [an insurer] can refuse payment for services unlawfully rendered. Fla. Stat. § 627.736(5)(b)(1)(b). As a result of Defendants' conduct, Plaintiffs paid claims which it was statutorily entitled to deny. Accordingly, it would be inequitable to allow Defendants to retain those benefits, regardless of whether those services were medically necessary."); <u>State Farm Fire & Cas. Co. v. Silver Star Health & Rehab, Inc.</u>, 2011 U.S. Dist. LEXIS 145629 at * 16 - * 17 (M.D. Fla. Dec. 19, 2011)(same).

**D.    No-Fault Reimbursement and Medical Necessity**

36.    Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. <u>See</u> Fla. Stat. § 627.736. Concomitantly, a health care services provider, including a clinic organized under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services. <u>Id</u>.

37.    Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a) In accordance with generally accepted standards of medical practice;

(b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c) Not primarily for the convenience of the patient, physician, or other health care provider.

See Fla. Stat. § 627.732.

**E.      No-Fault Reimbursement, Massage Therapy, and Massage Therapists**

38.      Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics organized under the Clinic Act, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

39.      However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5)("Medical benefits [that are reimbursable under the No-Fault Law] do not include massage …, regardless of the person, entity, or licensee providing massage …, and a licensed massage therapist … may not be reimbursed for medical benefits under this section.")

40.      The No-Fault Law was amended to prohibit PIP reimbursement for massage or for services provided by massage therapists in response to widespread PIP fraud involving massage services and massage therapists. See, e.g., Florida House of Representatives Staff Analysis for House Bill 119 (amending the No-Fault Law), noting that "PIP fraud remains rampant", and citing dramatic increases in PIP claims for massage therapy as a significant part of the problem.

41.      Pursuant to Fla. Stat. § 486.028, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

**F.      No-Fault Billing and No-Fault Reimbursement**

42.      Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)      For any service or treatment that was not lawful at the time rendered;

(ii)     To any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii)    With respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

See Fla. Stat. § 627.736.

43.      The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes. See Fla. Stat. § 627.736.

**II.      Defendants' Interrelated Fraudulent Schemes**

44.      Since at least 2013, and continuing through the present day, Defendants masterminded and implemented a series of interrelated fraudulent schemes in which they billed GEICO, or caused GEICO to be billed, more than $1,500,000.00 for medically unnecessary, illusory, and otherwise unreimbursable services.

**A.      The Fraudulent Operation of the Clinic Defendants Without Legitimate Medical Directors**

**1.      The Fraudulent Operation of DA Health Without a Legitimate Medical Director**

45.      In or about early 2013, Alfonso – who is not and never has been licensed as a physician – sought to use DA Health as a vehicle to submit a large volume of fraudulent PIP billing to GEICO and other insurers.

12

46.     However, because DA Health was subject to the Clinic Act, Alfonso could not lawfully operate DA Health, or use DA Health as a vehicle to submit PIP billing to GEICO and other insurers, unless she recruited and retained a licensed physician to serve as DA Health's medical director. See Fla. Stat. §§ 400.9905, 440.9935.

47.     However, if Alfonso recruited and retained a legitimate physician to serve as a legitimate medical director at DA Health, the physician actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director. See, e.g., Fla. Stat. § 400.9935(1).  By extension, any such legitimate medical director would impede Alfonso's ability to use DA Health as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other Florida automobile insurers.

48.     Accordingly, Alfonso required a pliable physician willing to falsely pose as the "medical director" at DA Health, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby would permit Alfonso to use DA Health as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

49.     Thereafter, in or about July 2013, Alfonso recruited and retained Formisano, a licensed physician who was willing to falsely pose as the legitimate medical director of DA Health.

50.     Upon information and belief, Formisano was receptive to Alfonso's offer because his advanced age, in addition to his lack of experience and credentials, made it extremely difficult for him to obtain legitimate, sufficiently-remunerative employment as a physician.

51.     For instance, Formisano was approximately 69 years old in 2013, when he first began to falsely purport to serve as DA Health's "medical director".

52.     Though Formisano graduated from medical school in Mexico in 1986, Formisano did not become licensed to practice medicine until 2004, by which time he was already 59 years old.

53.     In addition, Formisano never obtained any board certification in any medical specialty, which – together with his advanced age, delayed licensure, and lack of experience – severely limited his employment prospects as a legitimate physician.

54.     Upon information and belief, Formisano also was receptive to Alfonso's offer because his extreme financial straits had left him desperate for money.

55.     Between 2004 and 2012, Formisano operated a solo medical practice, but the practice was not financially successful.

56.     Indeed, by 2012, Formisano was insolvent.  For example, Formisano had accrued approximately $176,000.00 in debt that he was unable to pay on his then-current monthly income, and he declared bankruptcy – in large part due to his inability to pay his mortgage, automobile loan, and credit card debt.

57.     Shortly after Formisano declared bankruptcy, he began to falsely purport to serve as medical director at a large number of Florida health care clinics, including not only DG Esthetic, DA Health, and Beacon, but also Delta Healthcare Center, Corp. ("Delta Healthcare"), and Alternative Medical Center of Florida, Inc. ("Alternative Medical").

58.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain DA Health's licensure and to permit DA Health to operate as a clinic, Alfonso and DA Health entered into a secret scheme with Formisano.  In exchange for a designated salary from Alfonso and DA Health, Formisano agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at DA

Health, and to the insurers including GEICO that received PIP claims from DA Health, that he was the true medical director at DA Health, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at DA Health.

59.     However, Formisano never genuinely served as medical director at DA Health. Instead, from the beginning of his association with DA Health as its phony "medical director", Formisano ceded all day-to-day decision-making and oversight regarding health care services at DA Health, and the resulting billing, to Alfonso.

60.     Formisano never legitimately served as medical director at DA Health, inasmuch as he never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of DA Health's billings to ensure that the billings were not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through DA Health, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

61.     Rather, true authority over the provision of health care services through DA Health, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by Alfonso.

62.     In keeping with the fact that Formisano never legitimately served as medical director at DA Health, Formisano simultaneously: (i) purported to serve as medical director at numerous other Florida clinics, including Beacon, DG Esthetic, Delta Healthcare, and Alternative Medical; (ii) purported to personally perform, or at least directly supervise, a massive number of individual health care services at numerous health care clinics and other medical practices throughout the Miami area; and (iii) operated a solo medical practice of his own.

63.     It is improbable – to the point of impossibility – that Formisano could have simultaneously fulfilled these various roles while also fulfilling his medical director role at DA Health.

64.     Alfonso used the façade of Formisano's phony "appointment" as DA Health's ersatz "medical director" to do indirectly what she was forbidden from doing directly – namely: (i) to operate a clinic without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at DA Health; (iii) to permit health care services to be provided at DA Health by individuals who lacked the proper licensure to perform the services; and (iv) to use DA Health as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

65.     In fact, the only thing that Formisano did during his phony tenure as DA Health's fake "medical director" was to occasionally purport to perform the initial and follow-up examinations that were billed through DA Health to GEICO and other insurers, and to sign bills and treatment reports prepared by other DA Health personnel, including Mejias, at Alfonso's direction.

66.     Formisano unlawfully permitted Alfonso to dictate every aspect of the manner in which Insureds would be treated at DA Health, and to dictate every aspect of the manner in which health care services at DA Health would be billed to GEICO and other insurers, because he sought to continue profiting from the fraudulent billing submitted through DA Health.

**2.      The Fraudulent Operation of DG Esthetic Without a Legitimate Medical Director**

67.     Concomitantly, in or about early 2013, Lima – who is not and never has been licensed as a physician – sought to use DG Esthetic as a vehicle to submit a large volume of fraudulent PIP billing to GEICO and other insurers.

68.     However, because DG Esthetic was subject to the Clinic Act, Lima could not lawfully operate DG Esthetic, or use DG Esthetic as a vehicle to submit PIP billing to GEICO and other insurers, unless she recruited and retained a licensed physician to serve as DG Esthetic's medical director. See Fla. Stat. §§ 400.9905, 440.9935.

69.     However, if Lima recruited and retained a legitimate physician to serve as a legitimate medical director at DG Esthetic, the physician actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director. See, e.g., Fla. Stat. § 400.9935(1).  By extension, any such legitimate medical director would impede Lima's ability to use DG Esthetic as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other Florida automobile insurers.

70.     Accordingly, Lima required a pliable physician willing to falsely pose as the "medical director" at DG Esthetic, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby would permit Lima to use DG Esthetic as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

71.     Thereafter, in or about August 2013, Lima recruited and retained Formisano, a licensed physician who was willing to falsely pose as the legitimate medical director of DG Esthetic, just as he had done at DA Health.

72.     Upon information and belief, Formisano was receptive to Lima's offer – just as he was receptive to Alfonso's offer – because of his difficulty obtaining legitimate, sufficiently-remunerative employment as a physician, and because of his extreme financial straits.

73.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain DG Esthetic's licensure and to permit DG Esthetic to operate as a

clinic, Lima and DG Esthetic entered into a secret scheme with Formisano.  In exchange for a designated salary from Lima and DG Esthetic, Formisano agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at DG Esthetic, and to the insurers including GEICO that received PIP claims from DG Esthetic, that he was the true medical director at DG Esthetic, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at DG Esthetic.

74.     However, Formisano never genuinely served as medical director at DG Esthetic. Instead, from the beginning of his association with DG Esthetic as its phony "medical director", Formisano ceded all day-to-day decision-making and oversight regarding health care services at DG Esthetic, and the resulting billing, to Lima.

75.     Formisano never legitimately served as medical director at DG Esthetic, inasmuch as he never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of DG Esthetic's billings to ensure that the billings were not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through DG Esthetic, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

76.     Rather, true authority over the provision of health care services through DG Esthetic, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by Lima.

77.     In keeping with the fact that Formisano never legitimately served as medical director at DG Esthetic, Formisano simultaneously: (i) purported to serve as medical director at numerous other Florida clinics, including Beacon, DA Health, Delta Healthcare, and Alternative Medical; (ii) purported to personally perform, or at least directly supervise, a massive number of

individual health care services at numerous health care clinics and other medical practices throughout the Miami area; and (iii) operated a solo medical practice of his own.

78. It is improbable – to the point of impossibility – that Formisano could have simultaneously fulfilled these various roles while also fulfilling his medical director role at DG Esthetic.

79. Lima used the façade of Formisano's phony "appointment" as DG Esthetic's ersatz "medical director" to do indirectly what she was forbidden from doing directly – namely: (i) to operate a clinic without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at DG Esthetic; (iii) to permit health care services to be provided at DG Esthetic by individuals who lacked the proper licensure to perform the services; and (iv) to use DG Esthetic as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

80. In fact, the only thing that Formisano did during his phony tenure as DG Esthetic's fake "medical director" was to occasionally purport to perform the initial and follow-up examinations that were billed through DG Esthetic to GEICO and other insurers, and to sign bills and treatment reports prepared by other DG Esthetic personnel, including Mejias, at Lima's direction.

81. Formisano unlawfully permitted Lima to dictate every aspect of the manner in which Insureds would be treated at DG Esthetic, and to dictate every aspect of the manner in which health care services at DG Esthetic would be billed to GEICO and other insurers, because he sought to continue profiting from the fraudulent billing submitted through DG Esthetic.

**3.      The Fraudulent Operation of Beacon Without a Legitimate Medical Director**

82. In or about October 2015, Herrera – who is not and never has been licensed as a physician – incorporated Beacon.

83.     Thereafter, Herrera sought to use Beacon as a vehicle to submit a large volume of fraudulent PIP billing to GEICO and other insurers.

84.     However, because Beacon was subject to the Clinic Act, Herrera could not lawfully operate Beacon, or use Beacon as a vehicle to submit PIP billing to GEICO and other insurers, unless he recruited and retained a licensed physician to serve as Beacon's medical director. See Fla. Stat. §§ 400.9905, 440.9935.

85.     However, if Herrera recruited and retained a legitimate physician to serve as a legitimate medical director at Beacon, the physician actually would be obligated to fulfill the statutory requirements applicable to a clinic medical director. See, e.g., Fla. Stat. § 400.9935(1).  By extension, any such legitimate medical director would impede Herrera's ability to use Beacon as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other Florida automobile insurers.

86.     Accordingly, Herrera required a pliable physician willing to falsely pose as the "medical director" at Beacon, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director, and thereby would permit Herrera to use Beacon as a vehicle to submit a large amount of fraudulent PIP billing to GEICO and other insurers.

87.     Thereafter, in or about 2015, Herrera recruited and retained Formisano, a licensed physician who was willing to falsely pose as the legitimate medical director of Beacon.

88.     Upon information and belief, Formisano was receptive to Herrera's offer – just as he was receptive to Alfonso's offer and Lima's offer – because of his difficulty obtaining legitimate, sufficiently-remunerative employment as a physician, and because of his extreme financial straits.

20

89.     In order to circumvent Florida law and induce the Florida Agency for Health Care Administration to maintain Beacon's licensure and to permit Beacon to operate as a clinic, Herrera and Beacon entered into a secret scheme with Formisano.  In exchange for a designated salary from Herrera and Beacon, Formisano agreed to falsely represent, to the Florida Agency for Health Care Administration, to the Insureds who sought treatment at Beacon, and to the insurers including GEICO that received PIP claims from Beacon, that he was the true medical director at Beacon, and that he truly fulfilled the statutory requirements applicable to clinic medical directors at Beacon.

90.     However, Formisano never genuinely served as medical director at Beacon. Instead, from the beginning of his association with Beacon as its phony "medical director", Formisano ceded all day-to-day decision-making and oversight regarding health care services at Beacon, and the resulting billing, to Herrera.

91.     Formisano never legitimately served as medical director at Beacon, inasmuch as he never ensured that all health care practitioners at the clinic had active appropriate certification or licensure for the level of care being provided, never conducted systematic reviews of Beacon's billings to ensure that the billings were not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through Beacon, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

92.     Rather, true authority over the provision of health care services through Beacon, and the resulting billing – including the authority that would, at a legitimate clinic, be vested in the medical director – was held at all times by Herrera.

93.     In keeping with the fact that Formisano never legitimately served as medical director at Beacon, Formisano simultaneously: (i) purported to serve as medical director at

numerous other Florida clinics, including DA Health, DG Esthetic, Delta Healthcare, and Alternative Medical; (ii) purported to personally perform, or at least directly supervise, a massive number of individual health care services at numerous health care clinics and other medical practices throughout the Miami area; and (iii) operated a solo medical practice of his own.

94.     It is improbable – to the point of impossibility – that Formisano could have simultaneously fulfilled these various roles while also fulfilling his medical director role at Beacon.

95.     Herrera used the façade of Formisano's phony "appointment" as Beacon's ersatz "medical director" to do indirectly what he was forbidden from doing directly – namely: (i) to operate a clinic without a legitimate medical director; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought treatment at Beacon; (iii) to permit health care services to be provided at Beacon by individuals who lacked the proper licensure to perform the services; and (iv) to use Beacon as a vehicle to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

96.     In fact, the only thing that Formisano did during his phony tenure as Beacon's fake "medical director" was to occasionally purport to perform the initial and follow-up examinations that were billed through Beacon to GEICO and other insurers, and to sign bills and treatment reports prepared by other Beacon personnel, including Guerra, at Herrera's direction.

97.     Formisano unlawfully permitted Herrera to dictate every aspect of the manner in which Insureds would be treated at Beacon, and to dictate every aspect of the manner in which health care services at Beacon would be billed to GEICO and other insurers, because he sought to continue profiting from the fraudulent billing submitted through Beacon.

**B.    The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at the Clinic Defendants**

98.    In keeping with the fact that Formisano never truly served as medical director at DG Esthetic, DA Health, and Beacon, and never fulfilled the statutory obligations of a clinic medical director at DG Esthetic, DA Health, and Beacon, Formisano permitted DG Esthetic, DA Health, Beacon, and their associates to routinely falsely represent the identities of the health care providers who rendered services at DG Esthetic, DA Health, and Beacon, in order to obtain payment for the Fraudulent Services to which they otherwise would not be entitled.

**1.    The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at DA Health**

99.    DA Health, Alfonso, Formisano, and Mejias (collectively, the "DA Health Defendants") billed for a limited range of health care services through DA Health, specifically: (i) purported initial patient examinations; (ii) purported follow-up patient examinations; and (iii) purported physical therapy services, including hot/cold packs, mechanical traction, paraffin bath, infrared therapy, contrast baths, ultrasound therapy, neuromuscular reeducation, hydro-bed therapy, therapeutic exercises, manual therapy, therapeutic activities, "self-care training", and electrical stimulation.

100.    As set forth in Exhibit "1", the purported physical therapy services constituted the vast majority of the services that the DA Health Defendants billed through DA Health to GEICO.

101.    Formisano was between approximately 70 and 73 years old during the period from 2013 to the present when he falsely purported to serve as "medical director" at DA Health.

102.    Even so, during Formisano's tenure as DA Health's purported "medical director", Formisano also purported to serve as the "medical director" for numerous other medical clinics, including Beacon, DG Esthetic, Delta, and Alternative Medical Center, purported to personally

perform or directly supervise a massive amount of medical services for other health care providers, and operated a solo medical practice.

103.    As a result, Formisano was only occasionally physically present at DA Health, and did not personally perform – or even directly supervise – the massive amount of physical therapy services that DA Health purported to provide to GEICO Insureds.

104.    Indeed, during his tenure as DA Health's purported "medical director", Formisano only visited the clinic sporadically to purport to conduct initial and follow-up patient examinations – to the extent the examinations were performed at all – and to sign bills and treatment reports prepared by other DA Health personnel, including Mejias, at Alfonso's direction.

105.    Even when Formisano was physically present at DA Health, he never provided, supervised, ordered, or prescribed the physical therapy services purportedly provided at DA Health.

106.    All of the physical therapy services that DA Health purported to provide between 2013 and the present were performed by Mejias and other massage therapists associated with DA Health, who reported directly to Alfonso without any legitimate supervision or oversight by Formisano or any other licensed physician.

107.    As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

108.    However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

109.    What is more, and as set forth above, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy. See Fla. Stat. § 486.028.

110.    Mejias was licensed as a massage therapist. Mejias was never licensed as a physical therapist.

111.    As a result, with respect to insurance policies issued after January 1, 2013, the No-Fault Law prohibited DA Health from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by unsupervised massage therapists such as Mejias.

112.    The DA Health Defendants were well-aware of the fact that – with respect to insurance policies issued after January 1, 2013 – DA Health could not legally recover PIP Benefits for services provided by unsupervised massage therapists such as Mejias. For example, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or for services provided by massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

113.    In keeping with the fact that the DA Health Defendants knew that – with respect to insurance policies issued after January 1, 2013 – they could not lawfully recover PIP Benefits for services provided by unsupervised massage therapists, in 2013 the DA Health Defendants

began to list Formisano as the treating provider on virtually every single bill submitted to GEICO for virtually every single service that the DA Health Defendants purported to provide to GEICO Insureds, including almost every individual physical therapy service that was billed through DA Health to GEICO.

114. Considering his advanced age, and the fact that he simultaneously was purporting to serve as medical director at no fewer than five health care clinics, to perform a massive number of individual health care services at numerous health care practices throughout the Miami area, and to operate his own solo medical practice, Formisano could not physically have performed, or even directly supervised, the massive number of physical therapy services that were billed through DA Health to GEICO between late 2013 and the present.

115. Even so, the DA Health Defendants routinely falsely represented in the billing they submitted or caused to be submitted through DA Health to GEICO for physical therapy services between late 2013 and the present that Formisano personally performed, or at least directly supervised, the underlying physical therapy services.

116. For example:

(i)     On March 5, 2014, the DA Health Defendants purported to provide at least 56 individual physical therapy services to at least 10 individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 7.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano also purported to personally perform, or at least directly supervise: (a) one 30-minute patient examination at DA Health; and (b) at least 50 additional physical therapy services purportedly provided to at least 10 additional GEICO Insureds at Alternative Medical, including at least 9.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 17.25 hours of services that Formisano purported to personally perform, or at least directly supervise, on March 5, 2014.

(ii)    On March 12, 2014, the DA Health Defendants purported to provide at least 59 individual physical therapy services to at least nine individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 7.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 41 <u>additional</u> physical therapy services purportedly provided to at least nine <u>additional</u> GEICO Insureds at Alternative Medical, including at least eight hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (b) at least 11 <u>more</u> physical therapy services purportedly provided to at least two <u>more</u> GEICO Insureds at DG Esthetic, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 16.5 hours of services that Formisano purported to personally perform, or at least directly supervise, on March 12, 2014.

(iii)    On May 5, 2014, the DA Health Defendants purported to provide at least 10 individual physical therapy services to at least two individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 65 <u>additional</u> physical therapy services purportedly provided to at least 15 <u>additional</u> GEICO Insureds at Alternative Medical, including at least 14.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (b) at least 15 <u>more</u> physical therapy services purportedly provided to at least two <u>more</u> GEICO Insureds at DG Esthetic, including at least three hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 19 hours of services that Formisano purported to personally perform, or at least directly supervise, on May 5, 2014.

(iv)    On July 21, 2015 the DA Health Defendants purported to provide at least 36 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) one 15-minute patient

27

examination at DA Health; (b) at least 34 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at Alternative Medical, including at least 6.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) two patient examinations at Alternative Medical that required at least 40 minutes, in total, to perform; and (d) at least six <u>more</u> physical therapy services purportedly provided to at <u>another</u> GEICO Insured at DG Esthetic, including at least 30 minutes of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. In all, GEICO received billing for at least 13.66 hours of services that Formisano purported to personally perform, or at least directly supervise, on July 21, 2015.

(v)     On November 4, 2015 the DA Health Defendants purported to provide at least 28 individual physical therapy services to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least four hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 93 <u>additional</u> physical therapy services purportedly provided to at least 20 <u>additional</u> GEICO Insureds at Alternative Medical, including at least 18.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (b) at least 10 <u>more</u> physical therapy services purportedly provided to at two <u>more</u> GEICO Insureds at his solo medical practice, including at least two hours minutes of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. In all, GEICO received billing for at least 24.75 hours of services that Formisano purported to personally perform, or at least directly supervise, on November 4, 2015.

(vi)    On January 20, 2016, the DA Health Defendants purported to provide at least 23 individual physical therapy services to at least four individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least four hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 17 <u>additional</u> physical therapy services purportedly provided to at least three <u>additional</u> GEICO Insureds at still another healthcare clinic called AMS Medical and Rehabilitation Center, Inc. ("AMS Medical"), including at least three hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 80 <u>more</u> physical therapy services purportedly provided to at least 16 <u>more</u> GEICO

Insureds at Alternative Medical, including at least 15 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (c) at least 45 <u>more</u> physical therapy services purportedly provided to at least seven <u>more</u> GEICO Insureds at DG Esthetic, including at least 6.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 28.5 hours of services that Formisano purported to personally perform, or at least directly supervise, on January 20, 2016.

(vii)    On April 7, 2016, the DA Health Defendants purported to provide at least 29 individual physical therapy services to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 37 <u>additional</u> physical therapy services purportedly provided to at least eight <u>additional</u> GEICO Insureds at Alternative Medical, including at least 7.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 17 <u>more</u> physical therapy services purportedly provided to at least three <u>more</u> GEICO Insureds at DG Esthetic, including at least three hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (c) two patient examinations at his solo medical practice that required at least an hour, in total, to perform. In all, GEICO received billing for at least 16 hours of services that Formisano purported to personally perform, or at least directly supervise, on April 7, 2016.

(viii)    On July 26, 2016, the DA Health Defendants purported to provide at least 29 individual physical therapy services to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least five hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) two patient examinations at DA Health that required at least an hour, in total, to perform; (b) at least 30 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at Alternative Medical, including at least five hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) three patient examinations at Alternative Medical that required at least 45 minutes, in total, to perform; (d) at least 12 <u>more</u> physical therapy services purportedly

provided to at least two <u>more</u> GEICO Insureds at DG Esthetic, including at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least 12 <u>more</u> physical therapy services purportedly provided to at least two <u>more</u> GEICO Insureds at still another health care clinic called Genesis Medical Center, Corp. ("Genesis Medical"), including at least two hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (f) at least 19 <u>more</u> physical therapy services purportedly provided to at least four <u>more</u> GEICO Insureds at his solo medical practice, including at least 2.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 18.25 hours of services that Formisano purported to personally perform, or at least directly supervise, on July 26, 2016.

(ix)    On August 1, 2016, the DA Health Defendants purported to provide at least 27 individual physical therapy services to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 31 <u>additional</u> physical therapy services purportedly provided to at least seven <u>additional</u> GEICO Insureds at Alternative Medical, including at least 6.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 10 <u>more</u> physical therapy services purportedly provided to at least two <u>more</u> GEICO Insureds at Beacon, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least 12 <u>more</u> physical therapy services purportedly provided to at least two <u>more</u> GEICO Insureds at DG Esthetic, including at least 2.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) a patient examination at DG Esthetic that required at least 30 minutes to perform; (e) at least 12 <u>more</u> physical therapy services purportedly provided to at least two <u>more</u> GEICO Insureds at Genesis Medical, including at least two hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (f) at least 19 <u>more</u> physical therapy services purportedly provided to at least four <u>more</u> GEICO Insureds at his solo medical practice, including at least 3.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21 hours of services that Formisano purported to personally perform, or at least directly supervise, on August 1, 2016.

(x)     On February 14, 2017, the DA Health Defendants purported to provide at least six individual physical therapy services to an Insured, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano also purported to personally perform, or at least directly supervise: (a) at least six additional physical therapy services purportedly provided to an Insured at AMS Medical, including at least one hour of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least five more physical therapy services purportedly provided to an Insured at Beacon, including at least one hour of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least 29 more physical therapy services purportedly provided to at least five more GEICO Insureds at DG Esthetic, including at least 5.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) at least five more physical therapy services purportedly provided to an Insured at yet another health care clinic called Medical and Rehabilitation Center, Inc. ("Medical Rehab"), including at least one hour of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (e) at least 14 more physical therapy services purportedly provided to at least three more GEICO Insureds at his solo medical practice, including at least three hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 12.75 hours of services that Formisano purported to personally perform, or at least directly supervise, on February 14, 2017.

117.    These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "1", the DA Health Defendants routinely falsely represented that Formisano had performed – or at least directly supervised – an improbable, and often impossible, number of physical therapy services on individual dates, considering the amounts of services he simultaneously was purporting to perform or directly supervise at the other Clinic Defendants, other health care clinics, and at his solo medical practice.

118.    It is improbable, to the point of impossibility, that Formisano – who was advanced in age at the time, and simultaneously working or purporting to work at various other

medical practices and clinics – routinely performed or directly supervised such a high volume of physical therapy services on individual dates.

119.    Upon information and belief, the fraudulent billing for physical therapy services that the DA Health Defendants submitted or caused to be submitted through DA Health to GEICO constituted only a fraction of the <u>total</u> fraudulent billing for physical therapy services that the DA Health Defendants submitted through DA Health to <u>all</u> of the automobile insurers in the Florida automobile insurance market.

120.    GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

121.    It is extremely improbable, to the point of impossibility, that the DA Health Defendants only submitted fraudulent billing to GEICO, and that the DA Health Defendants did not simultaneously bill other automobile insurers.

122.    Thus, upon information and belief, the impossible number of physical therapy services that Formisano purported to directly supervise or provide to GEICO Insureds at DA Health on individual dates of service, including the dates of service identified above, constituted only a fraction of the <u>total</u> number of physical therapy services that Formisano purported to directly supervise or provide at DA Health, including to individuals insured by companies other than GEICO, on those same dates of service.

123.    In fact, Formisano did not perform or directly supervise any of the physical therapy services that were billed through DA Health to GEICO.

124.    What is more, since at least January 1, 2013, DA Health did not actually provide any legitimate physical therapy services to GEICO Insureds.

125.    Rather: (i) all of the putative "physical therapy" services that the DA Health Defendants purported to provide through DA Health to Insureds since January 1, 2013 were performed, to the extent that they were performed at all, by Mejias and other massage therapists associated with DA Health, rather than by Formisano; (ii) Formisano did not even legitimately supervise the putative "physical therapy" services that were billed through DA Health to GEICO since January 1, 2013; and (iii) none of the putative "physical therapy" services that were billed through DA Health to GEICO since January 1, 2013 actually constituted physical therapy, because Mejias and the other massage therapists associated with DA Health are not and never have been licensed as physical therapists.

126.    As set forth above, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.

127.    All of the billing that the DA Health Defendants submitted through DA Health to GEICO, including the billing for putative physical therapy services, was submitted on HCFA-1500 forms.

128.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the healthcare provider who actually rendered or directly supervised the underlying physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

129.    To "directly supervise" a physical therapy treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the

performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, citing 42 C.F.R. 410.32.

130.     Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy treatment, then the actual name of the person who is actually performing the physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

131.     The DA Health Defendants were well-aware of the fact that – because Mejias and the other massage therapists associated with DA Health were unsupervised massage therapists, rather than physical therapists – DA Health could not recover PIP Benefits for any services that Mejias or the other massage therapists associated with DA Health purported to provide with respect to insurance policies issued after January 1, 2013.

132.     As a result, and in order to conceal the fact that Mejias and the other massage therapists associated with DA Health  unlawfully provided, without any legitimate supervision by Formisano, all of the "physical therapy" services that were billed through DA Health to GEICO with respect to insurance policies issued after January 1, 2013, the DA Health Defendants deliberately omitted any reference to either Mejias the other massage therapists associated with DA Health on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

133.     Instead, in the claims for physical therapy services identified in Exhibit "1", the DA Health Defendants falsely listed Formisano on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

134.     For example:

(i)      On or about December 11, 2014, the DA Health Defendants billed GEICO for physical therapy services that purportedly were provided through DA Health to an Insured named KL on December 3, 2014. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DA Health Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(ii)     On or about February 24, 2015, the DA Health Defendants billed GEICO for physical therapy services that purportedly were provided through DA Health to an Insured named JT on February 24, 2015. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DA Health Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(iii)    On or about May 28, 2015, the DA Health Defendants billed GEICO for physical therapy services that purportedly were provided through DA Health to an Insured named JF on May 14, 2015. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DA Health Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(iv)     On or about August 20, 2015, the DA Health Defendants billed GEICO for physical therapy services that purportedly were provided through DA Health to an Insured named MS on August 6, 2015. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DA Health Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical

therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(v)     On or about November 20, 2015, the DA Health Defendants billed GEICO for physical therapy services that purportedly were provided through DA Health to an Insured named AC on November 4, 2015. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DA Health Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(vi)    On or about February 25, 2016, the DA Health Defendants billed GEICO for physical therapy services that purportedly were provided through DA Health to an Insured named NB on February 16, 2016. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DA Health Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(vii)   On or about July 12, 2016, the DA Health Defendants billed GEICO for physical therapy services that purportedly were provided through DA Health to an Insured named JD on July 7, 2016. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DA Health Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(viii)  On or about July 28, 2016, the DA Health Defendants billed GEICO for physical therapy services that purportedly were provided through DA Health to an Insured named HM on July 7, 2016. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DA Health Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

36

(ix)     On or about December 28, 2016, the DA Health Defendants billed GEICO for physical therapy services that purportedly were provided through DA Health to an Insured named EM on December 27, 2016. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DA Health Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(x)      On or about June 14, 2017, the DA Health Defendants billed GEICO for physical therapy services that purportedly were provided through DA Health to an Insured named SM on June 12, 2017. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DA Health Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

135.     These are only representative examples. In virtually all of the claims for physical therapy services that are identified in Exhibit "1", the DA Health Defendants falsely represented in the HCFA-1500 forms they submitted to GEICO that Formisano had performed or at least directly supervised the underlying physical therapy services, when in fact the services were performed by Mejias or other massage therapists associated with DA Health, to the extent that they were performed at all, without any supervision by Formisano.

136.     In the claims for physical therapy services identified in Exhibit "1", the DA Health Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)      the putative physical therapy services were illegally performed – to the extent they were performed at all – by massage therapists, without any supervision by any licensed physicians or physical therapists, in contravention of Florida law;

(ii)    DA Health could not lawfully recover PIP Benefits for the putative physical therapy services, because they were illegally performed by massage therapists, without any supervision by any licensed physicians or physical therapists, in contravention of Florida law; and

(iii)    the DA Health Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed the putative physical therapy services in their billing for the putative "physical therapy" services.

137.    These fraudulent misrepresentations and acts of fraudulent concealment demonstrate that DA Health was operated without a legitimate medical director.

138.    For instance, Formisano – who purported to serve as the "medical director" at DA Health beginning in 2013 – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." <u>See</u> Fla. Stat. § 400.9935(1).

139.    Nor, for that matter, did Formisano "[e]nsure that all practitioners providing health care services or supplies to patients maintain[ed] a current active and unencumbered Florida license", or "[e]nsure that all health care practitioners at the clinic [had] active appropriate certification or licensure for the level of care being provided." <u>See</u> Fla. Stat. § 400.9935(1).

140.    Had Formisano actually fulfilled his statutory role as medical director at DA Health, he would have noted – among other things – that the DA Health Defendants routinely fraudulently represented in DA Health's billing that the physical therapy services were performed by Formisano.

141.    Had Formisano actually fulfilled his statutory role as medical director at DA Health, he would have noted – among other things – that the DA Health Defendants routinely fraudulently concealed the fact that the physical therapy services were provided – to the extent that they were provided at all – by Mejias and other massage therapists associated with DA

Health, who were massage therapists and not physical therapists, and therefore were unreimbursable under the No-Fault Law.

142.    Had Formisano actually fulfilled his statutory role as medical director at DA Health, he would have ensured – among other things – that all of the individuals providing physical therapy services had active appropriate licensure to perform physical therapy services. Formisano also would have ensured that individuals providing physical therapy were being supervised by a licensed physician while the treatment was being rendered.

143.    Formisano did none of these things, because he never actually served as a legitimate medical director at DA Health in the first instance, rendering DA Health ineligible to collect PIP Benefits in the first instance.

**2.      The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at DG Esthetic**

144.    DG Esthetic, Lima, Formisano, and Mejias (collectively, the "DG Esthetic Defendants") billed for a limited range of health care services through DG Esthetic, specifically: (i) purported initial patient examinations; (ii) purported follow-up patient examinations; and (iii) purported physical therapy services, including hot/cold packs, mechanical traction, paraffin bath, infrared therapy, contrast baths, ultrasound therapy, neuromuscular reeducation, hydro-bed therapy, therapeutic exercises, manual therapy, therapeutic activities, "self-care training," and electrical stimulation.

145.    As set forth in Exhibit "2", the purported physical therapy services constituted the vast majority of the services that the DG Esthetic Defendants billed through DG Esthetic to GEICO.

146.    Formisano was between approximately 70 and 73 years old during the period from 2013 to the present when he falsely purported to serve as "medical director" at DG Esthetic.

147.    Even so, during Formisano's tenure as DG Esthetic's purported "medical director", Formisano also purported to serve as the "medical director" for numerous other medical clinics, including Beacon, DA Health, Delta, and Alternative Medical Center, purported to personally perform or directly supervise a massive amount of medical services for other health care providers, and operated a solo medical practice.

148.    As a result, Formisano was only occasionally physically present at DG Esthetic, and did not personally perform – or even directly supervise – the massive amount of physical therapy services that DG Esthetic purported to provide to GEICO Insureds.

149.    Indeed, during his tenure as DG Esthetic's purported "medical director", Formisano only visited the clinic sporadically to purport to conduct initial and follow-up patient examinations – to the extent the examinations were performed at all – and to sign bills and treatment reports prepared by other DG Esthetic personnel, including Mejias, at Lima's direction.

150.    Even when Formisano was physically present at DG Esthetic, he never provided, supervised, ordered, or prescribed the physical therapy services purportedly provided at DG Esthetic.

151.    All of the physical therapy services that DG Esthetic purported to provide between 2013 and the present were performed by Mejias and other massage therapists associated with DG Esthetic, who reported directly to Lima without any legitimate supervision or oversight by Formisano or any other licensed physician.

152.   As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

153.   However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

154.   What is more, and as set forth above, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy. See Fla. Stat. § 486.028.

155.   Mejias and the other massage therapists associated with DG Esthetic were licensed as massage therapists. They were never licensed as physical therapists.

156.   As a result, with respect to insurance policies issued after January 1, 2013, the No-Fault Law prohibited DG Esthetic from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by unsupervised massage therapists such as Mejias.

157.   The DG Esthetic Defendants were well-aware of the fact that – with respect to insurance policies issued after January 1, 2013 – DG Esthetic could not legally recover PIP Benefits for services provided by unsupervised massage therapists such as Mejias. For example, and as set forth above, the amendments to the No-Fault Law prohibiting PIP reimbursement for

massage or for services provided by massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

158.    In keeping with the fact that the DG Esthetic Defendants knew that – with respect to insurance policies issued after January 1, 2013 – they could not lawfully recover PIP Benefits for services provided by unsupervised massage therapists, in 2013 the DG Esthetic Defendants began to list Formisano as the treating provider on virtually every single bill submitted to GEICO for virtually every single service that the DG Esthetic Defendants purported to provide to GEICO Insureds, including almost every individual physical therapy service that was billed through DG Esthetic to GEICO.

159.    Considering his advanced age, and the fact that he simultaneously was purporting to serve as medical director at no fewer than five health care clinics, to perform a massive number of individual health care services at numerous health care practices throughout the Miami area, and to operate his own solo medical practice, Formisano could not physically have performed, or even directly supervised, the physical therapy services that were billed through DG Esthetic to GEICO between late 2013 and the present.

160.    Even so, the DG Esthetic Defendants routinely falsely represented in the billing they submitted or caused to be submitted through DG Esthetic to GEICO for physical therapy services between late 2013 and the present that Formisano personally performed, or at least directly supervised, the underlying physical therapy services.

161.    For example:

(i)    On October 14, 2014, the DG Esthetic Defendants purported to provide at least 16 individual physical therapy services to at least three individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is

more, those putative treatments included at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 23 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at AMS Medical, including at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 32 <u>more</u> physical therapy services purportedly provided to at least 12 <u>more</u> GEICO Insureds at Alternative  Medical, including at least 6.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least 11 <u>more</u> physical therapy services purportedly provided to at least two <u>more</u> GEICO Insureds at DA Health, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (d) a patient examination at Alternative Medical, which took at least 30 minutes to perform. In all, GEICO received billing for at least 15.75 hours of services that Formisano purported to personally perform, or at least directly supervise, on October 14, 2014.

(ii)     On February 12, 2015, the DG Esthetic Defendants purported to provide at least 16 individual physical therapy services to at least three individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 2.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 10 <u>additional</u> physical therapy services purportedly provided to at least two <u>additional</u> GEICO Insureds at AMS Medical, including at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 30 <u>more</u> physical therapy services purportedly provided to at least six <u>more</u> GEICO Insureds at Alternative  Medical, including at least five hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least six <u>more</u> physical therapy services purportedly provided to yet another GEICO Insured at DA Health, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (d) five patient examinations at Alternative Medical, and two patient examinations at DG Esthetic, which collectively took at least 2.5 hours to perform. In all, GEICO received billing for at least 12.75 hours of services that Formisano purported to personally perform, or at least directly supervise, on February 12, 2015.

(iii)   On May 4, 2015, the DG Esthetic Defendants purported to provide at least 23 individual physical therapy services to at least four individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 3.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano also purported to personally perform, or at least directly supervise: (a) at least 11 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at AMS Medical, including at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 47 more physical therapy services purportedly provided to at least 10 more GEICO Insureds at Alternative  Medical, including at least 9.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (c) at least 17 more physical therapy services purportedly provided to at least three more GEICO Insureds at DA Health, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. In all, GEICO received billing for at least 16.75 hours of services that Formisano purported to personally perform, or at least directly supervise, on May 4, 2015.

(iv)   On December 21, 2015, the DG Esthetic Defendants purported to provide at least 26 individual physical therapy services to at least four individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano also purported to personally perform, or at least directly supervise: (a) at least 12 additional physical therapy services purportedly provided to at least two additional GEICO Insureds at AMS Medical, including at least two hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 93 more physical therapy services purportedly provided to at least 20 more GEICO Insureds at Alternative  Medical, including at least 17.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) at least 35 more physical therapy services purportedly provided to at least six more GEICO Insureds at DA Health, including at least six hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (e) at least 10 more physical therapy services purportedly provided to at least two more GEICO Insureds at his solo medical practice, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds

44

throughout the services. In all, GEICO received billing for at least 31.75 hours of services that Formisano purported to personally perform, or at least directly supervise, on December 21, 2015.

(v)     On January 4, 2016, the DG Esthetic Defendants purported to provide at least 35 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least six hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 18 <u>additional</u> physical therapy services purportedly provided to at least three <u>additional</u> GEICO Insureds at AMS Medical, including at least three hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 93 <u>more</u> physical therapy services purportedly provided to at least 20 <u>more</u> GEICO Insureds at Alternative  Medical, including at least 17.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (c) at least 17 <u>more</u> physical therapy services purportedly provided to at least three <u>more</u> GEICO Insureds at DA Health, including at least three hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 29.5 hours of services that Formisano purported to personally perform, or at least directly supervise, on January 4, 2016.

(vi)    On January 14, 2016, the DG Esthetic Defendants purported to provide at least 34 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 17 <u>additional</u> physical therapy services purportedly provided to at least three <u>additional</u> GEICO Insureds at AMS Medical, including at least three hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 190 <u>more</u> physical therapy services purportedly provided to at least 18 <u>more</u> GEICO Insureds at Alternative  Medical, including at least 16.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (c) at least 23 <u>more</u> physical therapy services purportedly provided to at least four <u>more</u> GEICO Insureds at DA Health, including at least four hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds

throughout the services. In all, GEICO received billing for at least 29.25 hours of services that Formisano purported to personally perform, or at least directly supervise, on January 14, 2016.

(vii)    On March 22, 2016, the DG Esthetic Defendants purported to provide at least 36 individual physical therapy services to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 6.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 16 <u>additional</u> physical therapy services purportedly provided to at least three <u>additional</u> GEICO Insureds at AMS Medical, including at least 2.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 58 <u>more</u> physical therapy services purportedly provided to at least 12 <u>more</u> GEICO Insureds at Alternative Medical, including at least 12 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (c) at least 11 <u>more</u> physical therapy services purportedly provided to at least two <u>more</u> GEICO Insureds at DA Health, including at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 23 hours of services that Formisano purported to personally perform, or at least directly supervise, on March 22, 2016.

(viii)    On July 6, 2016, the DG Esthetic Defendants purported to provide at least 29 individual physical therapy services to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least six hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least six <u>additional</u> physical therapy services purportedly provided to an <u>additional</u> GEICO Insured at AMS Medical, including at least one hour of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 61 <u>more</u> physical therapy services purportedly provided to at least 13 <u>more</u> GEICO Insureds at Alternative Medical, including at least 11.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least 22 <u>more</u> physical therapy services purportedly provided to at least four <u>more</u> GEICO Insureds at DA Health, including at least four hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services;

and (d) at least 12 <u>more</u> physical therapy services purportedly provided to at least three <u>more</u> GEICO Insureds at his solo medical practice, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 24.75 hours of services that Formisano purported to personally perform, or at least directly supervise, on July 6, 2016.

(ix)     On August 8, 2016, the DG Esthetic Defendants purported to provide at least 27 individual physical therapy services to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least six <u>additional</u> physical therapy services purportedly provided to an <u>additional</u> GEICO Insured at AMS Medical, including at least one hour of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 15 <u>more</u> physical therapy services purportedly provided to at least four <u>more</u> GEICO Insureds at Alternative Medical, including at least 3.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least 22 <u>more</u> physical therapy services purportedly provided to at least four <u>more</u> GEICO Insureds at DA Health, including at least 3.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) at least 11 <u>more</u> physical therapy services purportedly provided to at least two <u>more</u> GEICO Insureds at Genesis Medical, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least six <u>more</u> physical therapy services purportedly provided to still another GEICO Insured at his solo medical practice, including at least one hour of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (f) one patient examination at Alternative Medical, and two patient examinations at DG Esthetic, which collectively took at least 1.5 hours to perform. In all, GEICO received billing for at least 18 hours of services that Formisano purported to personally perform, or at least directly supervise, on August 8, 2016.

(x)      On October 3, 2016, the DG Esthetic Defendants purported to provide at least 47 individual physical therapy services to at least eight individual Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least eight hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u>

purported to personally perform, or at least directly supervise: (a) at least six additional physical therapy services purportedly provided to an additional GEICO Insured at AMS Medical, including at least 45 minutes of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 60 more physical therapy services purportedly provided to at least 12 more GEICO Insureds at Alternative Medical, including at least 11 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least 11 more physical therapy services purportedly provided to at least two more GEICO Insureds at DA Health, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) at least five more physical therapy services purportedly provided to still another GEICO Insured at his solo medical practice, including at least one hour of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (e) at least six more physical therapy services purportedly provided to yet another GEICO Insured at still another health care clinic called Sunset Medical Center ("Sunset Medical"), including at least one hour of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (f) two patient examinations at Alternative Medical, and one patient examination at DG Esthetic, which collectively took at least 1.25 hours to perform. In all, GEICO received billing for at least 24.25 hours of services that Formisano purported to personally perform, or at least directly supervise, on October 3, 2016.

162.    These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "1", the DG Esthetic Defendants routinely falsely represented that Formisano had performed – or at least directly supervised – an improbable, and often impossible number of physical therapy services on individual dates, considering the amounts of services he simultaneously was purporting to perform or directly supervise at the other Clinic Defendants, other health care clinics, and at his solo medical practice.

163.    It is improbable, to the point of impossibility, that Formisano – who was advanced in age at the time, and simultaneously working or purporting to work at various other medical practices and clinics – routinely performed or directly supervised such a high volume of physical therapy services on individual dates.

164.    Upon information and belief, the fraudulent billing for physical therapy services that the DG Esthetic Defendants submitted or caused to be submitted through DG Esthetic to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that the DG Esthetic Defendants submitted through DG Esthetic to all of the automobile insurers in the Florida automobile insurance market.

165.    As set forth above, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

166.    It is extremely improbable, to the point of impossibility, that the DG Esthetic Defendants only submitted fraudulent billing to GEICO, and that the DG Esthetic Defendants did not simultaneously bill other automobile insurers.

167.    Thus, upon information and belief, the impossible number of physical therapy services that Formisano purported to directly supervise or provide to GEICO Insureds at DG Esthetic on individual dates of service, including the dates of service identified above, constituted only a fraction of the total number of physical therapy services that Formisano purported to directly supervise or provide at DG Esthetic, including to individuals insured by companies other than GEICO, on those same dates of service.

168.    In fact, Formisano did not perform or directly supervise any of the physical therapy services that were billed through DG Esthetic to GEICO.

169.    What is more, since at least January 1, 2013, DG Esthetic did not actually provide any legitimate physical therapy services to GEICO Insureds.

170.    Rather: (i) all of the putative "physical therapy" services that the DG Esthetic Defendants purported to provide through DG Esthetic to Insureds since January 1, 2013 were performed, to the extent that they were performed at all, by Mejias and other massage therapists

49

associated with DG Esthetic, rather than by Formisano; (ii) Formisano did not even legitimately supervise the putative "physical therapy" services that were billed through DG Esthetic to GEICO since January 1, 2013; and (iii) none of the putative "physical therapy" services that were billed through DG Esthetic to GEICO since January 1, 2013 actually constituted physical therapy, because Mejias and the other massage therapists associated with DG Esthetic are not and never have been licensed as physical therapists.

171.    As set forth above, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.

172.    All of the billing that the DG Esthetic Defendants submitted through DG Esthetic to GEICO, including the billing for putative physical therapy services, was submitted on HCFA-1500 forms.

173.    As set forth above, pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the healthcare provider who actually rendered or directly supervised the underlying physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

174.    As set forth above, to "directly supervise" a physical therapy treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing

Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, citing 42 C.F.R. 410.32.

175.    Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy treatment, then the actual name of the person who is actually performing the physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

176.    The DG Esthetic Defendants were well-aware of the fact that – because Mejias and the other massage therapists associated with DG Esthetic were unsupervised massage therapists, rather than physical therapists – DG Esthetic could not recover PIP Benefits for any services that Mejias or the other massage therapists associated with DG Esthetic purported to provide with respect to insurance policies issued after January 1, 2013.

177.    As a result, and in order to conceal the fact that Mejias and the other massage therapists associated with DG Esthetic  unlawfully provided, without any legitimate supervision by Formisano, all of the "physical therapy" services that were billed through DG Esthetic to GEICO with respect to insurance policies issued after January 1, 2013, the DG Esthetic Defendants deliberately omitted any reference to either Mejias the other massage therapists associated with DG Esthetic on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

178.    Instead, in the claims for physical therapy services identified in Exhibit "2", the DG Esthetic Defendants falsely listed Formisano on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

179.    For example:

(i)     On or about January 26, 2015, the DG Esthetic Defendants billed GEICO for physical therapy services that purportedly were provided through DG Esthetic to an Insured named DN on January 26, 2015. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DG Esthetic Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(ii)    On or about February 4, 2015, the DG Esthetic Defendants billed GEICO for physical therapy services that purportedly were provided through DG Esthetic to an Insured named ML on February 4, 2015. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DG Esthetic Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(iii)   On or about November 16, 2015, the DG Esthetic Defendants billed GEICO for physical therapy services that purportedly were provided through DG Esthetic to an Insured named MG on October 30, 2015. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DG Esthetic Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(iv)    On or about February 5, 2016, the DG Esthetic Defendants billed GEICO for physical therapy services that purportedly were provided through DG Esthetic to an Insured named FV on January 22, 2016. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DG Esthetic Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(v)     On or about March 8, 2016, the DG Esthetic Defendants billed GEICO for physical therapy services that purportedly were provided through DG Esthetic to an Insured named AT on February 24, 2016. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DG Esthetic Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(vi)    On or about June 14, 2016, the DG Esthetic Defendants billed GEICO for physical therapy services that purportedly were provided through DG Esthetic to an Insured named MO on June 7, 2016. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DG Esthetic Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(vii)   On or about August 26, 2016, the DG Esthetic Defendants billed GEICO for physical therapy services that purportedly were provided through DG Esthetic to an Insured named AV on August 22, 2016. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DG Esthetic Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(viii)  On or about March 24, 2017, the DG Esthetic Defendants billed GEICO for physical therapy services that purportedly were provided through DG Esthetic to an Insured named MS on March 23, 2017. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DG Esthetic Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(ix)    On or about August 31, 2017, the DG Esthetic Defendants billed GEICO for physical therapy services that purportedly were provided through DG Esthetic to an Insured named NM on August 17, 2017. The HCFA-1500 form falsely

represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DG Esthetic Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

(x)     On or about October 25, 2017, the DG Esthetic Defendants billed GEICO for physical therapy services that purportedly were provided through DG Esthetic to an Insured named CR on October 13, 2017. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the DG Esthetic Defendants deliberately omitted any reference to Mejias from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Mejias, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Mejias, without any legitimate supervision by Formisano.

180.    These are only representative examples. In virtually all of the claims for physical therapy services that are identified in Exhibit "2", the DG Esthetic Defendants falsely represented in the HCFA-1500 forms they submitted to GEICO that Formisano had performed or at least directly supervised the underlying physical therapy services, when in fact the services were performed by Mejias or another massage therapist associated with DG Esthetic, to the extent that they were performed at all, without any supervision by Formisano.

181.    In the claims for physical therapy services identified in Exhibit "2", the DG Esthetic Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative physical therapy services were illegally performed – to the extent they were performed at all – by massage therapists, without any supervision by any licensed physicians or physical therapists, in contravention of Florida law;

(ii)    DG Esthetic could not lawfully recover PIP Benefits for the putative physical therapy services, because they were illegally performed by massage therapists,

without any supervision by any licensed physicians or physical therapists, in contravention of Florida law; and

(iii)    the DG Esthetic Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed the putative physical therapy services in their billing for the putative "physical therapy" services.

182.    These fraudulent misrepresentations and acts of fraudulent concealment demonstrate that DG Esthetic was operated without a legitimate medical director.

183.    For instance, Formisano – who purported to serve as the "medical director" at DG Esthetic beginning in 2013 – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

184.    Nor, for that matter, did Formisano "[e]nsure that all practitioners providing health care services or supplies to patients maintain[ed] a current active and unencumbered Florida license", or "[e]nsure that all health care practitioners at the clinic [had] active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

185.    Had Formisano actually fulfilled his statutory role as medical director at DG Esthetic, he would have noted – among other things – that the DG Esthetic Defendants routinely fraudulently represented in DG Esthetic's billing that the physical therapy services were performed by Formisano.

186.    Had Formisano actually fulfilled his statutory role as medical director at DG Esthetic, he would have noted – among other things – that the DG Esthetic Defendants routinely fraudulently concealed the fact that the physical therapy services were provided – to the extent that they were provided at all – by Mejias and other massage therapists associated with DG

Esthetic, who were massage therapists and not physical therapists, and therefore were unreimbursable under the No-Fault Law.

187.    Had Formisano actually fulfilled his statutory role as medical director at DG Esthetic, he would have ensured – among other things – that all of the individuals providing physical therapy services had active appropriate licensure to perform physical therapy services. Formisano also would have ensured that individuals providing physical therapy were being supervised by a licensed physician while the treatment was being rendered.

188.    Formisano did none of these things, because he never actually served as a legitimate medical director at DG Esthetic in the first instance, rendering DG Esthetic ineligible to collect PIP Benefits in the first instance.

**3.     The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at Beacon**

189.    Like the DA Health Defendants and the DG Esthetic Defendants, Beacon, Herrera, Formisano, and Guerra (collectively, the "Beacon Defendants") billed for a limited range of health care services through Beacon, specifically: (i) purported initial patient examinations; (ii) purported follow-up patient examinations; and (iii) purported physical therapy services, including hot/cold packs, mechanical traction, infrared therapy, contrast baths, ultrasound therapy, neuromuscular reeducation, hydro-bed therapy, therapeutic exercises, manual therapy, therapeutic activities, and electrical stimulation.

190.    As set forth in Exhibit "3", the purported physical therapy services constituted the vast majority of the services that the Beacon Defendants billed through Beacon to GEICO.

191.    Formisano was between approximately 73 and 74 years old during the period from 2016 to the present when he falsely purported to serve as "medical director" at Beacon.

192.    Even so, during Formisano's tenure as Beacon's purported "medical director", Formisano also purported to serve as the "medical director" for numerous other medical clinics, including DG Esthetic, DA Health, Delta, and Alternative Medical Center, purported to personally perform or directly supervise a massive amount of medical services for other health care providers, and operated a solo medical practice.

193.    As a result, Formisano was only occasionally physically present at Beacon, and did not personally perform – or even directly supervise – the massive amount of physical therapy services that Beacon purported to provide to GEICO Insureds.

194.    Indeed, during his tenure as Beacon's purported "medical director", Formisano only visited the clinic sporadically to purport to conduct initial and follow-up patient examinations – to the extent the examinations were performed at all – and to sign bills and treatment reports prepared by other Beacon personnel, including Guerra, at Herrera's direction.

195.    Even when Formisano was physically present at Beacon, he never provided, supervised, ordered, or prescribed the physical therapy services purportedly provided at Beacon.

196.    All of the physical therapy services that Beacon purported to provide between 2016 and the present were performed by Guerra or other unsupervised massage therapists at Beacon – including Leydiana R. Fernandez, LMT ("Fernandez") and Gustavo Ramirez, LMT ("Ramirez") – who reported directly to Herrera without any legitimate supervision or oversight by Formisano or any other licensed physician.

197.    As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed"

by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

198.    However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

199.    What is more, and as set forth above, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy. See Fla. Stat. § 486.028.

200.    Guerra, Fernandez, and Ramirez were licensed as massage therapists. They were never licensed as physical therapists.

201.    As a result, with respect to insurance policies issued after January 1, 2013, the No-Fault Law prohibited Beacon from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by unsupervised massage therapists such as Guerra, Fernandez, and Ramirez.

202.    The Beacon Defendants were well-aware of the fact that – with respect to insurance policies issued after January 1, 2013 – Beacon could not legally recover PIP Benefits for services provided by unsupervised massage therapists such as Guerra, Fernandez, and Ramirez. For example, and as set forth above, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or for services provided by massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to fight the amendments.

203.    Moreover, when the Beacon Defendants first began submitting billing through Beacon to GEICO in 2016, they frequently listed Ramirez on the bills as the treating provider who provided the underlying physical therapy services.

204.    GEICO frequently denied reimbursement to the Beacon Defendants for the physical therapy services that Ramirez purported to perform on behalf of Beacon, because Ramirez was a massage therapist, not a physical therapist, and because massage therapy is not eligible for PIP reimbursement.

205.    In early 2017, once the Beacon Defendants had received a number of claims denials from GEICO, denying claims for services that Ramirez purported to perform, the Beacon Defendants abruptly stopped listing Ramirez as the treating provider on their bills, and began to list Formisano as the treating provider on virtually every single bill submitted to GEICO for virtually every single service that the Beacon Defendants purported to provide to GEICO Insureds, including almost every individual physical therapy service that was billed through Beacon to GEICO.

206.    Considering his advanced age, and the fact that he simultaneously was purporting to serve as medical director at no fewer than five health care clinics, to perform a massive number of individual health care services at numerous health care practices throughout the Miami area, and to operate his own solo medical practice, Formisano could not physically have performed, or even directly supervised, the physical therapy services that were billed through Beacon to GEICO between 2017 and the present.

207.    Even so, the Beacon Defendants routinely falsely represented in the billing they submitted or caused to be submitted through Beacon to GEICO for physical therapy services

between early 2017 and the present that Formisano personally performed, or at least directly supervised, the underlying physical therapy services.

208.    For example:

(i)    On February 6, 2017, the Beacon Defendants purported to provide at least 10 individual physical therapy services to a GEICO Insured, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least nine <u>additional</u> physical therapy services purportedly provided to an <u>additional</u> GEICO Insureds at AMS Medical, including at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 18 <u>more</u> physical therapy services purportedly provided to three <u>more</u> GEICO Insureds at DA Health, including at least 3.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least 58 <u>more</u> physical therapy services purportedly provided at least eight <u>more</u> GEICO Insureds at DG Esthetic, including at least 10.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) at least seven <u>more</u> physical therapy services purportedly provided to at least <u>another</u> GEICO Insured at Genesis Medical, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (e) at least 16 <u>more</u> physical therapy services purportedly provided to two <u>more</u> GEICO Insureds at his solo medical practice, including at least 3.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. In all, GEICO received billing for at least 22.25 hours of services that Formisano purported to personally perform, or at least directly supervise, on February 6, 2017.

(ii)    On March 9, 2017, the Beacon Defendants purported to provide at least nine individual physical therapy services to a GEICO Insured, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 24 <u>additional</u> physical therapy services purportedly provided to at least three <u>additional</u> GEICO Insureds at AMS Medical, including at least 4.5 hours of physical therapy services that required

direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 28 more physical therapy services purportedly provided to four more GEICO Insureds at DG Esthetic, including at least five hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least 10 more physical therapy services purportedly provided to another GEICO Insured at Medical Rehab, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (d) at least 15 more physical therapy services purportedly provided to at least two more GEICO Insureds at his solo medical practice, including at least 3.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. In all, GEICO received billing for at least 16.5 hours of services that Formisano purported to personally perform, or at least directly supervise, on March 9, 2017.

(iii)   On March 21, 2017, the Beacon Defendants purported to provide at least five individual physical therapy services to a GEICO Insured, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 45 minutes of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Formisano also purported to personally perform, or at least directly supervise: (a) at least 17 additional physical therapy services purportedly provided to at least three additional GEICO Insureds at AMS Medical, including at least 3.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least five more physical therapy services purportedly provided to another GEICO Insured at DA Health, including at least one hour of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (c) at least 35 more physical therapy services purportedly provided to at least seven more GEICO Insureds at DG Esthetic, including at least 5.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) at least 19 more physical therapy services purportedly provided to at least four more GEICO Insureds at his solo medical practice, including at least 3.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (e) three patient examinations at DG Esthetic, which required at least one hour to perform. In all, GEICO received billing for at least 15.25 hours of services that Formisano purported to personally perform, or at least directly supervise, on March 21, 2017.

(iv)   On April 4, 2017, the Beacon Defendants purported to provide at least eight individual physical therapy services to a GEICO Insured, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least

directly supervised every one of those treatments. What is more, those putative treatments included at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 39 <u>additional</u> physical therapy services purportedly provided to at least five <u>additional</u> GEICO Insureds at AMS Medical, including at least seven hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 14 <u>more</u> physical therapy services purportedly provided to at least three <u>more</u> GEICO Insureds at DA Health, including at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least 14 <u>more</u> physical therapy services purportedly provided to two <u>more</u> GEICO Insureds at DG Esthetic, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (d) at least 27 <u>more</u> physical therapy services purportedly provided to two <u>more</u> GEICO Insureds at Medical Rehab, including at least 6.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (e) at least 14 <u>more</u> physical therapy services purportedly provided to at least two <u>more</u> GEICO Insureds at his solo medical practice, including at least three hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 22.5 hours of services that Formisano purported to personally perform, or at least directly supervise, on April 4, 2017.

(v)     On April 12, 2017, the Beacon Defendants purported to provide at least five individual physical therapy services to a GEICO Insured, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 45 minutes of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 23 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at AMS Medical, including at least four hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 12 <u>more</u> physical therapy services purportedly provided to at least two <u>more</u> GEICO Insureds at DA Health, including at least two hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least six <u>more</u> physical therapy services purportedly provided to another GEICO Insured at DG Esthetic, including at least one hour of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (d) at least six <u>more</u> physical

therapy services purportedly provided to another GEICO Insured at Genesis Medical, including at least 1.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (e) at least 25 <u>more</u> physical therapy services purportedly provided to at least five <u>more</u> GEICO Insureds at Medical Rehab, including at least 6.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (f) a patient examination at Medical Rehab that required at least 45 minutes to perform; and (g) at least five <u>more</u> physical therapy services purportedly provided to another GEICO Insured at his solo medical practice, including at least one hour of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. In all, GEICO received billing for at least 17 hours of services that Formisano purported to personally perform, or at least directly supervise, on April 12, 2017.

(vi)     On May 30, 2017, the Beacon Defendants purported to provide at least five individual physical therapy services to a GEICO Insured, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 45 minutes of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 24 <u>additional</u> physical therapy services purportedly provided to at least four <u>additional</u> GEICO Insureds at AMS Medical, including at least four hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 11 <u>more</u> physical therapy services purportedly provided to at least two <u>more</u> GEICO Insureds at DA Health, including at least two hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least 11 <u>more</u> physical therapy services purportedly provided to two <u>more</u> GEICO Insureds at DG Esthetic, including at least 2.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (d) at least 34 <u>more</u> physical therapy services purportedly provided to at least seven <u>more</u> GEICO Insureds at Medical Rehab, including at least 8.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (e) at least five <u>more</u> physical therapy services purportedly provided to another GEICO Insured at his solo medical practice, including at least one hour of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; and (f) a patient examination at AMS Medical, which required at least 15 minutes to perform. In all, GEICO received billing for at least 18.75 hours of services that Formisano purported to personally perform, or at least directly supervise, on May 30, 2017.

(vii)   On June 22, 2017, the Beacon Defendants purported to provide at least 30 individual physical therapy services to three GEICO Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least 33 <u>additional</u> physical therapy services purportedly provided to four <u>additional</u> GEICO Insureds at AMS Medical, including at least six hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 21 <u>more</u> physical therapy services purportedly provided to at least three <u>more</u> GEICO Insureds at DA Health, including at least 3.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least eight <u>more</u> physical therapy services purportedly provided to <u>another</u> GEICO Insured at DG Esthetic, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (d) at least 13 <u>more</u> physical therapy services purportedly provided to two <u>more</u> GEICO Insureds at Medical Rehab, including at least 3.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services . In all, GEICO received billing for at least 18.75 hours of services that Formisano purported to personally perform, or at least directly supervise, on June 22, 2017.

(viii)   On July 18, 2017, the Beacon Defendants purported to provide at least 29 individual physical therapy services to three GEICO Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano <u>also</u> purported to personally perform, or at least directly supervise: (a) at least eight <u>additional</u> physical therapy services purportedly provided to another GEICO Insured at AMS Medical, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services; (b) at least 21 <u>more</u> physical therapy services purportedly provided to at least three <u>more</u> GEICO Insureds at DA Health, including at least 3.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least 15 <u>more</u> physical therapy services purportedly provided to two <u>more</u> GEICO Insureds at Medical Rehab, including at least 3.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (d) at least seven

more physical therapy services purportedly provided to another GEICO Insured at his solo medical practice, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services .  In all, GEICO received billing for at least 15.75 hours of services that Formisano purported to personally perform, or at least directly supervise, on July 18, 2017.

(ix)    On August 3, 2017, the Beacon Defendants purported to provide at least 22 individual physical therapy services to two GEICO Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least four hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano also purported to personally perform, or at least directly supervise: (a) at least 23 additional physical therapy services purportedly provided to three additional GEICO Insureds at AMS Medical, including at least 4.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 27 more physical therapy services purportedly provided to at least five more GEICO Insureds at DA Health, including at least 4.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least eight more physical therapy services purportedly provided to another GEICO Insured at DG Esthetic, including at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (d) at least eight more physical therapy services purportedly provided to another GEICO Insured at his solo medical practice, including at least 1.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services .  In all, GEICO received billing for at least 16.25 hours of services that Formisano purported to personally perform, or at least directly supervise, on August 3, 2017.

(x)    On September 20, 2017, the Beacon Defendants purported to provide at least 21 individual physical therapy services to two GEICO Insureds, and falsely contended in the resulting bills to GEICO that Formisano personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least five hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Formisano also purported to personally perform, or at least directly supervise: (a) at least 16 additional physical therapy services purportedly provided to two additional GEICO Insureds at AMS Medical, including at least 2.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (b) at least 14 more physical therapy services purportedly provided to at least two more GEICO Insureds at DA Health,

including at least 2.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; (c) at least 21 more physical therapy services purportedly provided to three more GEICO Insureds at DG Esthetic, including at least 4.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services; and (d) at least seven more physical therapy services purportedly provided to another GEICO Insured at his solo medical practice, including at least 1.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insured throughout the services . In all, GEICO received billing for at least 16 hours of services that Formisano purported to personally perform, or at least directly supervise, on September 20, 2017.

209. These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "3", the Beacon Defendants routinely falsely represented that Formisano had performed – or at least directly supervised – an improbable, and often impossible number of physical therapy services on individual dates, considering the amounts of services he simultaneously was purporting to perform or directly supervise at the other Clinic Defendants, other health care clinics, and at his solo medical practice.

210. It is improbable, to the point of impossibility, that Formisano – who was advanced in age at the time, and simultaneously working or purporting to work at various other medical practices and clinics – routinely performed or directly supervised such a high volume of physical therapy services on individual dates.

211. Upon information and belief, the fraudulent billing for physical therapy services that the Beacon Defendants submitted or caused to be submitted through Beacon to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that the Beacon Defendants submitted through Beacon to all of the automobile insurers in the Florida automobile insurance market.

212. As set forth above, GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

213.    It is extremely improbable, to the point of impossibility, that the Beacon Defendants only submitted fraudulent billing to GEICO, and that the Beacon Defendants did not simultaneously bill other automobile insurers.

214.    Thus, upon information and belief, the impossible number of physical therapy services that Formisano purported to directly supervise or provide to GEICO Insureds at Beacon on individual dates of service, including the dates of service identified above, constituted only a fraction of the <u>total</u> number of physical therapy services that Formisano purported to directly supervise or provide at Beacon, including to individuals insured by companies other than GEICO, on those same dates of service.

215.    In fact, Formisano did not perform or directly supervise any of the physical therapy services that were billed through Beacon to GEICO.

216.    What is more, from the date of its incorporation, Beacon did not actually provide any legitimate physical therapy services to GEICO Insureds.

217.    Rather: (i) all of the putative "physical therapy" services that the Beacon Defendants purported to provide through Beacon to Insureds were performed, to the extent that they were performed at all, by Guerra, Fernandez, Ramirez, and other massage therapists associated with Beacon, rather than by Formisano; (ii) Formisano did not even legitimately supervise the putative "physical therapy" services that were billed through Beacon to GEICO; and (iii) none of the putative "physical therapy" services that were billed through Beacon to GEICO actually constituted physical therapy, because Guerra, Fernandez, Ramirez, and the other massage therapists associated with Beacon are not and never have been licensed as physical therapists.

218. As set forth above, the No-Fault Law's billing requirements provide – among other things – that all PIP billing must comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms. See Fla. Stat. § 627.736.

219. All of the billing that the Beacon Defendants submitted through Beacon to GEICO, including the billing for putative physical therapy services, was submitted on HCFA-1500 forms.

220. As set forth above, pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, the name of the healthcare provider who actually rendered or directly supervised the underlying physical therapy treatment must be listed on the HCFA-1500 form. See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

221. As set forth above, to "directly supervise" a physical therapy treatment, a physician "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician must be present in the room when the procedure is performed." See, e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set, citing 42 C.F.R. 410.32.

222. Pursuant to the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, to the extent that a physician is not actually "directly supervising" a physical therapy treatment, then the actual name of the person who is actually performing the physical therapy treatment must be listed on the HCFA-1500 form. See,

e.g., Medicare Claims Processing Manual, Chapter 26 – Completing and Processing Form CMS-1500 Data Set.

223.   The Beacon Defendants were well-aware of the fact that – because Guerra, Fernandez, and Ramirez were unsupervised massage therapists, rather than physical therapists – Beacon could not recover PIP Benefits for any services that Guerra, Fernandez, and Ramirez purported to provide with respect to insurance policies issued after January 1, 2013.

224.   As a result, and in order to conceal the fact that Guerra, Fernandez, and Ramirez unlawfully provided, without any legitimate supervision by Formisano, all of the "physical therapy" services that were billed through Beacon to GEICO since early 2017, the Beacon Defendants deliberately omitted any reference to Guerra, Fernandez, and Ramirez on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

225.   Instead, in the claims for physical therapy services identified in Exhibit "3", the Beacon Defendants falsely listed Formisano on the HCFA-1500 forms as the supposed provider or direct supervisor of the physical therapy services.

226.   For example:

(i)      On or about May 25, 2017, the Beacon Defendants billed GEICO for physical therapy services that purportedly were provided through Beacon to an Insured named HF on May 25, 2017. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the Beacon Defendants deliberately omitted any reference to Guerra from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Guerra, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Guerra, without any legitimate supervision by Formisano.

(ii)     On or about June 8, 2017, the Beacon Defendants billed GEICO for physical therapy services that purportedly were provided through Beacon to an Insured named RA on June 8, 2017. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the Beacon Defendants deliberately omitted any reference to Guerra from the HCFA-1500 form. However, the underlying physical therapy

treatment notes were signed by Guerra, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Guerra, without any legitimate supervision by Formisano.

(iii)    On or about June 22, 2017, the Beacon Defendants billed GEICO for physical therapy services that purportedly were provided through Beacon to an Insured named HF on June 22, 2017. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the Beacon Defendants deliberately omitted any reference to Guerra from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Guerra, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Guerra, without any legitimate supervision by Formisano.

(iv)    On or about July 25, 2017, the Beacon Defendants billed GEICO for physical therapy services that purportedly were provided through Beacon to an Insured named DM on July 25, 2017. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the Beacon Defendants deliberately omitted any reference to Guerra from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Guerra, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Guerra, without any legitimate supervision by Formisano.

(v)     On or about August 21, 2017, the Beacon Defendants billed GEICO for physical therapy services that purportedly were provided through Beacon to an Insured named DM on August 21, 2017. The HCFA-1500 form falsely represented that Formisano performed, or at least directly supervised, the pertinent physical therapy services, and the Beacon Defendants deliberately omitted any reference to Guerra from the HCFA-1500 form. However, the underlying physical therapy treatment notes were signed by Guerra, in keeping with the fact that the pertinent services were performed – to the extent that they were performed at all – by Guerra, without any legitimate supervision by Formisano.

227.    These are only representative examples. In virtually all of the claims for physical therapy services that are identified in Exhibit "3", the Beacon Defendants falsely represented in the HCFA-1500 forms they submitted to GEICO that Formisano had performed or at least directly supervised the underlying physical therapy services, when in fact the services were performed by Guerra or another massage therapist associated with Beacon, to the extent that they were performed at all, without any supervision by Formisano.

228.    In the claims for physical therapy services identified in Exhibit "3", the Beacon Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)      the putative physical therapy services were illegally performed – to the extent they were performed at all – by massage therapists, without any supervision by any licensed physicians or physical therapists, in contravention of Florida law;

(ii)     Beacon could not lawfully recover PIP Benefits for the putative physical therapy services, because they were illegally performed by massage therapists, without any supervision by any licensed physicians or physical therapists, in contravention of Florida law; and

(iii)    the Beacon Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who performed the putative physical therapy services in their billing for the putative "physical therapy" services.

229.    These fraudulent misrepresentations and acts of fraudulent concealment demonstrate that Beacon was operated without a legitimate medical director.

230.    For instance, Formisano – who purported to serve as the "medical director" of Beacon from its incorporation in 2015 – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

231.    Nor, for that matter, did Formisano "[e]nsure that all practitioners providing health care services or supplies to patients maintain[ed] a current active and unencumbered Florida license", or "[e]nsure that all health care practitioners at the clinic [had] active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

232.    Had Formisano actually fulfilled his statutory role as medical director at Beacon, he would have noted – among other things – that the Beacon Defendants routinely fraudulently represented in Beacon's billing that the physical therapy services were performed by Formisano.

233.    Had Formisano actually fulfilled his statutory role as medical director at Beacon, he would have noted – among other things – that the Beacon Defendants routinely fraudulently concealed the fact that the physical therapy services were provided – to the extent that they were provided at all – by Guerra and other massage therapists associated with Beacon, who were massage therapists and not physical therapists, and therefore were unreimbursable under the No-Fault Law.

234.    Had Formisano actually fulfilled his statutory role as medical director at Beacon, he would have ensured – among other things – that all of the individuals providing physical therapy services had active appropriate licensure to perform physical therapy services. Formisano also would have ensured that individuals providing physical therapy were being supervised by a licensed physician while the treatment was being rendered.

235.    Formisano did none of these things, because he never actually served as a legitimate medical director at Beacon in the first instance, rendering Beacon ineligible to collect PIP Benefits in the first instance.

C.      **The Fraudulent Billing for Services That Never Were Provided in the First Instance**

236.    Not only did the Defendants falsely represent that the Clinic Defendants were eligible to collect PIP Benefits, when in fact they never were eligible to collect PIP Benefits because they were operated in violation of the licensing and operating requirements of the Clinic Act, but they also routinely billed GEICO for services that they never provided in the first instance.

237.     As set forth above, the Defendants, together with other clinics and medical practices, routinely billed GEICO for more than 15 hours, and sometimes more than 24 hours, of physical therapy and other services that Formisano – who was elderly and employed as a medical director and/or treating physician at multiple other medical clinics – purported to personally perform or directly supervise on individual dates of service.

238.     What is more, upon information and belief as set forth above, the Defendants not only were billing GEICO for an improbable or impossible number of services per day, but also – simultaneously – were billing other Florida automobile insurers for a commensurate, and impossible, number of services per day.

239.     In fact, Defendants were able to bill an improbable or impossible number of services to GEICO and other automobile insurers because they were not actually providing the services in the first instance.

240.     Additionally, Defendants were able to bill an improbable or impossible number of services to GEICO and other automobile insurers because Formisano never provided any legitimate oversight or supervision of Mejias, Guerra, or any of the other massage therapists associated with DA Health, DG Esthetic, and Beacon – to the extent any of the purported "physical therapy" services were provided to the Insureds at all.

241.     In keeping with the fact that the DG Esthetic Defendants often never even provided the pertinent physical therapy services in the first instance, numerous GEICO Insureds provided statements to insurance investigators to the effect that they never received the services that were billed through DG Esthetic to GEICO.

242.     For example:

(i)     On February 1, 2017, an Insured named GM swore, among other things, that he never received any mechanical traction, contrast baths, ultrasound treatment,

therapeutic exercises, neuromuscular reeducation, or "self-care training" at DG Esthetic. This, despite the fact that the DG Esthetic Defendants billed GEICO at least $175.00 for mechanical traction that they purported to provide to GM on various dates of service in July-August 2016, at least $80.00 for contrast baths that they purported to provide to GM on various dates of service in July 2016, at least $540.00 for ultrasound treatments that they purported to provide to GM on various dates of service in June-August 2016, at least $1,120.00.00 for therapeutic exercises that they purported to provide to GM on various dates of service in June-August 2016, at least $845.00 for neuromuscular reeducation that they purported to provide to GM on various dates of service in July-August 2016, and at least $70.00 for "self-care training" that they purported to provide to GM on June 30, 2016.

(ii)     On February 7, 2017, an Insured named HT swore, among other things, that he never received any contrast baths, paraffin baths, therapeutic exercises, or manual therapy at DG Esthetic. This, despite the fact that the DG Esthetic Defendants billed GEICO at least $40.00 for contrast baths that they purported to provide to HT on October 4, 2016, at least $46.00 for paraffin baths that they purported to provide to HT on October 26-27, 2016, at least $840.00 for therapeutic exercises that they purported to provide to HT on various dates of service between September-November 2016, and at least $2,400.00.00 for manual therapy that they purported to provide to HT on various dates of service between September-November 2016.

(iii)    On February 10, 2017, an Insured named DN swore, among other things, that she never received any "self-care training" or manual therapy at DG Esthetic. This, despite the fact that the DG Esthetic Defendants billed GEICO at least $140.00 for "self-care training" that they purported to provide to DN on October 4, 2016, at least $46.00 for paraffin baths that they purported to provide to DN on September 19, 2014 and November 2, 2014, and at least $9,100.00 for manual therapy that they purported to provide to DN on various dates of service between September 2014 and January 2015.

(iv)     On February 22, 2017, an Insured named RP swore, among other things, that he never received any contrast baths, ultrasound treatment, therapeutic exercises, or "self-care training" at DG Esthetic. This, despite the fact that the DG Esthetic Defendants billed GEICO at least $275.00 for contrast baths, ultrasound treatment, therapeutic exercises, and "self-care training" that they purported to provide to RP on January 28, 2016.

243.    These are only representative examples. In the claims identified in Exhibit "2",

numerous Insureds provided statements to insurance investigators to the effect that the DG

Esthetic Defendants were billing for services they had not rendered, and which contradict the

representations made by the DG Esthetic Defendants in their bills to GEICO regarding the physical therapy services they purported to provide the Insureds.

244.    The Defendants' submission of charges to GEICO for services that were not – and, given Formisano's advanced age and schedule – could not have been performed, demonstrate that the Clinic Defendants were operated without any legitimate medical directors, and were ineligible to collect PIP Benefits in the first instance.

**D.      The Defendants' Fraudulent Treatment and Billing Protocols**

245.    In the claims identified in Exhibits "1" – "3", virtually all of the Insureds whom the Defendants purported to treat at the Clinic Defendants were involved in minor, low-speed, low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

246.    Concomitantly, in the claims identified in Exhibits "1" – "3", almost none of the Insureds whom the Defendants purported to treat at the Clinic Defendants suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

247.    Even so, in the claims identified in Exhibits "1" – "3", the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

248.    The Defendants purported to provide their pre-determined fraudulent treatment protocols to the Insureds in the claims identified in Exhibits "1"  - "3" without regard for the Insureds' individual symptoms or presentment, or – in most cases – the total absence of any actual continuing medical problems arising from any actual automobile accidents.

249.    Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

250.    No legitimate physician, physical therapist, clinic, or other health care provider would permit the fraudulent treatment and billing protocols described below to proceed under his, her, or its auspices.

251.    The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because: (i) the Clinic Defendants were, at all relevant times, operating in violation of the Clinic Act, without legitimate medical directors who legitimately fulfilled their statutory duties as medical directors; (ii) all decision-making with respect to medical care and billing at the Clinic Defendants was, at all relevant times, vested entirely with non-physicians – specifically Alfonso at DA Health, Lima at DG Esthetic, and Herrera at Beacon – in violation of Florida law; (iii) virtually all of the putative "physical therapy" services that purportedly were provided to Insureds at the Clinic Defendants were provided – to the extent that they were provided at all – by massage therapists without legitimate oversight and supervision, rather than by licensed physical therapists, in further violation of Florida law; and (iv) the Defendants sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

**1.      The DA Health Defendants' Fraudulent Treatment and Billing Protocol**

**(i)      The Fraudulent Charges for Initial Examinations at DA Health**

252.    As an initial step in the DA Health Defendants' fraudulent treatment and billing protocol, DA Health, Alfonso, and Formisano purported to provide each of the Insureds in the claims identified in Exhibit "1" with a putative initial examination.

253. Formisano purported to personally perform virtually all of the initial examinations in the claims identified in Exhibit "1".

254. As set forth in Exhibit "1", DA Health, Alfonso, and Formisano then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203, resulting in charges of $300.00 for each initial examination that they purported to provide.

255. In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented DA Health's eligibility to collect PIP Benefits in the first instance.

256. In fact, and as set forth above, DA Health never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

257. As set forth below, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

258. As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

259. The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

260. Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity.

261.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

262.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, in the vast majority of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

263.    Furthermore, in the substantial majority of the claims identified in Exhibit "1", contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were functional following the accidents, and that no one was injured in the accidents.

264.    Even so, in the claims for initial examinations identified in Exhibit "1", DA Health, Alfonso, and Formisano routinely billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

265.    For example:

(i)     On February 25, 2014, an Insured named AC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, AC's vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that AC was not seriously injured in the minor accident, AC did not visit any hospital following the accident. To the extent that AC suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of AC by Formisano on March 5, 2014, DA Health, Alfonso, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that AC presented with moderately severe health problems as the result of her minor accident.

(ii)    On September 19, 2014, an Insured named CT was involved in a minor automobile accident. The contemporaneous police report indicated that the

accident was a low-speed, low-impact collision, CT's vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that CT was not seriously injured in the minor accident, CT did not visit any hospital following the accident. To the extent that CT suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of CT by Formisano on September 24, 2014, DA Health, Alfonso, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that CT presented with moderately severe health problems as the result of her minor accident.

(iii)    On May 20, 2015, an Insured named JR was involved in a minor automobile accident. The contemporaneous police report indicated that no one was injured in the accident. In keeping with the fact that JR was not seriously injured in the minor accident, JR did not visit any hospital following the accident. To the extent that JR suffered any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of JR by Formisano on May 21, 2015, DA Health, Alfonso, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JR presented with moderately severe health problems as the result of his minor accident.

(iv)    On July 6, 2015, an Insured named VG was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, VG's vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that VG was not seriously injured in the minor accident, VG did not visit any hospital following the accident. To the extent that VG suffered any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of VG by Formisano on July 9, 2015, DA Health, Alfonso, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that VG presented with moderately severe health problems as the result of his minor accident.

(v)    On October 1, 2015, an Insured named CG was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, CG's vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that CG was not seriously injured in the minor accident, CG did not visit any hospital following the accident. To the extent that CG suffered any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of CG by Formisano on October 2, 2015, DA Health, Alfonso, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that CG presented with moderately severe health problems as the result of his minor accident.

(vi)     On December 9, 2016, an Insured named EM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, EM's vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that EM was not seriously injured in the minor accident, EM did not visit any hospital following the accident. To the extent that EM suffered any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of EM by Formisano on December 12, 2016, DA Health, Alfonso, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that EM presented with moderately severe health problems as the result of his minor accident.

(vii)    On January 27, 2017, an Insured named CC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, CC's vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that CC was not seriously injured in the minor accident, CC did not visit any hospital following the accident. To the extent that CC suffered any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of CC by Formisano on January 30, 2017, DA Health, Alfonso, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that CC presented with moderately severe health problems as the result of his minor accident.

(viii)   On March 25, 2017, an Insured named JC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, JC's vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that JC was not seriously injured in the minor accident, JC did not visit any hospital following the accident. To the extent that JC suffered any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of JC by Formisano on March 27, 2017, DA Health, Alfonso, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JC presented with moderately severe health problems as the result of his minor accident.

(ix)     On April 3, 2017, an Insured named NC was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, NC's vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that NC was not seriously injured in the minor accident, NC did not visit any hospital following the accident. To the extent that NC suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of NC by Formisano on April 7, 2017, DA Health, Alfonso, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that NC presented with moderately severe

health problems as the result of her minor accident.

    (x)    On June 3, 2017, an Insured named DS was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, DS's vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that DS was not seriously injured in the minor accident, DS did not visit any hospital following the accident. To the extent that DS suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of DS by Formisano on June 6, 2017, DA Health, Alfonso, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that DS presented with moderately severe health problems as the result of her minor accident.

266.    These are only representative examples. In all of the claims for initial examinations identified in Exhibit "1", DA Health, Alfonso, and Formisano falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

267.    In the claims for initial examinations identified in Exhibit "1", DA Health, Alfonso, and Formisano routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

268.    In the claims for initial examinations identified in Exhibit "1", DA Health, Alfonso, and Formisano also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that the DA Health Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

269.      What is more, in every claim identified in Exhibit "1" for initial examinations under CPT code 99203, DA Health, Alfonso, and Formisano misrepresented and exaggerated the amount of face-to-face time that the examining physician – purportedly Formisano – spent with the Insureds or the Insureds' families during the putative initial examination.

270.      Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination typically represents that the physician who conducted the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

271.      As set forth in Exhibit "1", DA Health, Alfonso, and Formisano virtually always billed for their putative initial examinations using CPT code 99203, and thereby represented that the physician who purported to conduct the examinations – namely Formisano – spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations.

272.      In fact, in the initial examinations identified in Exhibit "1", Formisano never spent even 15 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 30 minutes, to the extent that the examinations actually were conducted at all.

273.      Rather, in the purported initial examinations identified in Exhibit "1", the examinations rarely entailed more than 10 minutes of face-to-face time between Formisano, the Insureds, or the Insureds' families, to the extent that they were provided at all.

274.      In keeping with the fact that the initial examinations in the claims identified in Exhibit "1" did not involve more than 10 minutes of face-to-face time between Formisano, the Insureds, or the Insureds' families – to the extent that they were provided at all – Formisano used pre-printed checklist forms in purporting to conduct the examinations.

275.     All that was required to complete the pre-printed checklist forms was a brief patient interview and a perfunctory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, and basic range of motion and muscle strength testing.

276.     These interviews and examinations did not require Formisano to spend more than 10 minutes of face-to-face time with the Insureds during the putative initial examinations.

277.     Indeed, Formisano could not legitimately have personally spent at least 30 minutes of face-to-face time with the Insureds or their families during the initial examinations at DA Health, considering the massive amount of healthcare services he simultaneously was purporting to personally perform or directly supervise at numerous healthcare clinics and medical practices throughout the Miami area.

278.     For example:

(i)      On February 18, 2014, DA Health, Alfonso, and Formisano billed GEICO under CPT code 99203 for five initial examinations of five individual insureds named YJ, DM, MM, OM, and VR, and falsely represented that Formisano spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of two-and-a-half hours. On that same date, Formisano also purported to personally provide or directly supervise more than 27 hours of physical therapy services to 17 individual Insureds, from two different facilities, namely DA Health and Alternative Medical, all of which were billed to GEICO.

(ii)     On May 26, 2015, DA Health, Alfonso, and Formisano billed GEICO under CPT code 99203 for an initial examination of an Insured named AH, and falsely represented that Formisano spent at least 30 minutes of face-to-face time with the Insured or his family during the examination. On that same date, Formisano also purported to personally provide or directly supervise more than 24 hours of physical therapy services to 19 individual Insureds, from four different facilities, namely DA Health, DG Esthetic, AMS Medical, and Alternative Medical, all of which were billed to GEICO.

(iii)    On November 24, 2015, DA Health, Alfonso, and Formisano billed GEICO under CPT code 99203 for an initial examination of an Insured named named NB, and falsely represented that Formisano spent at least 30 minutes of face-to-face time with the Insured or his family during the examination. On that same date, Formisano also purported to personally provide or directly supervise more than 39 hours of physical therapy services to 29 individual Insureds, from four different

facilities, namely DA Health, DG Esthetic, Alternative Medical, and his solo medical practice, all of which were billed to GEICO.

(iv)    On June 6, 2016, DA Health, Alfonso, and Formisano billed GEICO under CPT code 99203 for three initial examinations of three individual insureds named JD, EM, and TM, and falsely represented that Formisano spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one-and-a-half hours.  On that same date, Formisano also purported to personally provide or directly supervise more than 33 hours of physical therapy services to 22 individual Insureds, from five different facilities, namely AMS Medical, Alternative Medical, DA Health, DG Esthetic, and his solo medical practice, all of which were billed to GEICO.

(v)    On November 7. 2016, DA Health, Alfonso, and Formisano billed GEICO under CPT code 99203 for three initial examinations of three individual insureds named LB, MB, and AB, and falsely represented that Formisano spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one-and-a-half hours. On that same date, Formisano also purported to personally provide or directly supervise more than 25 hours of physical therapy services to 16 individual Insureds, from four different facilities, namely Alternative Medical, DA Health, DG Esthetic, and Genesis Medical, all of which were billed to GEICO.

279.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", DA Health, Alfonso, and Formisano routinely falsely represented that Formisano had spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations, despite the fact that – on those same dates – Formisano also purported to personally perform a massive amount of physical therapy and other services to large numbers of Insureds at multiple locations throughout the Miami area.

280.    DA Health, Alfonso, and Formisano routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT code 99203 are reimbursable at higher rates than examinations that take less time to perform.

c.      **Misrepresentations Regarding "Detailed" Physical Examinations**

281.    Moreover, in every claim identified in Exhibit "1" for initial examinations under CPT code 99203, DA Health, Alfonso, and Formisano falsely represented the extent of the underlying physical examinations.

282.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination conducted a "detailed" physical examination.

283.    As set forth in Exhibit "1", DA Health, Alfonso, and Formisano virtually always billed for their putative initial examinations using CPT code 99203, and thereby represented that the physician who purported to conduct the examinations – namely Formisano – conducted detailed physical examinations of the Insureds who purportedly received the examinations.

284.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

285.    To the extent that the Insureds in the claims identified in Exhibit "1" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, specifically sprains and strains.

286.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)     examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)     examination of gait and station;

(vii)     inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)     coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)     examination of sensation.

287.    In the claims for initial examinations identified in Exhibit "1", when DA Health, Alfonso, and Formisano billed for the initial examinations under CPT code 99203, they falsely represented that Formisano performed "detailed" patient examinations on the Insureds he purported to treat during the initial examinations.

288.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Formisano never conducted an extended examination of the Insureds' musculoskeletal systems.

289.    For instance, in each of the claims under CPT code 99203 identified in Exhibit "1", Formisano did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as he did not document findings with respect to the following:

(i)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(ii)     brief assessment of mental status;

(iii)    examination of gait and station;

(iv)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(v)    coordination;

(vi)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(vii)    examination of sensation.

290.    For example:

(i)    On February 18, 2014, DA Health, Alfonso, and Formisano billed GEICO under CPT code 99203 for five initial examinations of five individual Insureds named YJ, DM, MM, OM, and VR that Formisano purported to perform, and thereby represented that they had provided "detailed" physical examinations to YJ, DM, MM, OM, and VR.  However, Formisano did not document an extended examination of the musculoskeletal systems of YJ, DM, MM, OM, and VR, despite the fact that – to the extent YJ, DM, MM, OM, and VR had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(ii)    On September 24, 2014, DA Health, Alfonso, and Formisano billed GEICO under CPT code 99203 for an initial examination that Formisano purported to perform on an Insured named CT, and thereby represented that they had provided a "detailed" physical examination to CT.  However, Formisano did not document an extended examination of the musculoskeletal system of CT, despite the fact that – to the extent CT had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

(iii)    On May 26, 2015, DA Health, Alfonso, and Formisano billed GEICO under CPT code 99203 for an initial examination that Formisano purported to perform on an Insured named AH, and thereby represented that they had provided a "detailed" physical examination to AH.  However, Formisano did not document an extended examination of the musculoskeletal system of AH, despite the fact that – to the extent AH had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(iv)    On July 9, 2015, DA Health, Alfonso, and Formisano billed GEICO under CPT code 99203 for an initial examination that Formisano purported to perform on an Insured named VG, and thereby represented that they had provided a "detailed" physical examination to VG.  However, Formisano did not document an extended

examination of the musculoskeletal system of VG, despite the fact that – to the extent VG had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(v)     On October 27, 2015, DA Health, Alfonso, and Formisano billed GEICO under CPT code 99203 for an initial examination that Formisano purported to perform on an Insured named AC, and thereby represented that they had provided a "detailed" physical examination to AC.  However, Formisano did not document an extended examination of the musculoskeletal system of AC, despite the fact that – to the extent AC had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(vi)    On November 24, 2015, DA Health, Alfonso, and Formisano billed GEICO under CPT code 99203 for an initial examination that Formisano purported to perform on an Insured named NB. However, Formisano did not document an extended examination of the musculoskeletal system of NB, despite the fact that – to the extent NB had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(vii)   On February 4, 2016, DA Health, Alfonso, and Formisano billed GEICO under CPT code 99203 for an initial examination that Formisano purported to perform on an Insured named MD, and thereby represented that they had provided a "detailed" physical examination to MD.  However, Formisano did not document an extended examination of the musculoskeletal system of MD, despite the fact that – to the extent MD had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

(viii)  On June 6, 2016, DA Health, Alfonso, and Formisano billed GEICO under CPT code 99203 for three initial examinations of three individual Insureds named JD, EM, and TM that Formisano purported to perform, and thereby represented that they had provided "detailed" physical examinations to JD, EM, and TM. However, Formisano did not document an extended examination of the musculoskeletal systems of JD, EM, and TM, despite the fact that – to the extent JD, EM, and TM had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(ix)    On November 7, 2016, DA Health, Alfonso, and Formisano billed GEICO under CPT code 99203 for three initial examinations of three individual Insureds named LB, MB, and AB that Formisano purported to perform, and thereby represented that they had provided "detailed" physical examinations to LB, MB, and AB. However, Formisano did not document an extended examination of the musculoskeletal systems of LB, MB, and AB, despite the fact that – to the extent LB, MB, and AB had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

(x)     On June 6, 2017, DA Health, Alfonso, and Formisano billed GEICO under CPT

88

code 99203 for three initial examinations of three individual insureds named ML, DS, and MV that Formisano purported to perform, and thereby represented that they had provided "detailed" physical examinations to ML, DS, and MV. However, Formisano did not document an extended examination of the musculoskeletal systems of ML, DS, and MV, despite the fact that – to the extent ML, DS, and MV had any complaints at all as the result of their automobile accidents – they were limited to minor musculoskeletal complaints.

291.    These are only representative examples. In all of the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", DA Health, Alfonso, and Formisano falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because Formisano had not documented an extended examination of the affected body areas and other symptomatic or related organ systems.

292.    In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", DA Health, Alfonso, and Formisano falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" physical examinations.

**d.    Misrepresentations Regarding the Extent of Medical Decision-Making**

293.    Furthermore, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination engaged in "low complexity" medical decision-making.

294.    In addition, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and

other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

295.    As set forth above, and in Exhibit "1", DA Health, Alfonso, and Formisano billed for all of their putative initial patient examinations using CPT code 99203, and thereby represented that Formisano engaged in some genuine, low-complexity medical decision-making during the initial examinations.

296.    In actuality, however, the purported initial examinations did not involve any legitimate medical decision-making at all.

297.    First, in DA Health, Alfonso, and Formisano's claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information.

298.    When the Insureds in the claims identified in Exhibit "1" presented to DA Health for "treatment", they did not arrive with any medical records.

299.    Furthermore, prior to the initial examinations, DA Health neither requested any medical records from any other providers, nor conducted any complex diagnostic tests beyond the basic range of motion and muscle strength testing that is attendant to any physical examination.

300.    Second, in DA Health, Alfonso, and Formisano's claims for initial examinations identified in Exhibit "1",  there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

301.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the DA Health Defendants, to the extent that the DA Health Defendants provided any such diagnostic procedures or treatment options in the first instance.

302.    In virtually every one of the claims identified in Exhibit "1", any diagnostic procedures and "treatments" that the DA Health Defendants actually provided were limited to a series of medically unnecessary follow-up examinations and physical therapy treatments, none of which was health- or life-threatening if properly administered.

303.    Third, in DA Health, Alfonso, and Formisano's claims for initial examinations identified in Exhibit "1", Formisano did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

304.    Rather, to the extent that the initial examinations were conducted in the first instance, DA Health and Formisano – at the direction of Alfonso – provided a nearly identical, pre-determined "diagnosis" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

305.    Specifically, in almost every instance in the claims identified in Exhibit "1", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

306.    Even so, DA Health, Alfonso, and Formisano prepared initial examination reports in which they provided phony, boilerplate sprain/strain "diagnoses" to virtually every Insured.

307.    Then, based upon these phony "diagnoses", DA Health, Alfonso, and Formisano directed virtually every Insured to return to DA Health five times each week for medically unnecessary physical therapy during the first three weeks of "treatment".

308.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

309.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

310.    As set forth above, in the claims identified in Exhibit "1", virtually all of the Insureds whom the DA Health Defendants purported to treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

311.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

312.    It is even more improbable – to the point of impossibility – that this would occur over and over again.

313.    It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, requiring a substantially identical course of treatment, on the exact same date after their underlying automobile accident.

314.    Even so, in keeping with the fact that these putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, DA Health and Formisano – at the direction of Alfonso – frequently issued substantially identical, phony "diagnoses", on the same date, to more than one Insured

involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

315.    For example:

(i)    On August 17, 2013, two Insureds – DG and DS – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at DA Health for initial examinations by Formisano on the <u>exact same date</u>, October 10, 2013. DG and DS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DG and DS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DA Health and Formisano – at the direction of Alfonso – provided DG and DS with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(ii)    On December 27, 2013, three Insureds – MF, SO, and JR – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at DA Health for initial examinations by Formisano on the <u>exact same date</u>, January 6, 2014. MF, SO, and JR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MF, SO, and JR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DA Health and Formisano – at the direction of Alfonso – provided MF, SO, and JR with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all three of them.

(iii)    On February 12, 2014, two Insureds – YP and VR – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at DA Health for initial examinations by Formisano on the <u>exact same date</u>, February 18, 2014. YP and VR were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YP and VR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DA Health and Formisano – at the direction of Alfonso – provided YP and VR with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them. What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that DA Health and Formisano provided to YP and VR were pre-determined and phony, DA Health and Formisano stopped treating YP and VR on the same day, April 16, 2014. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the two months when they

purportedly were treating at DA Health.

(iv)    On February 13, 2014, three Insureds – DM, MM, and OM – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at DA Health for initial examinations by Formisano on the <u>exact same date</u>, February 18, 2014. DM, MM, and OM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that DM, MM, and OM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DA Health and Formisano – at the direction of Alfonso – provided DM, MM, and OM with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all three of them.

(v)    On July 6, 2015, two Insureds – VG and MS – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at DA Health for initial examinations by Formisano on the <u>exact same date</u>, July 9, 2015. VG and MS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that VG and MS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DA Health and Formisano – at the direction of Alfonso – provided VG and MS with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(vi)    On October 10, 2015, two Insureds – RL and GE – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at DA Health for initial examinations by Formisano on the <u>exact same date</u>, October 15, 2015. RL and GE were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RL and GE suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DA Health and Formisano – at the direction of Alfonso – provided RL and GE with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them. What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that DA Health and Formisano provided to RL and GE were pre-determined and phony, DA Health and Formisano stopped treating RL and GE on the same day, January 22, 2014. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the three months when they purportedly were treating at DA Health.

(vii)   On January 27, 2016, three Insureds – AH, AH, and EH – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at DA Health for initial examinations by Formisano on the <u>exact same date</u>, January 29, 2016. AH, AH, and EH were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AH, AH, and EH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DA Health and Formisano – at the direction of Alfonso – provided AH, AH, and EH with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all three of them.

(viii)  On July 26, 2016, two Insureds – JI and CH – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at DA Health for initial examinations by Formisano on the <u>exact same date</u>, July 26, 2016. JI and CH were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JI and CH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DA Health and Formisano – at the direction of Alfonso – provided JI and CH with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them. What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that DA Health and Formisano provided to JI and CH were pre-determined and phony, DA Health and Formisano stopped treating JI and CH on the same day, October 17, 2016. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the three months when they purportedly were treating at DA Health.

(ix)    On January 27, 2017, two Insureds – CC and OL – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at DA Health for initial examinations by Formisano on the <u>exact same date</u>, January 30, 2017. CC and OL were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CC and OL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DA Health and Formisano – at the direction of Alfonso – provided CC and OL with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(x)     On June 3, 2017, three Insureds – ML, DS, and MV – were involved in the same automobile accident. Thereafter – incredibly – all three Insureds presented at DA Health for initial examinations by Formisano with ML and DS on the <u>exact same date</u>, June 6, 2017, and MV three days later on June 9, 2017.  ML, DS, and MV

were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that ML, DS, and MV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DA Health and Formisano – at the direction of Alfonso – provided ML, DS, and MV with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all three of them. What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that DA Health and Formisano provided to ML, DS, and MV were pre-determined and phony, DA Health and Formisano stopped treating ML, DS, and MV on the same day, August 16, 2017. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the two months when they purportedly were treating at DA Health.

316.    DA Health, Alfonso, and Formisano routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the DA Health Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

317.    In keeping with the fact that DA Health, Alfonso, and Formisano routinely inserted false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, for virtually every one of the Insureds in the claims identified in Exhibit "1", DA Health and Formisano – at the direction of Alfonso – diagnosed the Insureds with virtually identical neck and back injuries, and inserted into virtually every initial examination report the following language: "[t]his is a medical emergency condition! The patient is experiencing excruciating pain and discomfort!"

318.    It is extremely improbable that virtually every one of the Insureds in the claims identified in Exhibit "1" would – during their initial examinations – report the same "excruciating" levels of accident-related pain in their neck, back, or extremities.

319.    It is even more improbable – to the point of impossibility – that this would occur over and over again, in the context of minor automobile accidents that could not possibly have caused such severe levels of pain.

320.    DA Health, Alfonso, and Formisano inserted this false information in their initial examination reports despite the fact that the minor underlying accidents did not and could not possibly have caused such consistent, high levels of pain in the Insureds, much less to more than one Insured involved in a single accident.

321.    For example:

(i)     On February 13, 2014, three Insureds – DM, MM, and OM – were involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the vehicle suffered only minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that DM, MM, and OM was not seriously injured in the minor accident, neither DM, MM, nor OM visited any hospital following the accident. To the extent that DM, MM, and OM suffered any health problems at all as the result of their minor accident, they were of low severity. Even so, following purported initial examinations of DM, MM, and OM by Formisano on February 18, 2014, DA Health and Formisano – at the direction of Alfonso – falsely reported that DM, MM, and OM suffered from cervical, lumbar and sacrum spine pain, and further falsely reported "[t]his is a medical emergency condition! The patient is experiencing excruciating pain and discomfort."

(ii)    On July 6, 2015, two Insureds – VG and MS – were involved in the same automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the vehicle suffered only minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that VG and MS were not seriously injured in the minor accident, neither VG nor MS visited any hospital following the accident. To the extent that VG and MS suffered any health problems at all as the result of their minor accident, they were of low severity. Even so, following purported initial examinations of VG and MS by Formisano on July 9, 2015, DA Health and Formisano – at the direction of Alfonso – falsely reported that VG and MS

suffered from cervical, lumbar and sacrum spine pain, and further falsely reported "[t]his is a medical emergency condition! The patient is experiencing excruciating pain and discomfort."

(iii)    On October 10, 2015, two Insureds – RL and GE – were involved in the same automobile accident.   The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the vehicle suffered only minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that RL and GE were not seriously injured in the minor accident, neither RL nor GE visited any hospital following the accident. To the extent that RL and GE suffered any health problems at all as the result of their minor accident, they were of low severity. Even so, following purported initial examinations of RL and GE by Formisano on October 15, 2015, DA Health and Formisano – at the direction of Alfonso – falsely reported that RL and GE suffered from cervical, lumbar and sacrum spine pain, and further falsely reported "[t]his is a medical emergency condition! The patient is experiencing excruciating pain and discomfort."

(iv)    On January 27, 2017, two Insureds – CC and OL – were involved in the same automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that CC's vehicle suffered only minor damage in the accident, and that no one was injured in the accident.  In keeping with the fact that CC and OL were not seriously injured in the minor accident, neither CC nor OL visited any hospital following the accident. To the extent that CC and OL suffered any health problems at all as the result of their minor accident, they were of low severity. Even so, following purported initial examinations of CC and OL by Formisano on January 30, 2017, DA Health and Formisano – at the direction of Alfonso – falsely reported that CC and OL suffered from cervical, lumbar and sacrum spine pain, and further falsely reported "[t]his is a medical emergency condition! The patient is experiencing excruciating pain and discomfort."

(v)    On June 3, 2017, three Insureds – ML, DS, and MV – were involved in the same automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the vehicle suffered minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that ML, DS, and MV were not seriously injured in the minor accident, neither ML, DS, nor MV visited any hospital following the accident. To the extent that ML, DS, and MV suffered any health problems at all as the result of their minor accident, they were of low severity. Even so, following purported initial examinations of ML, DS, and MV by Formisano on June 9, 2017, DA Health and Formisano – at the direction of Alfonso – falsely reported that ML, DS, and MV suffered from cervical, lumbar and sacrum spine pain, and further falsely reported "[t]his is a medical emergency condition! The patient is experiencing excruciating pain and discomfort."

322.    These are only representative examples. In virtually every claim for initial examinations identified in Exhibit "1", DA Health, Alfonso, and Formisano falsely reported that the Insureds suffered from the same severe pain in their neck, back, and extremities, that it was a "medical emergency condition!", and that the Insureds were experiencing "excruciating pain and discomfort".

323.    DA Health, Alfonso, and Formisano routinely inserted this false information in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the DA Health Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

324.    To the extent that the Insureds in the claims identified in Exhibit "1" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary sprains or strains of the back, neck, or extremities.

325.    The diagnosis and treatment of these ordinary sprains and strains did not require any "low complexity" medical decision-making on the part of Formisano or anyone else.

326.    To the contrary, and as set forth above, Formisano did not engage in any legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibit "1", because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the laundry-list of other Fraudulent Services that the DA Health Defendants purported to provide.

327.    In the claims for initial examinations identified in Exhibit "1", DA Health, Alfonso, and Formisano routinely falsely represented that the initial examinations involved

99

medical decision-making of low complexity in order to provide a false basis to bill for the initial examinations under CPT code 99203, because CPT code 99203 is reimbursable at a higher rate than examinations that do not require low complexity medical decision-making.

328.    In the claims for initial examinations identified in Exhibit "1", DA Health, Alfonso, and Formisano routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentment;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   DA Health never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

329.    In this context, Formisano – who at all relevant times purported to serve as the "medical director" at DA Health – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

330.    Had Formisano actually fulfilled his statutory role as medical director at DA Health, he would have noted – among other things – that the DA Health Defendants routinely fraudulently represented in DA Health's billing that the putative initial examinations were legitimately and lawfully performed.

331.    Formisano failed to do so, because he never actually served as a legitimate medical director at DA Health in the first instance.

**(ii)      The Fraudulent Charges for Follow-Up Examinations at DA Health**

332.    In addition to their fraudulent initial examinations, DA Health, Alfonso, and Formisano virtually always purported to subject each of the Insureds in the claims identified in Exhibit "1" to multiple, fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

333.    Formisano purported to personally perform virtually all of the follow-up examinations in the claims identified in Exhibit "1".

334.    As set forth in Exhibit "1", DA Health, Alfonso, and Formisano then billed the follow-up examinations to GEICO under: (i) CPT code 99213, virtually always resulting in charges of $200.00 for each follow-up examination they purported to provide; or (ii) CPT code 99214, virtually always resulting in charges of $250.00 for reach follow-up examination they purported to provide.

335.    In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations were fraudulent in that they misrepresented DA Health's eligibility to collect PIP Benefits in the first instance.

336.    In fact, and as set forth above, DA Health never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing requirements set forth in the Clinic Act.

337.    As set forth below, DA Health, Alfonso, and Formisano's charges for the follow-up examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

a.     **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

338.    Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

339.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

340.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

    (i)     Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

    (ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

    (iii)   Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

    (iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

    (v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

    (vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

    (vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

> (viii)   Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

341.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

342.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

343.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

344.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

> (i)   Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)
>
> (ii)   Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)
>
> (iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)
>
> (iv)   Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)
>
> (v)   Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)
>
> (vi)   Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

345.   Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

346.   By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

347.   In keeping with the fact that the Insureds in the claims identified in Exhibit "1" almost never suffered any injuries more serious than garden-variety soft tissue injuries such as sprains and strains, in the vast majority of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

348.   To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

349.   Furthermore, in the substantial majority of cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

350.   Ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

351.    By the time the Insureds in the claims identified in Exhibit "1" presented at DA Health for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

352.    Even so, in the claims for follow-up examinations identified in Exhibit "1", DA Health, Alfonso, and Formisano routinely billed for their putative follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of either low to moderate severity or moderate to high severity.

353.    For example:

(i)    On February 13, 2014, two Insureds – DM and MM – were involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the vehicle suffered only minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that DM and MM were not seriously injured in the minor accident, neither DM nor MM visited any hospital following the accident. To the extent that DM and MM suffered any health problems at all as the result of the minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of DM on March 18, 2014, and April 25, 2014, and MM on March 13, 2014, and April 25, 2014, DA Health, Alfonso, and Formisano billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that DM and MM presented with problems of low to moderate severity. What is more, following purported follow-up examinations of DM on June 4, 2014, and MM on May 14, 2014, DA Health, Alfonso, and Formisano billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that DM and MM presented with problems of moderate to high severity, despite the fact that they previously represented that DM and MM presented with problems of low to moderate severity and that DM and MM's condition had improved during the three months of treatment at DA Health. In keeping with the fact that DM and MM had no presenting problems of low to moderate severity or moderate to high severity, DA Health and Formisano actually stopped treating DM and MM after the purported June 4, 2014, and May 14, 2014 follow-up examinations, respectively.

(ii)    On July 6, 2015, two Insureds – VG and MS – were involved in the same automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the vehicle suffered only

minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that VG and MS were not seriously injured in the minor accident, neither VG nor MS visited any hospital following the accident. To the extent that VG and MS suffered any health problems at all as the result of the minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of VG and MS on July 30, 2015, and September 1, 2015, DA Health, Alfonso, and Formisano billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that VG and MS presented with problems of low to moderate severity.

(iii)    On October 1, 2015, an Insured named CG was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, CG's vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that CG was not seriously injured in the minor accident, CG did not visit any hospital following the accident. To the extent that CG suffered any health problems at all as the result of his minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of CG on December 7, 2015, DA Health, Alfonso, and Formisano billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that CG presented with problems of low to moderate severity.

(iv)    On October 10, 2015, two Insureds – RL and GE – were involved in the same automobile accident.  The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that the vehicle suffered only minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that RL and GE were not seriously injured in the minor accident, neither RL nor GE visited any hospital following the accident. To the extent that RL and GE suffered any health problems at all as the result of the minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of RL and GE on November 13, 2015, and December 28, 2015, DA Health, Alfonso, and Formisano billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that RL and GE presented with problems of low to moderate severity. What is more, following purported follow-up examinations of RL and GE on January 22, 2016, DA Health, Alfonso, and Formisano billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that RL and GE presented with problems of moderate to high severity, despite the fact that they previously represented that RL and GE presented with problems of low to moderate severity and that RL and GE's condition had improved during the three months of treatment at DA Health. In keeping with the fact that RL and GE had no presenting problems of low to moderate severity or moderate to high severity, DA Health and Formisano actually stopped treating RL and GE after the January 22, 2016 follow-up

examinations.

(v)    On December 9, 2016, an Insured named EM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, EM's vehicle was not towed subsequent to the accident, and that no one was injured in the accident. In keeping with the fact that EM was not seriously injured in the minor accident, EM did not visit any hospital following the accident. To the extent that EM suffered any health problems at all as the result of his minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of EM on February 21, 2017, DA Health, Alfonso, and Formisano billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that EM presented with problems of moderate to high severity.  In keeping with the fact that EM had no presenting problems of moderate to high severity, DA Health and Formisano actually stopped treating EM after the February 21, 2017 follow-up examination.

354.    These are only representative examples. In all of the claims for follow-up examinations identified in Exhibit "1", DA Health, Alfonso, and Formisano falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

355.    In the claims for follow-up examinations identified in Exhibit "1", DA Health, Alfonso, and Formisano routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99213 and 99214, because follow-up examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

356.    In the claims for follow-up examinations identified in Exhibit "1", DA Health, Alfonso, and Formisano also routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false

basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional, medically unnecessary follow-up examinations and physical therapy.

**b.     Misrepresentations Regarding the Results of the Follow-Up Examinations**

357.    What is more, pursuant to the CPT Assistant, when DA Health, Alfonso, and Formisano billed for their putative follow-up examinations under CPT code 99214, they represented that Formisano performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

358.    Similarly, pursuant to the CPT Assistant, when DA Health, Alfonso, and Formisano billed for their putative follow-up examinations under CPT code 99213, they represented that Formisano performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

359.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "1", Formisano did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

360.    Rather, following their purported follow-up examinations, DA Health and Formisano – at the direction of Alfonso – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either  (ii) referred the Insureds back to DA Health for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services from DA Health that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been

exhausted.

361.    In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentment, DA Health and Formisano – at the direction of Alfonso – recommended a substantially identical course of medically unnecessary "treatment" to virtually every one of the Insureds identified in Exhibit "1", irrespective of the Insureds' actual presenting problems, to the extent the Insureds suffered any legitimate injuries at all.

362.    Specifically, DA Health and Formisano – at the direction of Alfonso – directed virtually every Insured to receive two to four months of purported "physical therapy" treatments, typically consisting of daily physical therapy for the first three weeks of treatment, followed by physical therapy four times per week for the subsequent four weeks, followed by physical therapy three times a week for the final four weeks.

363.    In addition, DA Health and Formisano – at the direction of Alfonso – directed virtually every Insured to receive substantially identical types of physical therapy services, including: (i) cold/hot packs/electricity; (ii) therapeutic exercises and activities; (iii) ultrasound; (iv) neuromuscular (vibration); (v) contrast baths; and (vi) manual therapy. See Exhibit "1".

364.    In a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentment.

365.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

366.   By contrast, at DA Health, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentment, or progress through the Defendants' fraudulent treatment and billing protocol.

367.   The phony "follow-up examinations" that DA Health, Alfonso, and Formisano purported to provide the Insureds in the claims identified in Exhibit "1" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into DA Health's offices.

368.   In the claims for follow-up examinations identified in Exhibit "1", DA Health, Alfonso, and Formisano routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentment;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   DA Health never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

369.   In this context, Formisano – who at all relevant times purported to serve as the "medical director" at DA Health – did not, and could not have, "[c]onduct[ed] systematic

110

reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

370.     Had Formisano actually fulfilled his statutory role as medical director at DA Health, he would have noted – among other things – that the Defendants routinely fraudulently represented in DA Health's billing that the putative follow-up examinations were legitimately and lawfully performed and billed.

371.     Formisano failed to do so, because he never actually served as a legitimate medical director at DA Health in the first instance.

**(iii)     The Fraudulent Charges for Physical Therapy at DA Health**

372.     In addition to the fraudulent initial examinations and follow-up examinations, the DA Health Defendants virtually always purported to subject each of the Insureds in the claims identified in Exhibit "1" to between two and four months of medically unnecessary physical therapy.

373.     As set forth above, though Formisano falsely purported to personally perform virtually all of the physical therapy services in the claims identified in Exhibit "1", the physical therapy services actually were performed by Mejias or other massage therapists associated with DA Health, to the extent that they were even provided at all.

374.     As set forth in Exhibit "1", the DA Health Defendants then billed the purported physical therapy services to GEICO under:

   (i)      CPT code 97010 for putative hot/cold/compression treatments, resulting in a charge of $12.00 for each round of hot/cold/compression treatments they purported to provide;

   (ii)     CPT code 97012, for putative mechanical traction therapy, resulting in a charge of $40.00 for each round of mechanical traction therapy they purported to provide;

   (iii)    CPT code 97018, for putative paraffin bath therapy, resulting in a charge of

between $20.00 and $25.00 for each round of paraffin bath therapy they purported to provide;

(iv)     CPT code 97032, for putative electrical stimulation, resulting in a charge of $50.00 for each round of electrical stimulation they purported to provide;

(v)     HCPCS code G0283, for putative electrical stimulation, resulting in a charge of $30.00 for each round of electrical stimulation they purported to provide;

(vi)     CPT code 97034, for putative contrast bath therapy, resulting in a charge of $60.00 for each round of contrast bath therapy they purported to provide;

(vii)     CPT code 97035, for putative ultrasound, resulting in a charge of $30.00 for each round of ultrasound they purported to provide;

(viii)     CPT code 97039, for putative hydrobed treatments, resulting in a charge of $55.00 for each round of hydrobed treatments they purported to provide;

(ix)     CPT code 97110, for putative therapeutic exercises, resulting in a charge of $65.00 for each round of therapeutic exercises they purported to provide;

(x)     CPT code 97112, for putative neuromuscular reeducation, resulting in a charge of $65.00 for each round of neuromuscular reeducation they purported to provide;

(xi)     CPT code 97140, for putative manual therapy, resulting in a charge of $59.00 for each round of manual therapy they purported to provide;

(xii)     CPT code 97530, for putative therapeutic activity, resulting in a charge of $70.00 for each round of therapeutic activity they purported to provide; and

(xiii)     CPT code 97535 for putative self-care management training, resulting in a charge of $70.00 for each round of training they purported to provide.

375.     In the claims for physical therapy services identified in Exhibit "1", the charges for the physical therapy services were fraudulent in that they misrepresented DA Health's eligibility to collect PIP Benefits in the first instance.

376.     In fact, and as set forth above, DA Health never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

377.     What is more, and as set forth above, in the claims for physical therapy services identified in Exhibit "1", the DA Health Defendants falsely represented that the physical therapy services lawfully had been performed by Formisano, when in fact they were unlawfully performed by Mejias or other massage therapists associated with DA Health, who are not and never have been licensed as physical therapists.

378.     Additionally, neither Mejias, nor any of the other massage therapists associated with DA Health, were directly supervised by Formisano, or by any other licensed physician associated with DA Health, when performing the physical therapy services identified in Exhibit "1".

379.     As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

380.     However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

381.     What is more, pursuant to Florida law, massage therapists cannot lawfully perform physical therapy services unless they also are licensed as physical therapists. See Fla. Stat. § 486.028.

382.     As a result, beginning in 2014, the DA Health Defendants falsely listed Formisano as the treating provider on almost every single bill for almost every single service that

they purported to provide through DA Health, including almost every individual physical therapy service that was billed through DA Health to GEICO.

383.    In fact, and as set forth above, Formisano did not perform any of the physical therapy services that were billed through DA Health to GEICO and other insurers, including but not limited to the services billed through DA Health between 2014 and the present.

384.    Formisano was approximately 70 years old in 2014, approximately 71 years old in 2015, approximately 72 years old in 2016, approximately 73 years old in 2017, and was advanced in age during this period.

385.    What is more, and as set forth above, during his putative service as the phony "medical director" at DA Health, Formisano simultaneously was purporting to serve as "medical director" at a host of other clinics, including Beacon, Delta, DG Esthetic, Alternative Medical, and Omega Therapy, and was purporting to treat patients at numerous other practices, as well.

386.    Formisano could not physically have performed, or even supervised, the massive number of physical therapy services that were billed through DA Health to GEICO after January 1, 2014.

387.    Even so, the DA Health Defendants routinely falsely represented in the billing they submitted through DA Health to GEICO for physical therapy services after January 1, 2014 that Formisano personally performed the underlying physical therapy services, when in fact the services unlawfully had been performed by Mejias or other unsupervised massage therapists associated with DA Health, to the extent that they were performed at all.

388.    As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

389.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

390.    In each of the claims for physical therapy services identified in Exhibit "1", the DA Health Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

391.    In fact, in the claims for physical therapy services identified in Exhibit "1", the services were not lawfully provided, inasmuch as: (i) the putative physical therapy services were performed – to the extent that they were performed at all – by Mejias or other unsupervised massage therapists associated with DA Health, who were individuals who were not licensed to practice physical therapy; and (ii) the DA Health Defendants deliberately misrepresented the identities of the individuals who purported to perform the physical therapy services in their billing for the physical therapy services, in a calculated attempt to induce GEICO to pay the unreimbursable charges.

**2.      The DG Esthetic Defendants' Fraudulent Treatment and Billing Protocol**

**(i)     The Fraudulent Charges for Initial Examinations at DG Esthetic**

392.    As an initial step in the DG Esthetic Defendants' fraudulent treatment and billing protocol, DG Esthetic, Lima, and Formisano purported to provide each of the Insureds in the claims identified in Exhibit "2" with a putative initial examination.

393.    As was the case at DA Health, Formisano purported to personally perform virtually all of the initial examinations at DG Esthetic in the claims identified in Exhibit "2".

394.    As set forth in Exhibit "2", DG Esthetic, Lima, and Formisano then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99203,

resulting in charges of either $250.00 or $300.00 for each initial examination that they purported to provide.

395.     In the claims for initial examinations identified in Exhibit "2", the charges for the initial examinations were fraudulent in that they misrepresented DG Esthetic's eligibility to collect PIP Benefits in the first instance.

396.     In fact, and as set forth above, DG Esthetic never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

397.     As set forth below, the charges for the initial examinations identified in Exhibit "2" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

398.     As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

399.     The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

400.     Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination represents that the Insured presented with problems of moderate severity.

401.     By contrast, to the extent that the Insureds in the claims identified in Exhibit "2" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

402. For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "2" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, in the vast majority of the claims identified in Exhibit "2" the Insureds did not seek treatment at any hospital as the result of their accidents.

403. Furthermore, in the substantial majority of the claims identified in Exhibit "2", contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were functional following the accidents, and that no one was injured in the accidents.

404. Even so, in the claims for initial examinations identified in Exhibit "2", DG Esthetic, Lima, and Formisano routinely billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

405. For example:

(i) On May 29, 2014, an Insured named IN was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that IN was not seriously injured in the minor accident, IN did not visit any hospital following the accident. To the extent that IN suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of IN by Formisano on June 4, 2014, DG Esthetic, Lima, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that IN presented with moderately severe health problems as the result of her minor accident.

(ii) On January 16, 2015, an Insured named RM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that RM's vehicle suffered only minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that RM was not seriously injured in the minor accident, RM did not visit any hospital following the accident. To the extent that RM suffered any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of RM by Formisano on January 29,

117

2015, DG Esthetic, Lima, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that RM presented with moderately severe health problems as the result of her minor accident.

(iii)    On June 25, 2015, an Insured named JR was involved in a minor automobile accident. The contemporaneous police report indicated that JR's vehicle was functional following the accident, and that JR was not injured in the accident. In keeping with the fact that JR was not seriously injured in the minor accident, JR did not visit any hospital following the accident. To the extent that JR suffered any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of JR by Formisano on July 2, 2015, DG Esthetic, Lima, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JR presented with moderately severe health problems as the result of his minor accident.

(iv)    On January 19, 2016, an Insured named YL was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that YL's vehicle suffered only minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that YL was not seriously injured in the minor accident, YL did not visit any hospital following the accident. To the extent that YL suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of YL by Formisano on January 21, 2016, DG Esthetic, Lima, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that YL presented with moderately severe health problems as the result of her minor accident.

(v)    On July 22, 2016, an Insured named RA was involved in a minor automobile accident. The contemporaneous police report indicated that no one was injured in the accident. In keeping with the fact that RA was not seriously injured in the minor accident, RA did not visit any hospital following the accident. To the extent that RA suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of RA by Formisano on August 1, 2016, DG Esthetic, Lima, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that RA presented with moderately severe health problems as the result of her minor accident.

(vi)    On October 13, 2016, an Insured named KL was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that KL's vehicle was functional following the accident, and that no one was injured in the accident. In keeping with the fact that KL was not seriously injured in the minor accident, KL did not visit any hospital following the accident. To the extent that KL suffered any health problems at all

as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of KL by Formisano on October 17, 2016, DG Esthetic, Lima, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that KL presented with moderately severe health problems as the result of her minor accident.

(vii) On November 22, 2016, an Insured named MV was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that MV's vehicle suffered only minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that MV was not seriously injured in the minor accident, MV did not visit any hospital following the accident. To the extent that MV suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of MV by Formisano on November 23, 2016, DG Esthetic, Lima, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that MV presented with moderately severe health problems as the result of her minor accident.

(viii) On November 26, 2016, an Insured named AV was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that AV's vehicle was functional following the accident, and that no one was injured in the accident. In keeping with the fact that AV was not seriously injured in the minor accident, AV did not visit any hospital following the accident. To the extent that AV suffered any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of AV by Formisano on November 28, 2016, DG Esthetic, Lima, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that AV presented with moderately severe health problems as the result of his minor accident.

(ix) On December 4, 2016, an Insured named JH was involved in a minor automobile accident. The contemporaneous police report indicated that JH's vehicle was functional following the accident, and that JH was not injured in the accident. In keeping with the fact that JH was not seriously injured in the minor accident, JH did not visit any hospital following the accident. To the extent that JH suffered any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of JH by Formisano on December 5, 2016, DG Esthetic, Lima, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JH presented with moderately severe health problems as the result of his minor accident.

(x) On April 14, 2017, an Insured named AL was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a

low-speed, low-impact collision, that AL's vehicle was functional the accident, and that no one was injured in the accident. In keeping with the fact that AL was not seriously injured in the minor accident, AL did not visit any hospital following the accident. To the extent that AL suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of AL by Formisano on April 17, 2017, DG Esthetic, Lima, and Formisano billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that AL presented with moderately severe health problems as the result of her minor accident.

406.     These are only representative examples. In all of the claims for initial examinations identified in Exhibit "2", DG Esthetic, Lima, and Formisano falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

407.     In the claims for initial examinations identified in Exhibit "2", DG Esthetic, Lima, and Formisano routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

408.     In the claims for initial examinations identified in Exhibit "2", DG Esthetic, Lima, and Formisano also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that the DG Health Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

**b.     Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

409.     What is more, in every claim identified in Exhibit "2" for initial examinations under CPT code 99203, DG Esthetic, Lima, and Formisano misrepresented and exaggerated the

120

amount of face-to-face time that the examining physician – purportedly Formisano – spent with the Insureds or the Insureds' families during the putative initial examination.

410.    As set forth above, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination typically represents that the physician who conducted the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

411.    As set forth in Exhibit "2", DG Esthetic, Lima, and Formisano virtually always billed for their putative initial examinations using CPT code 99203, and thereby represented that the physician who purported to conduct the examinations – namely Formisano – spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations.

412.    In fact, in the initial examinations identified in Exhibit "2", Formisano never spent even 15 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 30 minutes, to the extent that the examinations actually were conducted at all.

413.    Rather, in the purported initial examinations identified in Exhibit "2", the examinations rarely entailed more than 10 minutes of face-to-face time between Formisano, the Insureds, or the Insureds' families, to the extent that they were provided at all.

414.    In keeping with the fact that the initial examinations in the claims identified in Exhibit "2" did not involve more than 10 minutes of face-to-face time between Formisano, the Insureds, or the Insureds' families – to the extent that they were provided at all – Formisano used pre-printed checklist forms in purporting to conduct the examinations at DG Esthetic, just as he did at DA Health.

415.    All that was required to complete the pre-printed checklist forms was a brief patient interview and a perfunctory physical examination of the Insureds, consisting of a check

of some of the Insureds' vital signs, and basic range of motion and muscle strength testing.

416.   These interviews and examinations did not require Formisano to spend more than 10 minutes of face-to-face time with the Insureds during the putative initial examinations.

417.   Indeed, Formisano could not legitimately have personally spent at least 30 minutes of face-to-face time with the Insureds or their families during the initial examinations at DG Esthetic, considering the massive amount of healthcare services he simultaneously was purporting to personally perform or directly supervise at numerous healthcare clinics and medical practices throughout the Miami area.

418.   For example:

(i)    On October 14, 2014, DG Esthetic, Lima, and Formisano billed GEICO under CPT code 99203 for an initial examination of an Insured named JM, and falsely represented that Formisano spent at least 30 minutes of face-to-face time with the Insured or his family during the examination. On that same date, Formisano also purported to personally provide or directly supervise more than 13 hours of physical therapy services to 13 individual Insureds, from three different facilities, namely DA Health, DG Esthetic, and Alternative Medical, all of which were billed to GEICO.

(ii)   On November 9, 2015, DG Esthetic, Lima, and Formisano billed GEICO under CPT code 99203 for two initial examinations of two individual Insureds named RV and YT, and falsely represented that Formisano spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of one hour. On that same date, Formisano also purported to personally provide or directly supervise more than 36 hours of physical therapy services to 24 individual Insureds, from four different facilities, namely DA Health, DG Esthetic, Alternative Medical, and his solo medical practice, all of which were billed to GEICO.

(iii)  On December 17, 2015, DG Esthetic, Lima, and Formisano billed GEICO under CPT code 99203 for three initial examinations of three individual Insureds named AR, MB, and AT, and falsely represented that Formisano spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of 1.5 hours. On that same date, Formisano also purported to personally provide or directly supervise more than 35 hours of physical therapy services to 28 individual Insureds, from five different facilities, namely AMS Medical, DA Health, DG Esthetic, Alternative Medical, and his solo medical practice all of which were billed to GEICO.

(iv)   On May 16, 2016, DG Esthetic, Lima, and Formisano billed GEICO under CPT code 99203 for an initial examination of an Insured named LM, and falsely represented that Formisano spent at least 30 minutes of face-to-face time with the Insured or her family during the examination. On that same date, Formisano also purported to personally provide or directly supervise more than 26 hours of physical therapy services to 19 individual Insureds, from four different facilities, namely DA Health, DG Esthetic, Alternative Medical, and AMS Medical, all of which were billed to GEICO.

(v)   On November 23, 2016, DG Esthetic, Lima, and Formisano billed GEICO under CPT code 99203 for four initial examinations of four individual Insureds named MV, YM, KF, and ML, and falsely represented that Formisano spent at least 30 minutes of face-to-face time with the Insureds or their families during each examination, for a total of two hours. On that same date, Formisano also purported to personally provide or directly supervise more than 22 hours of physical therapy services to 13 individual Insureds, from six different facilities, namely AMS Medical, DG Esthetic, Genesis Medical, Medical Rehab, Alternative Medical, and his solo medical practice, all of which were billed to GEICO.

419.   These are only representative examples. In the claims for initial examinations that are identified in Exhibit "2", DG Esthetic, Lima, and Formisano routinely falsely represented that Formisano had spent at least 30 minutes of face-to-face time with the Insureds or their families during the examinations, despite the fact that – on those same dates – Formisano also purported to personally perform a massive amount of physical therapy and other services to large numbers of Insureds at multiple locations throughout the Miami area.

420.   DG Esthetic, Lima, and Formisano routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT code 99203 are reimbursable at higher rates than examinations that take less time to perform.

c.   **Misrepresentations Regarding "Detailed" Physical Examinations**

421.   Moreover, in every claim identified in Exhibit "2" for initial examinations under CPT code 99203, DG Esthetic, Lima, and Formisano falsely represented the extent of the

underlying physical examinations.

422.    As set forth above, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination conducted a "detailed" physical examination.

423.    As set forth in Exhibit "2", DG Esthetic, Lima, and Formisano virtually always billed for their putative initial examinations using CPT code 99203, and thereby represented that the physician who purported to conduct the examinations – namely Formisano – conducted detailed physical examinations of the Insureds who purportedly received the examinations.

424.    As set forth above, pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

425.    To the extent that the Insureds in the claims identified in Exhibit "2" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to minor musculoskeletal complaints, specifically sprains and strains.

426.    As set forth above, pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

    (i)      measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

    (ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)    brief assessment of mental status;

(vi)    examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)    coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)    examination of sensation.

427.    In the claims for initial examinations identified in Exhibit "2", when DG Esthetic, Lima, and Formisano billed for the initial examinations under CPT code 99203, they falsely represented that Formisano performed "detailed" patient examinations on the Insureds he purported to treat during the initial examinations.

428.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "2", Formisano never conducted an extended examination of the Insureds' musculoskeletal systems.

429.    For instance, in each of the claims under CPT code 99203 identified in Exhibit "2", Formisano did not conduct an extended examination of the Insureds' musculoskeletal systems, inasmuch as he did not document findings with respect to the following:

(i)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(ii)    brief assessment of mental status;

(iii)    examination of gait and station;

(iv)     inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(v)      coordination;

(vi)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(vii)    examination of sensation.

430.   For example:

(i)      On October 14, 2014, DG Esthetic, Lima, and Formisano billed GEICO under CPT code 99203 for an initial examination that Formisano purported to perform on an Insured named JM, and thereby represented that they had provided a "detailed" physical examination to JM. However, Formisano did not document an extended examination of JM's musculoskeletal system, despite the fact that – to the extent JM had any complaints at all as the result of his automobile accident – they were limited to minor musculoskeletal complaints.

(ii)     On November 9, 2015, DG Esthetic, Lima, and Formisano billed GEICO under CPT code 99203 for initial examinations that Formisano purported to perform on two Insureds named RV and YT, and thereby represented that they had provided "detailed" physical examinations to RV and YT. However, Formisano did not document extended examinations of RV or YT's musculoskeletal systems, despite the fact that – to the extent RV or YT had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(iii)    On December 17, 2015, DG Esthetic, Lima, and Formisano billed GEICO under CPT code 99203 for initial examinations that Formisano purported to perform on three Insureds named AR, MB, and AT, and thereby represented that they had provided "detailed" physical examination to AR, MB, and AT. However, Formisano did not document extended examinations of AR, MB, or AT's musculoskeletal systems, despite the fact that – to the extent AR, MB, or AT had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(iv)     On May 16, 2016, DG Esthetic, Lima, and Formisano billed GEICO under CPT code 99203 for an initial examination that Formisano purported to perform on an Insured named LM, and thereby represented that they had provided a "detailed" physical examination to LM. However, Formisano did not document an extended examination of LM's musculoskeletal system, despite the fact that – to the extent

LM had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

(v)    On June 6, 2016, DG Esthetic, Lima, and Formisano billed GEICO under CPT code 99203 for an initial examination that Formisano purported to perform on an Insured named EC, and thereby represented that they had provided a "detailed" physical examination to EC. However, Formisano did not document an extended examination of EC's musculoskeletal system, despite the fact that – to the extent EC had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

(vi)   On August 8, 2016, DG Esthetic, Lima, and Formisano billed GEICO under CPT code 99203 for initial examinations that Formisano purported to perform on two Insureds named AP and CP, and thereby represented that they had provided "detailed" physical examinations to AP and CP. However, Formisano did not document extended examinations of AP or CP's musculoskeletal systems, despite the fact that – to the extent AP or CP had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(vii)  On November 23, 2016, DG Esthetic, Lima, and Formisano billed GEICO under CPT code 99203 for initial examinations that Formisano purported to perform on four Insureds named MV, YM, KF, and ML, and thereby represented that they had provided "detailed" physical examinations to MV, YM, KF, and ML. However, Formisano did not document extended examinations of MV, YM, KF, or ML's musculoskeletal systems, despite the fact that – to the extent MV, YM, KF, or ML had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(viii) On December 5, 2016, DG Esthetic, Lima, and Formisano billed GEICO under CPT code 99203 for initial examinations that Formisano purported to perform on three Insureds named JH, RL, and IT, and thereby represented that they had provided "detailed" physical examinations to JH, RL, and IT.  However, Formisano did not document extended examinations of JH, RL, or IT's musculoskeletal systems, despite the fact that – to the extent JH, RL, or IT had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(ix)   On March 7, 2017, DG Esthetic, Lima, and Formisano billed GEICO under CPT code 99203 for initial examinations that Formisano purported to perform on two Insureds named NR and MS, and thereby represented that they had provided "detailed" physical examinations to NR and MS. However, Formisano did not document an extended examination of NR or MS's musculoskeletal systems, despite the fact that – to the extent NR or MS had any complaints at all as the result of their automobile accident – they were limited to minor musculoskeletal complaints.

(x)     On September 28, 2017, DG Esthetic, Lima, and Formisano billed GEICO under CPT code 99203 for an initial examination that Formisano purported to perform on an Insured named CR, and thereby represented that they had provided a "detailed" physical examination to CR. However, Formisano did not document an extended examination of CR's musculoskeletal system, despite the fact that – to the extent CR had any complaints at all as the result of her automobile accident – they were limited to minor musculoskeletal complaints.

431.    These are only representative examples. In all of the claims for initial examinations under CPT code 99203 that are identified in Exhibit "2", DG Esthetic, Lima, and Formisano falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because Formisano had not documented an extended examination of the affected body areas and other symptomatic or related organ systems.

432.    In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "2", DG Esthetic, Lima, and Formisano falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" physical examinations.

**d.      Misrepresentations Regarding the Extent of Medical Decision-Making**

433.    Furthermore, and as set forth above, pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician who performed the examination engaged in "low complexity" medical decision-making.

434.    In addition, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and

other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

435.    As set forth above, and in Exhibit "2", DG Esthetic, Lima, and Formisano billed for all of their putative initial patient examinations using CPT code 99203, and thereby represented that Formisano engaged in some genuine, low-complexity medical decision-making during the initial examinations.

436.    In actuality, however, the purported initial examinations did not involve any legitimate medical decision-making at all.

437.    First, in DG Esthetic, Lima, and Formisano's claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information.

438.    When the Insureds in the claims identified in Exhibit "2" presented to DG Esthetic for "treatment", they did not arrive with any medical records.

439.    Furthermore, prior to the initial examinations, DG Esthetic neither requested any medical records from any other providers, nor conducted any complex diagnostic tests beyond the basic range of motion and muscle strength testing that is attendant to any physical examination.

440.    Second, in DG Esthetic, Lima, and Formisano's claims for initial examinations identified in Exhibit "2",  there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

441.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the DG Esthetic Defendants, to the extent that the DG Esthetic Defendants provided any such diagnostic procedures or treatment options in the first instance.

442.    In virtually every one of the claims identified in Exhibit "2", any diagnostic procedures and "treatments" that the DG Esthetic Defendants actually provided were limited to a series of medically unnecessary follow-up examinations and physical therapy treatments, none of which was health- or life-threatening if properly administered.

443.    Third, in DG Esthetic, Lima, and Formisano's claims for initial examinations identified in Exhibit "2", Formisano did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

444.    Rather, to the extent that the initial examinations were conducted in the first instance, DG Esthetic and Formisano – at the direction of Lima – provided a nearly identical, pre-determined "diagnosis" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

445.    Specifically, in almost every instance in the claims identified in Exhibit "2", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

446.    Even so, DG Esthetic, Lima, and Formisano prepared initial examination reports in which they provided phony, boilerplate sprain/strain "diagnoses" to virtually every Insured.

447.    Then, based upon these phony "diagnoses", DG Esthetic, Lima, and Formisano directed virtually every Insured to return to DG Esthetic five times each week for medically unnecessary physical therapy during the first three weeks of "treatment".

448.    As set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

449.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

450.    As set forth above, in the claims identified in Exhibit "2", virtually all of the Insureds whom the DG Esthetic Defendants purported to treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

451.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "2" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

452.    It is even more improbable – to the point of impossibility – that this would occur over and over again.

453.    It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "2" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, requiring a substantially identical course of treatment, on the exact same date after their underlying automobile accident.

454.    Even so, in keeping with the fact that these putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, DG Esthetic and Formisano – at the direction of Lima – frequently issued substantially identical, phony "diagnoses", on the same date, to more than one Insured involved

in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

455.   For example:

(i)   On May 29, 2014, two Insureds – IN and MN – were involved in the same automobile accident. Thereafter – incredibly – both IN and MN presented at DG Esthetic for initial examinations by Formisano on the <u>exact same date</u>, June 4, 2014. IN and MN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that IN and MN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DG Esthetic and Formisano – at the direction of Lima – provided IN and MN with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them. What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that DG Esthetic and Formisano provided to IN and MN were pre-determined and phony, DG Esthetic and Formisano stopped treating IN and MN on the same date, August 25, 2014. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the three months when they purportedly were treating at DG Esthetic.

(ii)   On September 10, 2014, two Insureds – GB and DN – were involved in the same automobile accident. Thereafter – incredibly – both GB and DN presented at DG Esthetic for initial examinations by Formisano on the <u>exact same date</u>, September 18, 2014. GB and DN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that GB and DN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DG Esthetic and Formisano – at the direction of Lima – provided GB and DN with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them. What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that DG Esthetic and Formisano provided to GB and DN were pre-determined and phony, DG Esthetic and Formisano stopped treating GB and DN on the same date, January 6, 2015. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the four months when they purportedly were treating at DG Esthetic.

(iii)   On December 10, 2015, two Insureds – MB and AT – were involved in the same automobile accident. Thereafter – incredibly – both MB and AT presented at DG Esthetic for initial examinations by Formisano on the <u>exact same date</u>, December 17, 2015. MB and AT were different ages, in different physical conditions,

located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MB and AT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DG Esthetic and Formisano – at the direction of Lima – provided MB and AT with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(iv)     On June 16, 2016, two Insureds – GM and AV – were involved in the same automobile accident. Thereafter – incredibly – both GM and AV presented at DG Esthetic for initial examinations by Formisano on the <u>exact same date</u>, June 28, 2016. GM and AV were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that GM and AV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DG Esthetic and Formisano – at the direction of Lima – provided GM and AV with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(v)      On August 5, 2016, two Insureds – AP and CP – were involved in the same automobile accident. Thereafter – incredibly – both AP and CP presented at DG Esthetic for initial examinations by Formisano on the <u>exact same date</u>, August 8, 2016. AP and CP were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AP and CP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DG Esthetic and Formisano – at the direction of Lima – provided AP and CP with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(vi)     On November 7, 2016, two Insureds – JD and JG – were involved in the same automobile accident. Thereafter – incredibly – both JD and JG presented at DG Esthetic for initial examinations by Formisano on the <u>exact same date</u>, November 17, 2016. JD and JG were different sexes, different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JD and JG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DG Esthetic and Formisano – at the direction of Lima – provided JD and JG with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them. What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that DG Esthetic and Formisano provided to JD and JG were pre-determined and phony, DG Esthetic and Formisano stopped treating JD and

JG on the <u>exact same date</u>, February 14, 2017. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the three-and-a-half months when they purportedly were treating at DG Esthetic.

(vii)   On November 22, 2016, <u>three</u> Insureds – KF, YM, and MV – were involved in the same automobile accident. Thereafter – incredibly – KF, YM, and MV all presented at DG Esthetic for initial examinations by Formisano on the <u>exact same date</u>, November 23, 2016. KF, YM, and MV were different sexes, different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that KF, YM, and MV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DG Esthetic and Formisano – at the direction of Lima – provided KF, YM, and MV with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all three of them.

(viii)   On December 4, 2016, <u>three</u> Insureds – JH, RL, and IT – were involved in the same automobile accident. Thereafter – incredibly – JH, RL, and IT all presented at DG Esthetic for initial examinations by Formisano on the <u>exact same date</u>, December 5, 2016. JH, RL, and IT were different sexes, different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JH, RL, and IT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DG Esthetic and Formisano – at the direction of Lima – provided JH, RL, and IT with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all three of them.

(ix)   On March 6, 2017, two Insureds – NR and MS – were involved in the same automobile accident. Thereafter – incredibly – both NR and MS presented at DG Esthetic for initial examinations by Formisano on the <u>exact same date</u>, March 7, 2017. NR and MS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that NR and MS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DG Esthetic and Formisano – at the direction of Lima – provided NR and MS with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(x)   On September 29, 2017, two Insureds – LG and AG – were involved in the same automobile accident. Thereafter – incredibly – both LG and AG presented at DG Esthetic for initial examinations by Formisano on the <u>exact same date</u>, October 2,

2017. LG and AG were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LG and AG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, DG Esthetic and Formisano – at the direction of Lima – provided LG and AG with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

456.    DG Esthetic, Lima, and Formisano routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the DG Esthetic Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

457.    In keeping with the fact that DG Esthetic, Lima, and Formisano routinely inserted false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, for virtually every one of the Insureds in the claims identified in Exhibit "2", DG Esthetic and Formisano – at the direction of Lima – diagnosed the Insureds with virtually identical neck and back injuries, and inserted into virtually every initial examination report the following language: "[t]his is a medical emergency condition! The patient is experiencing excruciating pain and discomfort!"

458.    It is extremely improbable that virtually every one of the Insureds in the claims identified in Exhibit "2" would – during their initial examinations – report the same "excruciating" levels of accident-related pain in their neck, back, or extremities.

459.    It is even more improbable – to the point of impossibility – that this would occur over and over again, in the context of minor automobile accidents that could not possibly have caused such severe levels of pain.

460.     DG Esthetic, Lima, and Formisano inserted this false information in their initial examination reports despite the fact that the minor underlying accidents did not and could not possibly have caused such consistent, high levels of pain in the Insureds, much less to more than one Insured involved in a single accident.

461.     For example:

(i)      On January 16, 2015, an Insured named RM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that RM's vehicle suffered only minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that RM was not seriously injured in the minor accident, RM did not visit any hospital following the accident. To the extent that RM suffered any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of RM by Formisano on January 29, 2015, DG Esthetic and Formisano – at Lima's direction – falsely reported that RM was suffering from "excruciating pain and discomfort" and that his condition constituted an "medical emergency condition".

(ii)     On June 25, 2015, an Insured named JR was involved in a minor automobile accident. The contemporaneous police report indicated that JR's vehicle was functional following the accident, and that JR was not injured in the accident. In keeping with the fact that JR was not seriously injured in the minor accident, JR did not visit any hospital following the accident. To the extent that JR suffered any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of JR by Formisano on July 2, 2015, DG Esthetic and Formisano – at Lima's direction – falsely reported that JR was suffering from "excruciating pain and … discomfort" and that his condition constituted an "medical emergency condition".

(iii)    On December 19, 2015, an Insured named LH was involved in a minor automobile accident. The contemporaneous police report indicated that LH's vehicle was functional following the accident, and that LH was not injured in the accident. In keeping with the fact that LH was not seriously injured in the minor accident, LH did not visit any hospital following the accident. To the extent that LH suffered any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of LH by Formisano on December 21, 2015, DG Esthetic and Formisano – at Lima's direction – falsely reported that LH was suffering from "excruciating pain and … discomfort" and that his condition constituted an "medical emergency condition".

(iv)     On January 19, 2016, an Insured named YL was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a

low-speed, low-impact collision, that YL's vehicle suffered only minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that YL was not seriously injured in the minor accident, YL did not visit any hospital following the accident. To the extent that YL suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of YL by Formisano on January 21, 2016, DG Esthetic and Formisano – at Lima's direction – falsely reported that YL was suffering from "excruciating pain and discomfort" and that her condition constituted an "medical emergency condition".

(v)     On July 22, 2016, an Insured named RA was involved in a minor automobile accident. The contemporaneous police report indicated that no one was injured in the accident. In keeping with the fact that RA was not seriously injured in the minor accident, RA did not visit any hospital following the accident. To the extent that RA suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of RA by Formisano on August 1, 2016, DG Esthetic and Formisano – at Lima's direction – falsely reported that RA was suffering from "excruciating pain and discomfort" and that her condition constituted an "medical emergency condition".

(vi)    On October 13, 2016, an Insured named KL was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that KL's vehicle was functional following the accident, and that no one was injured in the accident. In keeping with the fact that KL was not seriously injured in the minor accident, KL did not visit any hospital following the accident. To the extent that KL suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of KL by Formisano on October 17, 2016, DG Esthetic and Formisano – at Lima's direction – falsely reported that KL was suffering from "excruciating pain and discomfort" and that her condition constituted an "medical emergency condition".

(vii)   On November 22, 2016, an Insured named MV was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that MV's vehicle suffered only minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that MV was not seriously injured in the minor accident, MV did not visit any hospital following the accident. To the extent that MV suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of MV by Formisano on November 23, 2016, DG Esthetic and Formisano – at Lima's direction – falsely reported that MV was suffering from "excruciating pain and discomfort" and that her condition constituted an "medical emergency condition".

(viii)  On November 26, 2016, an Insured named AV was involved in a minor automobile accident. The contemporaneous police report indicated that the

accident was a low-speed, low-impact collision, that AV's vehicle was functional following the accident, and that no one was injured in the accident. In keeping with the fact that AV was not seriously injured in the minor accident, AV did not visit any hospital following the accident. To the extent that AV suffered any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of AV by Formisano on November 28, 2016, DG Esthetic and Formisano – at Lima's direction – falsely reported that AV was suffering from "excruciating pain and discomfort" and that his condition constituted an "medical emergency condition".

(ix)    On December 4, 2016, an Insured named JH was involved in a minor automobile accident. The contemporaneous police report indicated that JH's vehicle was functional following the accident, and that JH was not injured in the accident. In keeping with the fact that JH was not seriously injured in the minor accident, JH did not visit any hospital following the accident. To the extent that JH suffered any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial examination of JH by Formisano on December 5, 2016, DG Esthetic and Formisano – at Lima's direction – falsely reported that JH was suffering from "excruciating pain and discomfort" and that his condition constituted an "medical emergency condition".

(x)    On April 14, 2017, an Insured named AL was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that AL's vehicle was functional the accident, and that no one was injured in the accident. In keeping with the fact that AL was not seriously injured in the minor accident, AL did not visit any hospital following the accident. To the extent that AL suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of AL by Formisano on April 17, 2017, DG Esthetic and Formisano – at Lima's direction – falsely reported that AL was suffering from "excruciating pain and discomfort" and that his condition constituted an "medical emergency condition".

462.    These are only representative examples. In virtually every claim for initial examinations identified in Exhibit "2", DG Esthetic, Lima, and Formisano falsely reported that the Insureds suffered from the same severe pain in their neck, back, and extremities, that it was a "medical emergency condition!", and that the Insureds were experiencing "excruciating pain and discomfort".

463.    DG Esthetic, Lima, and Formisano routinely inserted this false information in their initial examination reports in order to create the false impression that the initial

examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the DG Esthetic Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

464.    To the extent that the Insureds in the claims identified in Exhibit "2" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary sprains or strains of the back, neck, or extremities.

465.    The diagnosis and treatment of these ordinary sprains and strains did not require any "low complexity" medical decision-making on the part of Formisano or anyone else.

466.    To the contrary, and as set forth above, Formisano did not engage in any legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibit "2", because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the laundry-list of other Fraudulent Services that the DG Esthetic Defendants purported to provide.

467.    In the claims for initial examinations identified in Exhibit "2", DG Esthetic, Lima, and Formisano routinely falsely represented that the initial examinations involved medical decision-making of low complexity in order to provide a false basis to bill for the initial examinations under CPT code 99203, because CPT code 99203 is reimbursable at a higher rate than examinations that do not require low complexity medical decision-making.

468.    In the claims for initial examinations identified in Exhibit "2", DG Esthetic, Lima, and Formisano routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentment;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   DG Esthetic never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

469.    In this context, Formisano – who at all relevant times purported to serve as the "medical director" at DG Esthetic – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

470.    Had Formisano actually fulfilled his statutory role as medical director at DG Esthetic, he would have noted – among other things – that the DG Esthetic Defendants routinely fraudulently represented in DG Esthetic's billing that the putative initial examinations were legitimately and lawfully performed.

471.    Formisano failed to do so, because he never actually served as a legitimate medical director at DG Esthetic in the first instance.

**(ii)    The Fraudulent Charges for Follow-Up Examinations at DG Esthetic**

472.    In addition to their fraudulent initial examinations, DG Esthetic, Lima, and Formisano virtually always purported to subject each of the Insureds in the claims identified in Exhibit "2" to multiple, fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

473.    Formisano purported to personally perform virtually all of the follow-up examinations in the claims identified in Exhibit "2".

474.     As set forth in Exhibit "2", DG Esthetic, Lima, and Formisano then billed the follow-up examinations to GEICO under: (i) CPT code 99213, virtually always resulting in charges of either $160.00 or $200.00 for each follow-up examination they purported to provide; or (ii) CPT code 99214, virtually always resulting in charges of either $235.00 or $250.00 for reach follow-up examination they purported to provide.

475.     In the claims for follow-up examinations identified in Exhibit "2", the charges for the follow-up examinations were fraudulent in that they misrepresented DG Esthetic's eligibility to collect PIP Benefits in the first instance.

476.     In fact, and as set forth above, DG Esthetic never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing requirements set forth in the Clinic Act.

477.     As set forth below, DG Esthetic, Lima, and Formisano's charges for the follow-up examinations identified in Exhibit "2" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

478.     As set forth above, pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

479.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

480.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)     Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)   Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii)  Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

481.    Accordingly, and as set forth above, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

482.     As set forth above, pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

483.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

484.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)     Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

485.     Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

486.   By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "2" suffered any injuries at all in their minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

487.   In keeping with the fact that the Insureds in the claims identified in Exhibit "2" almost never suffered any injuries more serious than garden-variety soft tissue injuries such as sprains and strains, in the vast majority of the claims identified in Exhibit "2" the Insureds did not seek treatment at any hospital as the result of their accidents.

488.   To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

489.   Furthermore, in the substantial majority of cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

490.   As set forth above, ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

491.   By the time the Insureds in the claims identified in Exhibit "2" presented at DG Esthetic for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

492.    Even so, in the claims for follow-up examinations identified in Exhibit "2", DG Esthetic, Lima, and Formisano routinely billed for their putative follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of either low to moderate severity or moderate to high severity.

493.    For example:

(i)    On May 29, 2014, an Insured named IN was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that IN was not seriously injured in the minor accident, IN did not visit any hospital following the accident. To the extent that IN suffered any health problems at all as the result of her minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of IN on July 30, 2014 and August 25, 2014, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that IN presented with problems of low to moderate severity. In keeping with the fact that IN had no presenting problems of low to moderate severity, DG Esthetic and Formisano actually stopped treating IN after the purported August 25, 2014 follow-up examination.

(ii)    On January 16, 2015, an Insured named RM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that RM's vehicle suffered only minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that RM was not seriously injured in the minor accident, RM did not visit any hospital following the accident. To the extent that RM suffered any health problems at all as the result of his minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of RM on February 27, 2015 and April 16, 2015, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that RM presented with problems of low to moderate severity. Then, following a purported follow-up examination of RM on May 12, 2015, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that RM presented with problems of moderate to high severity, despite the fact that they previously had represented that RM's presenting problems were of low to moderate severity, and that his condition had improved over the course of treatment. In keeping with the fact that RM had no presenting problems of low to moderate severity, or moderate to high severity, DG Esthetic and Formisano actually stopped treating RM after the purported May 12,2015 follow-up examination.

(iii)     On June 25, 2015, an Insured named JR was involved in a minor automobile accident. The contemporaneous police report indicated that JR's vehicle was functional following the accident, and that JR was not injured in the accident. In keeping with the fact that JR was not seriously injured in the minor accident, JR did not visit any hospital following the accident. To the extent that JR suffered any health problems at all as the result of his minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of JR on July 22, 2015 and August 24, 2015, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that JR presented with problems of low to moderate severity. Then, following a purported follow-up examination of JR on September 4, 2015, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that JR presented with problems of moderate to high severity, despite the fact that they previously had represented that JR's presenting problems were of low to moderate severity, and that his condition had improved over the course of treatment. In keeping with the fact that JR had no presenting problems of low to moderate severity, or moderate to high severity, DG Esthetic and Formisano actually stopped treating JR after the purported September 4, 2015 follow-up examination.

(iv)     On January 19, 2016, an Insured named YL was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that YL's vehicle suffered only minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that YL was not seriously injured in the minor accident, YL did not visit any hospital following the accident. To the extent that YL suffered any health problems at all as the result of her minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of YL on March 4, 2016, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that YL presented with problems of low to moderate severity.

(v)     On July 22, 2016, an Insured named RA was involved in a minor automobile accident. The contemporaneous police report indicated that no one was injured in the accident. In keeping with the fact that RA was not seriously injured in the minor accident, RA did not visit any hospital following the accident. To the extent that RA suffered any health problems at all as the result of her minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of RA on August 18, 2016 and September 9, 2016, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examinatiosn using CPT code 99213 and thereby falsely represented that RA presented with problems of low to moderate severity.

146

(vi)     On October 13, 2016, an Insured named KL was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that KL's vehicle was functional following the accident, and that no one was injured in the accident. In keeping with the fact that KL was not seriously injured in the minor accident, KL did not visit any hospital following the accident. To the extent that KL suffered any health problems at all as the result of her minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of KL on December 28, 2016 and February 28, 2017, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that KL presented with problems of low to moderate severity. Then, following a purported follow-up examination of KL on April 5, 2017, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that KL presented with problems of moderate to high severity, despite the fact that they previously had represented that KL's presenting problems were of low to moderate severity, and that her condition had improved over the course of treatment. In keeping with the fact that KL had no presenting problems of low to moderate severity, or moderate to high severity, DG Esthetic and Formisano actually stopped treating KL after the purported April 5, 2017 follow-up examination.

(vii)    On November 22, 2016, an Insured named MV was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that MV's vehicle suffered only minor damage in the accident, and that no one was injured in the accident. In keeping with the fact that MV was not seriously injured in the minor accident, MV did not visit any hospital following the accident. To the extent that MV suffered any health problems at all as the result of her minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of MV on December 14, 2016 and January 12, 2017, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that MV presented with problems of low to moderate severity. Then, following a purported follow-up examination of MV on March 8, 2017, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that MV presented with problems of moderate to high severity, despite the fact that they previously had represented that MV's presenting problems were of low to moderate severity, and that her condition had improved over the course of treatment. In keeping with the fact that MV had no presenting problems of low to moderate severity, or moderate to high severity, DG Esthetic and Formisano actually stopped treating MV after the purported March 8, 2017 follow-up examination.

(viii)   On November 26, 2016, an Insured named AV was involved in a minor automobile accident. The contemporaneous police report indicated that the

147

accident was a low-speed, low-impact collision, that AV's vehicle was functional following the accident, and that no one was injured in the accident. In keeping with the fact that AV was not seriously injured in the minor accident, AV did not visit any hospital following the accident. To the extent that AV suffered any health problems at all as the result of his minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of AV on December 21, 2016 and January 18, 2017, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that AV presented with problems of low to moderate severity. Then, following a purported follow-up examination of AV on February 15, 2017, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that AV presented with problems of moderate to high severity, despite the fact that they previously had represented that AV's presenting problems were of low to moderate severity, and that his condition had improved over the course of treatment. In keeping with the fact that AV had no presenting problems of low to moderate severity, or moderate to high severity, DG Esthetic and Formisano actually stopped treating AV after the purported February 15, 2017 follow-up examination.

(ix)    On December 4, 2016, an Insured named JH was involved in a minor automobile accident. The contemporaneous police report indicated that JH's vehicle was functional following the accident, and that JH was not injured in the accident. In keeping with the fact that JH was not seriously injured in the minor accident, JH did not visit any hospital following the accident. To the extent that JH suffered any health problems at all as the result of his minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of JH on December 30, 2016, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that JH presented with problems of low to moderate severity.

(x)    On April 14, 2017, an Insured named AL was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that AL's vehicle was functional the accident, and that no one was injured in the accident. In keeping with the fact that AL was not seriously injured in the minor accident, AL did not visit any hospital following the accident. To the extent that AL suffered any health problems at all as the result of her minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of AL on May 4, 2017 and June 9, 2017, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that AL presented with problems of low to moderate severity. Then, following a purported follow-up examination of AL on June 22, 2017, DG Esthetic, Lima, and Formisano billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that AL

presented with problems of moderate to high severity, despite the fact that they previously had represented that AL's presenting problems were of low to moderate severity, and that his condition had improved over the course of treatment. In keeping with the fact that AL had no presenting problems of low to moderate severity, or moderate to high severity, DG Esthetic and Formisano actually stopped treating AL after the purported June 22, 2017 follow-up examination.

494.     These are only representative examples. In all of the claims for follow-up examinations identified in Exhibit "2", DG Esthetic, Lima, and Formisano falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

495.     In the claims for follow-up examinations identified in Exhibit "2", DG Esthetic, Lima, and Formisano routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99213 and 99214, because follow-up examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

496.     In the claims for follow-up examinations identified in Exhibit "2", DG Esthetic, Lima, and Formisano also routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional, medically unnecessary follow-up examinations and physical therapy.

b.      **Misrepresentations Regarding the Results of the Follow-Up Examinations**

497.    What is more, pursuant to the CPT Assistant, when DG Esthetic, Lima, and Formisano billed for their putative follow-up examinations under CPT code 99214, they represented that Formisano performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

498.    Similarly, pursuant to the CPT Assistant, when DG Esthetic, Lima, and Formisano billed for their putative follow-up examinations under CPT code 99213, they represented that Formisano performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

499.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "2", Formisano did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

500.    Rather, following their purported follow-up examinations, DG Esthetic and Formisano – at the direction of Lima – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either  (ii) referred the Insureds back to DG Esthetic for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services from DG Esthetic that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

501.    In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentment, DG Esthetic and Formisano – at the direction of Lima – recommended a substantially identical course of medically unnecessary "treatment" to virtually every one of the Insureds identified in Exhibit "2", irrespective of the Insureds' actual presenting problems, to the extent the Insureds suffered any legitimate injuries at all.

502.    Specifically, DG Esthetic and Formisano – at the direction of Lima – directed virtually every Insured to receive two to four months of purported "physical therapy" treatments, typically consisting of daily physical therapy for the first three weeks of treatment, followed by physical therapy four times per week for the subsequent four weeks, followed by physical therapy three times a week for the final four weeks.

503.    In addition, DG Esthetic and Formisano – at the direction of Lima – directed virtually every Insured to receive substantially identical types of physical therapy services, including: (i) cold/hot packs; (ii) therapeutic exercises and activities; (iii) mechanical traction; (iv) paraffin baths; (v) infrared treatment; (vi) contrast baths; (vii) ultrasound; (viii) neuromuscular reeducation; and (ix) massage. See Exhibit "2".

504.    As set forth above, in a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentment.

505.    In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

506.    By contrast, at DG Esthetic, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentment, or progress through the Defendants' fraudulent treatment and billing protocol.

507.    The phony "follow-up examinations" that DG Esthetic, Lima, and Formisano purported to provide the Insureds in the claims identified in Exhibit "2" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into DG Esthetic's offices.

508.    In the claims for follow-up examinations identified in Exhibit "2", DG Esthetic, Lima, and Formisano routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentment;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   DG Esthetic never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

509.    In this context, Formisano – who at all relevant times purported to serve as the "medical director" at DG Esthetic – did not, and could not have, "[c]onduct[ed] systematic

reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

510.    Had Formisano actually fulfilled his statutory role as medical director at DG Esthetic, he would have noted – among other things – that the DG Esthetic Defendants routinely fraudulently represented in DG Esthetic's billing that the putative follow-up examinations were legitimately and lawfully performed and billed.

511.    Formisano failed to do so, because he never actually served as a legitimate medical director at DG Esthetic in the first instance.

**(iii)    The Fraudulent Charges for Physical Therapy at DG Esthetic**

512.    In addition to the fraudulent initial examinations and follow-up examinations, the DG Esthetic Defendants virtually always purported to subject each of the Insureds in the claims identified in Exhibit "2" to between two and four months of medically unnecessary physical therapy.

513.    As set forth above, though Formisano falsely purported to personally perform virtually all of the physical therapy services in the claims identified in Exhibit "2", the physical therapy services actually were performed by Mejias or other massage therapists associated with DG Esthetic, to the extent that they were even provided at all.

514.    As set forth in Exhibit "2", the DG Esthetic Defendants then billed the purported physical therapy services to GEICO under:

(i)     CPT code 97010 for putative hot/cold/compression treatments, resulting in a charge of $12.00 for each round of hot/cold/compression treatments they purported to provide;

(ii)    CPT code 97012, for putative mechanical traction therapy, resulting in a charge of either $35.00 or $40.00 for each round of mechanical traction therapy they purported to provide

(iii)     CPT code 97018, for putative paraffin bath therapy, resulting in a charge of $60.00 for each round of paraffin bath therapy they purported to provide;

(iv)     HCPCS code G0283, for putative electrical stimulation, resulting in a charge of $30.00 for each round of electrical stimulation they purported to provide;

(v)     CPT code 97034, for putative contrast bath therapy, resulting in a charge of $70.00 for each round of contrast bath therapy they purported to provide;

(vi)     CPT code 97035, for putative ultrasound, resulting in a charge of $30.00 for each round of ultrasound they purported to provide;

(vii)     CPT code 97026, for putative infrared treatment, resulting in a charge of $60.00 for each round of infrared treatment they purported to provide;

(viii)     CPT code 97110, for putative therapeutic exercises, resulting in a charge of either $70.00 or $75.00 for each round of therapeutic exercises they purported to provide;

(ix)     CPT code 97112, for putative neuromuscular reeducation, resulting in a charge of $65.00 for each round of neuromuscular reeducation they purported to provide;

(x)     CPT code 97140, for putative manual therapy, resulting in a charge of $65.00 for each round of manual therapy they purported to provide;

(xi)     CPT code 97530, for putative therapeutic activity, resulting in a charge of $65.00 for each round of therapeutic activity they purported to provide; and

(xii)     CPT code 97535 for putative self-care management training, resulting in a charge of $70.00 for each round of training they purported to provide.

515.     In the claims for physical therapy services identified in Exhibit "2", the charges for the physical therapy services were fraudulent in that they misrepresented DG Esthetic's eligibility to collect PIP Benefits in the first instance.

516.     In fact, and as set forth above, DG Esthetic never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

517.     What is more, and as set forth above, in the claims for physical therapy services identified in Exhibit "2", the DG Esthetic Defendants falsely represented that the physical

therapy services lawfully had been performed by Formisano, when in fact they were unlawfully performed by Mejias or other massage therapists associated with DG Esthetic, who are not and never have been licensed as physical therapists.

518.    Additionally, neither Mejias, nor any of the other massage therapists associated with DG Esthetic, were directly supervised by Formisano, or by any other licensed physician associated with DG Esthetic, when performing the physical therapy services identified in Exhibit "2".

519.    As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

520.    However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

521.    What is more, pursuant to Florida law, massage therapists cannot lawfully perform physical therapy services unless they also are licensed as physical therapists. See Fla. Stat. § 486.028.

522.    As a result, beginning in late 2013, the DG Esthetic Defendants falsely listed Formisano as the treating provider on almost every single bill for almost every single service that they purported to provide through DG Esthetic, including almost every individual physical therapy service that was billed through DG Esthetic to GEICO.

523.     In fact, and as set forth above, Formisano did not perform any of the physical therapy services that were billed through DG Esthetic to GEICO and other insurers, including but not limited to the services billed through DG Esthetic between late 2013 and the present.

524.     Formisano was approximately 70 years old in 2014, approximately 71 years old in 2015, approximately 72 years old in 2016, approximately 73 years old in 2017, and was advanced in age during this period.

525.     What is more, and as set forth above, during his putative service as the phony "medical director" at DG Esthetic, Formisano simultaneously was purporting to serve as "medical director" at a host of other clinics, including Beacon, Delta, DA Health, Alternative Medical, and Omega Therapy, and was purporting to treat patients at numerous other practices, as well.

526.     Formisano could not physically have performed, or even supervised, the massive number of physical therapy services that were billed through DG Esthetic to GEICO since late 2013.

527.     Even so, the DG Esthetic Defendants routinely falsely represented in the billing they submitted through DG Esthetic to GEICO for physical therapy services after late 2013 that Formisano personally performed the underlying physical therapy services, when in fact the services unlawfully had been performed by Mejias or other unsupervised massage therapists associated with DG Esthetic, to the extent that they were performed at all.

528.     As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

529.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state

and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

530.    In each of the claims for physical therapy services identified in Exhibit "2", the DG Esthetic Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

531.    In fact, in the claims for physical therapy services identified in Exhibit "2", the services were not lawfully provided, inasmuch as: (i) the putative physical therapy services were performed – to the extent that they were performed at all – by Mejias or other unsupervised massage therapists associated with DG Esthetic, who were individuals who were not licensed to practice physical therapy; and (ii) the DG Esthetic Defendants deliberately misrepresented the identities of the individuals who purported to perform the physical therapy services in their billing for the physical therapy services, in a calculated attempt to induce GEICO to pay the unreimbursable charges.

**3.    The Beacon Defendants' Fraudulent Treatment and Billing Protocol**

**(i)    The Fraudulent Charges for Initial Examinations at Beacon**

532.    As an initial step in the Beacon Defendants' fraudulent treatment and billing protocol, Beacon, Herrera, and Formisano purported to provide each of the Insureds in the claims identified in Exhibit "3" with a putative initial examination.

533.    As was the case at DA Health and DG Esthetic, Formisano purported to personally perform virtually all of the initial examinations at Beacon in the claims identified in Exhibit "3".

534.    As set forth in Exhibit "3", Beacon, Herrera, and Formisano then billed the initial examinations to GEICO, or caused them to be billed to GEICO, under CPT code 99204,

resulting in charges of either $450.00 or $500.00 for each initial examination that they purported to provide.

535.     In the claims for initial examinations identified in Exhibit "3", the charges for the initial examinations were fraudulent in that they misrepresented Beacon's eligibility to collect PIP Benefits in the first instance.

536.     In fact, and as set forth above, Beacon never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

537.     As set forth below, the charges for the initial examinations identified in Exhibit "3" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

538.     As set forth above, the No-Fault Law's billing requirements provide that all PIP billing must – among other things – comply with the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology, or CPT, codes. See Fla. Stat. § 627.736.

539.     The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

540.     Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the Insured presented with problems of moderate to high severity.

541.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 to bill for an initial patient examination.

542.    Specifically, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

543.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health.

544.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "3" had any presenting problems at all as the result of their minor automobile accidents, the problems were low severity soft tissue injuries such as sprains and strains.

545.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "3" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, in the claims identified in Exhibit "3" the Insureds did not seek treatment at any hospital as the result of their accidents.

546.    Furthermore, to the extent that police reports existed with respect to the claims identified in Exhibit "3", the contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were functional following the accidents, and that no one was injured in the accidents.

547.    Even so, in the claims for initial examinations identified in Exhibit "3", Beacon, Herrera, and Formisano routinely billed for their putative initial examinations using CPT code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

548.    For example:

(i)      On January 25, 2017, an Insured named MB was involved in an automobile accident. In keeping with the fact that MB was not seriously injured in the accident, MB did not visit any hospital following the accident, and did not seek any treatment of any kind for a week after the accident. To the extent that MB suffered any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of MB by Formisano on February 1, 2017, Beacon, Herrera, and Formisano billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MB presented with moderately to highly severe health problems as the result of his accident.

(ii)     On May 19, 2017, an Insured named HF was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that HF's vehicle was functional following the accident, and that no one was injured in the accident. In keeping with the fact that HF was not seriously injured in the accident, HF did not visit any hospital following the accident. To the extent that HF suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of HF by Formisano on May 25, 2017, Beacon, Herrera, and Formisano billed GEICO for the initial examination using CPT code

99204, and thereby falsely represented that HF presented with moderately to highly severe health problems as the result of her minor accident.

(iii)   On June 2, 2017, an Insured named DM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that DM was not seriously injured in the accident, DM did not visit any hospital following the accident. To the extent that DM suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of DM by Formisano on June 5, 2017, Beacon, Herrera, and Formisano billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that DM presented with moderately to highly severe health problems as the result of her minor accident.

(iv)   On June 2, 2017, an Insured named RA was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that RA was not seriously injured in the accident, RA did not visit any hospital following the accident. To the extent that RA suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of RA by Formisano on June 5, 2017, Beacon, Herrera, and Formisano billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that RA presented with moderately to highly severe health problems as the result of her minor accident.

549.   In all of the claims for initial examinations identified in Exhibit "3", Beacon, Herrera, and Formisano falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

550.   In the claims for initial examinations identified in Exhibit "3", Beacon, Herrera, and Formisano routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

161

551.    In the claims for initial examinations identified in Exhibit "3", Beacon, Herrera, and Formisano also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Beacon Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

552.    What is more, in every claim identified in Exhibit "3" for initial examinations under CPT code 99204, Beacon, Herrera, and Formisano misrepresented and exaggerated the amount of face-to-face time that the examining physician – purportedly Formisano – spent with the Insureds or the Insureds' families during the putative initial examination.

553.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination typically represents that the physician who conducted the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

554.    As set forth in Exhibit "3", Beacon, Herrera, and Formisano always billed for their putative initial examinations using CPT code 99204, and thereby represented that the physician who purported to conduct the examinations – namely Formisano – spent at least 45 minutes of face-to-face time with the Insureds or their families during the examinations.

555.    In fact, in the initial examinations identified in Exhibit "3", Formisano never spent even 15 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 45 minutes, to the extent that the examinations actually were conducted at all.

556.    Rather, in the purported initial examinations identified in Exhibit "3", the examinations rarely entailed more than 10 minutes of face-to-face time between Formisano, the

Insureds, or the Insureds' families, to the extent that they were provided at all.

557.    In keeping with the fact that the initial examinations in the claims identified in Exhibit "3" did not involve more than 10 minutes of face-to-face time between Formisano, the Insureds, or the Insureds' families – to the extent that they were provided at all – Formisano used pre-printed checklist forms in purporting to conduct the examinations at Beacon, just as he did at DA Health and DG Esthetic.

558.    All that was required to complete the pre-printed checklist forms was a brief patient interview and a perfunctory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, and basic range of motion and muscle strength testing.

559.    These interviews and examinations did not require Formisano to spend more than 10 minutes of face-to-face time with the Insureds during the putative initial examinations.

560.    Indeed, Formisano could not legitimately have personally spent at least 45 minutes of face-to-face time with the Insureds or their families during the initial examinations at Beacon, considering the massive amount of healthcare services he simultaneously was purporting to personally perform or directly supervise at numerous healthcare clinics and medical practices throughout the Miami area.

561.    For example:

(i)      On February 1, 2017, Beacon, Herrera, and Formisano billed GEICO under CPT code 99204 for an initial examination of an Insured named MB, and falsely represented that Formisano spent at least 45 minutes of face-to-face time with the Insured or his family during the examination. On that same date, Formisano purported to personally provide or directly supervise more than 22 hours of physical therapy services to 15 individual Insureds, from six different facilities, namely AMS Medical, Beacon, DA Health, DG Esthetic, Medical Rehab, and his solo practice, all of which were billed to GEICO.

(ii)     On May 25, 2017, Beacon, Herrera, and Formisano billed GEICO under CPT code 99204 for an initial examination of an Insured named HF, and falsely represented that Formisano spent at least 45 minutes of face-to-face time with the

Insured or her family during the examination. On that same date, Formisano purported to personally provide or directly supervise more than 18 hours of physical therapy services to 11 individual Insureds, from five different facilities, namely AMS Medical, Beacon, DA Health, DG Esthetic, and Medical Rehab, all of which were billed to GEICO.

(iii)     On June 5, 2017, Beacon, Herrera, and Formisano billed GEICO under CPT code 99204 for an initial examination of an Insured named RA, and falsely represented that Formisano spent at least 45 minutes of face-to-face time with the Insured or her family during the examination. On that same date, Formisano purported to personally provide or directly supervise more than 13 hours of physical therapy services to nine individual Insureds, from five different facilities, namely AMS Medical, Beacon, DA Health, DG Esthetic, and Genesis Medical, all of which were billed to GEICO.

(iv)     On June 5, 2017, Beacon, Herrera, and Formisano billed GEICO under CPT code 99204 for an initial examination of an Insured named DM, and falsely represented that Formisano spent at least 45 minutes of face-to-face time with the Insured or her family during the examination. On that same date, Formisano purported to personally provide or directly supervise more than 13 hours of physical therapy services to nine individual Insureds, from five different facilities, namely AMS Medical, Beacon, DA Health, DG Esthetic, and Genesis Medical, all of which were billed to GEICO.

562.     In the claims for initial examinations that are identified in Exhibit "3", Beacon, Herrera, and Formisano routinely falsely represented that Formisano had spent at least 45 minutes of face-to-face time with the Insureds or their families during the examinations, despite the fact that – on those same dates – Formisano also purported to personally perform a massive amount of physical therapy and other services to large numbers of Insureds at multiple locations throughout the Miami area.

563.     Beacon, Herrera, and Formisano routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT code 99204 are reimbursable at higher rates than examinations that take less time to perform.

**c.     Misrepresentations Regarding "Comprehensive" Physical Examinations**

564.    Moreover, in every claim identified in Exhibit "3" for initial examinations under CPT code 99204, Beacon, Herrera, and Formisano falsely represented the extent of the underlying physical examinations.

565.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination conducted a "comprehensive" physical examination.

566.    As set forth in Exhibit "3", Beacon, Herrera, and Formisano virtually always billed for their putative initial examinations using CPT code 99204, and thereby represented that the physician who purported to conduct the examinations – namely Formisano – conducted comprehensive physical examinations of the Insureds who purportedly received the examinations.

567.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

568.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

569.    The CPT Assistant recognizes the following organ systems:

(i)     constitutional symptoms (<u>e.g.</u>, fever, weight loss);

(ii)    eyes;

(iii)   ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

(vi)     gastrointestinal;

(vii)    genitourinary;

(viii)   musculoskeletal;

(ix)     integumentary (skin and/or breast);

(x)      neurological;

(xi)     psychiatric;

(xii)    endocrine;

(xiii)   hematologic/lymphatic; and

(xiv)    allergic/immunologic.

570.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

571.   In the claims for initial examinations identified in Exhibit "3", when Beacon, Herrera, and Formisano billed for the initial examinations under CPT code 99204, they falsely represented that Formisano performed "comprehensive" patient examinations on the Insureds he purported to treat during the initial examinations.

572.   In fact, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibit "3", Formisano never conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

573.   For instance, in each of the claims under CPT code 99204 identified in Exhibit "3", Formisano did not conduct any general examination of multiple patient organ systems, inasmuch as he did not document findings with respect to at least eight organ systems.

574.   Furthermore, although Formisano often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems in the claims for initial examinations identified in Exhibit "3", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)      the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(ii)     examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iii)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

167

(iv)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(v)    coordination, deep tendon reflexes, and sensation; and/or

(vi)    mental status, including orientation to time, place and person, as well as mood and affect.

575.    For example:

(i)    On February 1, 2017, Beacon, Herrera, and Formisano billed GEICO under CPT code 99204 for an initial examination of an Insured named MB, and thereby represented that they had provided a "comprehensive" physical examination to MB. However, Formisano did not document findings with respect to at least eight of MB's organ systems, nor did he document a "complete" examination of MB's musculoskeletal system or any of MB's other organ systems.

(v)    On May 25, 2017, Beacon, Herrera, and Formisano billed GEICO under CPT code 99204 for an initial examination of an Insured named HF, and thereby represented that they had provided a "comprehensive" physical examination to HF. However, Formisano did not document findings with respect to at least eight of HF's organ systems, nor did he document a "complete" examination of HF's musculoskeletal system or any of HF's other organ systems.

(vi)    On June 5, 2017, Beacon, Herrera, and Formisano billed GEICO under CPT code 99204 for an initial examination of an Insured named RA, and thereby represented that they had provided a "comprehensive" physical examination to RA. However, Formisano did not document findings with respect to at least eight of RA's organ systems, nor did he document a "complete" examination of RA's musculoskeletal system or any of RA's other organ systems.

(vii)    On June 5, 2017, Beacon, Herrera, and Formisano billed GEICO under CPT code 99204 for an initial examination of an Insured named DM, and thereby represented that they had provided a "comprehensive" physical examination to DM. However, Formisano did not document findings with respect to at least eight of DM's organ systems, nor did he document a "complete" examination of DM's musculoskeletal system or any of DM's other organ systems.

576.    In all of the claims for initial examinations under CPT code 99204 that are identified in Exhibit "3", Beacon, Herrera, and Formisano falsely represented that they had provided "comprehensive" physical examinations. In fact, they had not provided comprehensive

physical examinations because Formisano had not documented findings with respect to at least eight of the Insureds' organ systems, nor had he documented "complete" examinations of the Insureds' musculoskeletal systems or any of the Insureds' other organ systems.

577.    In the claims for initial examinations under CPT code 99204 that are identified in Exhibit "2", Beacon, Herrera, and Formisano falsely represented that they had provided "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations that do not require the examining physician to provide "comprehensive" physical examinations.

**d.    Misrepresentations Regarding the Extent of Medical Decision-Making**

578.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination engaged in "moderate complexity" medical decision-making.

579.    As set forth above, pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

580.    As set forth above, and in Exhibit "3", Beacon, Herrera, and Formisano billed for all of their putative initial patient examinations using CPT code 99204, and thereby represented

that Formisano engaged in some genuine, moderate-complexity medical decision-making during the initial examinations.

581.    In actuality, however, the purported initial examinations did not involve any legitimate medical decision-making at all.

582.    First, in Beacon, Herrera, and Formisano's claims for initial examinations identified in Exhibit "3", the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information.

583.    When the Insureds in the claims identified in Exhibit "3" presented to Beacon for "treatment", they did not arrive with any medical records.

584.    Furthermore, prior to the initial examinations, Beacon neither requested any medical records from any other providers, nor conducted any complex diagnostic tests beyond the basic range of motion and muscle strength testing that is attendant to any physical examination.

585.    Second, in Beacon, Herrera, and Formisano's claims for initial examinations identified in Exhibit "3",  there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

586.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Beacon Defendants, to the extent that the Beacon Defendants provided any such diagnostic procedures or treatment options in the first instance.

587.    In virtually every one of the claims identified in Exhibit "3", any diagnostic procedures and "treatments" that the Beacon Defendants actually provided were limited to a

series of medically unnecessary follow-up examinations and physical therapy treatments, none of which was health- or life-threatening if properly administered.

588.    Third, in Beacon, Herrera, and Formisano's claims for initial examinations identified in Exhibit "3", Formisano did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

589.    Rather, to the extent that the initial examinations were conducted in the first instance, Beacon and Formisano – at the direction of Herrera – provided a nearly identical, pre-determined "diagnosis" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

590.    Specifically, in the claims identified in Exhibit "3", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

591.    Even so, Beacon, Herrera, and Formisano prepared initial examination reports in which they provided phony, boilerplate sprain/strain "diagnoses" to virtually every Insured.

592.    Then, based upon these phony "diagnoses", Beacon, Herrera, and Formisano directed every Insured to return to Beacon five times each week for medically unnecessary physical therapy during the first three weeks of "treatment".

593.    As set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

594.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

595.    As set forth above, in the claims identified in Exhibit "3", virtually all of the Insureds whom the Beacon Defendants purported to treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

596.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "3" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

597.    It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "3" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, requiring a substantially identical course of treatment, on the exact same date after their underlying automobile accident.

598.    Even so, in keeping with the fact that these putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Beacon and Formisano – at the direction of Herrera –issued substantially identical, phony "diagnoses", on the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

599.    Specifically, on June 2, 2017, two Insureds – RA and DM – were involved in the same automobile accident. Thereafter – incredibly – both RA and DM presented at Beacon for initial examinations by Formisano on the <u>exact same date</u>, June 5, 2017.

600.    RA and DM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the

vehicle. To the extent that RA and DM suffered any injuries at all in their accident, the injuries were different.

601.    Even so, at the conclusion of the purported initial examinations, Beacon and Formisano – at the direction of Herrera – provided RA and DM with substantially identical sprain/strain "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

602.    What is more, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that Beacon and Formisano provided to RA and DM were pre-determined and phony, Beacon and Formisano stopped treating RA and DM on the same date, September 29, 2017. This, despite the fact that any injuries they actually did experience in their accident would have resolved differently over the four months when they purportedly were treating at Beacon.

603.    Beacon, Herrera, and Formisano routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Beacon Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

604.    In keeping with the fact that Beacon, Herrera, and Formisano routinely inserted false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, for every one of the Insureds in the claims identified in Exhibit "3", Beacon and Formisano – at the direction of Herrera – diagnosed the Insureds with virtually identical neck and back injuries, and inserted into virtually every initial examination report the following language: "[t]his is a medical emergency condition! The patient is experiencing excruciating pain and discomfort!"

605.    It is extremely improbable that every one of the Insureds in the claims identified in Exhibit "3" would – during their initial examinations – report the same "excruciating" levels of accident-related pain in their neck, back, or extremities.

606.    It is even more improbable – to the point of impossibility – that this would occur over and over again, in the context of minor automobile accidents that could not possibly have caused such severe levels of pain.

607.    Beacon, Herrera, and Formisano inserted this false information in their initial examination reports despite the fact that the minor underlying accidents did not and could not possibly have caused such consistent, high levels of pain in the Insureds, much less to more than one Insured involved in a single accident.

608.    For example:

(i)     On January 25, 2017, an Insured named MB was involved in an automobile accident. In keeping with the fact that MB was not seriously injured in the accident, MB did not visit any hospital following the accident, and did not seek any treatment of any kind for a week after the accident. To the extent that MB suffered any health problems at all as the result of his accident, they were of low severity. Even so, following a purported initial examination of MB by Formisano on February 1, 2017, Beacon and Formisano – at Herrera's direction – falsely reported that MB was suffering from "excruciating pain and discomfort" and that his condition constituted an "medical emergency condition".

(ii)    On May 19, 2017, an Insured named HF was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that HF's vehicle was functional following the accident, and that no one was injured in the accident. In keeping with the fact that HF was not seriously injured in the accident, HF did not visit any hospital following the accident. To the extent that HF suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of HF by Formisano on May 25, 2017, Beacon and Formisano – at Herrera's direction – falsely reported that HF was suffering from "excruciating pain and discomfort" and that her condition constituted an "medical emergency condition".

(iii)   On June 2, 2017, an Insured named DM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a

low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that DM was not seriously injured in the accident, DM did not visit any hospital following the accident. To the extent that DM suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of DM by Formisano on June 5, 2017, Beacon and Formisano – at Herrera's direction – falsely reported that DM was suffering from "excruciating pain and discomfort" and that her condition constituted an "medical emergency condition".

(iv)     On June 2, 2017, an Insured named RA was involved in the same minor automobile accident as DM. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that RA was not seriously injured in the accident, RA did not visit any hospital following the accident. To the extent that RA suffered any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial examination of RA by Formisano on June 5, 2017, Beacon and Formisano – at Herrera's direction – falsely reported that RA, like DM, who was involved the same accident, was suffering from "excruciating pain and discomfort" and that her condition constituted an "medical emergency condition".

609.     In every claim for initial examinations identified in Exhibit "3", Beacon, Herrera, and Formisano falsely reported that the Insureds suffered from the same severe pain in their neck, back, and extremities, that it was a "medical emergency condition!", and that the Insureds were experiencing "excruciating pain and discomfort".

610.     Beacon, Herrera, and Formisano routinely inserted this false information in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Beacon Defendants purported to provide to the Insureds, including medically unnecessary follow-up examinations and physical therapy services.

611.     To the extent that the Insureds in the claims identified in Exhibit "3" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary sprains or strains of the back, neck, or extremities.

612.     The diagnosis and treatment of these ordinary sprains and strains did not require any "moderate complexity" medical decision-making on the part of Formisano or anyone else.

613.     To the contrary, and as set forth above, Formisano did not engage in any legitimate medical decision-making at all in connection with the initial examinations in the claims identified in Exhibit "3", because the purported "results" of the examinations were pre-determined, phony, and designed to provide a false justification for the laundry-list of other Fraudulent Services that the Beacon Defendants purported to provide.

614.     In the claims for initial examinations identified in Exhibit "3", Beacon, Herrera, and Formisano routinely falsely represented that the initial examinations involved medical decision-making of low complexity in order to provide a false basis to bill for the initial examinations under CPT code 99204, because CPT code 99204 is reimbursable at a higher rate than examinations that do not require moderate complexity medical decision-making.

615.     In the claims for initial examinations identified in Exhibit "3", Beacon, Herrera, and Formisano routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentment;

(ii)     the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)     Beacon never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

616.     In this context, Formisano – who at all relevant times purported to serve as the "medical director" at Beacon – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

617.     Had Formisano actually fulfilled his statutory role as medical director at Beacon, he would have noted – among other things – that the Beacon Defendants routinely fraudulently represented in Beacon's billing that the putative initial examinations were legitimately and lawfully performed.

618.     Formisano failed to do so, because he never actually served as a legitimate medical director at Beacon in the first instance.

**(ii)     The Fraudulent Charges for Follow-Up Examinations at Beacon**

619.     In addition to their fraudulent initial examinations, Beacon, Herrera, and Formisano virtually always purported to subject each of the Insureds in the claims identified in Exhibit "3" to multiple, fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

620.     Formisano purported to personally perform virtually all of the follow-up examinations in the claims identified in Exhibit "3".

621.     As set forth in Exhibit "3", Beacon, Herrera, and Formisano then billed the follow-up examinations to GEICO under: (i) CPT code 99213, virtually always resulting in charges of $246.94 for each follow-up examination they purported to provide; or (ii) CPT code 99214, virtually always resulting in charges of $380.00 for reach follow-up examination they purported to provide.

622.     In the claims for follow-up examinations identified in Exhibit "3", the charges for the follow-up examinations were fraudulent in that they misrepresented Beacon's eligibility to collect PIP Benefits in the first instance.

623.     In fact, and as set forth above, Beacon never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing requirements set forth in the Clinic Act.

624.     As set forth below, Beacon, Herrera, and Formisano's charges for the follow-up examinations identified in Exhibit "3" also were fraudulent in that they misrepresented the nature and extent of the initial examinations.

**a.     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

625.     As set forth above, pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

626.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

627.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)     Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)     Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)     Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

    (iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

    (v)    Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

    (vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

    (vii)    Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

    (viii)    Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

628.    Accordingly, and as set forth above, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

629.    As set forth above, pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

630.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

631.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

    (i)    Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)     Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)    Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)     Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)      Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)     Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)    Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

632.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

633.    By contrast, and as set forth above, to the limited extent that the Insureds in the claims identified in Exhibit "3" suffered any injuries at all in their minor automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains, which were not severe at all.

634.    In keeping with the fact that the Insureds in the claims identified in Exhibit "3" almost never suffered any injuries more serious than garden-variety soft tissue injuries such as sprains and strains, in the claims identified in Exhibit "3" the Insureds did not seek treatment at any hospital as the result of their accidents.

635.    Furthermore, in the substantial majority of cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, and that no one was seriously injured in the underlying accidents, or injured at all.

636.    As set forth above, ordinary strains and sprains virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, or no treatment at all.

637.    By the time the Insureds in the claims identified in Exhibit "3" presented at Beacon for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

638.    Even so, in the claims for follow-up examinations identified in Exhibit "3", Beacon, Herrera, and Formisano routinely billed for their putative follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of either low to moderate severity or moderate to high severity.

639.    For example:

(i)     On June 3, 2016, an Insured named FL was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that FL's vehicle was functional following the accident, and that no one was injured in the accident. In keeping with the fact that FL was not seriously injured in the accident, FL did not visit any hospital following the accident. To the extent that FL suffered any health problems at all as the result of his minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of FL on June 28, 2016, July 19, 2016, and August 16, 2016, Beacon, Herrera, and Formisano billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that FL presented with problems of low to moderate severity. In keeping with the fact that FL had no presenting problems of low to moderate severity, Beacon and Formisano actually stopped treating FL after the purported August 16, 2016 follow-up examination.

(ii)    On June 3, 2016, an Insured named AM was involved in a minor automobile

accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that AM's vehicle was functional following the accident, and that no one was injured in the accident. In keeping with the fact that AM was not seriously injured in the accident, AM did not visit any hospital following the accident. To the extent that AM suffered any health problems at all as the result of her minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of AM on June 28, 2016, July 19, 2016, and August 16, 2016, Beacon, Herrera, and Formisano billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that AM presented with problems of low to moderate severity. In keeping with the fact that AM had no presenting problems of low to moderate severity, Beacon and Formisano actually stopped treating AM after the purported August 16, 2016 follow-up examination.

(iii)    On January 25, 2017, an Insured named MB was involved in an automobile accident. In keeping with the fact that MB was not seriously injured in the accident, MB did not visit any hospital following the accident, and did not seek any treatment of any kind for a week after the accident. To the extent that MB suffered any health problems at all as the result of his accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of MB on February 27, 2017 and April 20, 2017, Beacon, Herrera, and Formisano billed GEICO for the follow-up examinations using CPT code 99214 and thereby falsely represented that MB presented with problems of moderate to high severity. In keeping with the fact that MB had no presenting problems of moderate to high severity, Beacon and Formisano actually stopped treating MB after the purported April 20, 2017 follow-up examination.

(iv)    On May 19, 2017, an Insured named HF was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that HF's vehicle was functional following the accident, and that no one was injured in the accident. In keeping with the fact that HF was not seriously injured in the accident, HF did not visit any hospital following the accident. To the extent that HF suffered any health problems at all as the result of her minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following a purported follow-up examination of HF on June 19, 2017, Beacon, Herrera, and Formisano billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that HF presented with problems of low to moderate severity. Then, following a purported follow-up examination of HF on July 25, 2017, Beacon, Herrera, and Formisano billed GEICO for the follow-up examination using CPT code 99214 and thereby falsely represented that HF presented with problems of moderate to high severity, despite the fact that they previously had represented that HF's presenting problems were of low to moderate severity, and that her condition had improved over the course of treatment. In keeping with the fact that HF had no presenting problems of low to moderate severity, or moderate

to high severity, Beacon and Formisano actually stopped treating HF after the purported July 25, 2017 follow-up examination.

(v)     On June 2, 2017, an Insured named DM was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that DM was not seriously injured in the accident, DM did not visit any hospital following the accident. To the extent that DM suffered any health problems at all as the result of her minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of DM on July 17, 2017 and September 29, 2017, Beacon, Herrera, and Formisano billed GEICO for the follow-up examinations using CPT code 99214 and thereby falsely represented that DM presented with problems of moderate to high severity. In keeping with the fact that DM had no presenting problems of moderate to high severity, Beacon and Formisano actually stopped treating DM after the purported September 29, 2017 follow-up examination.

(vi)     On June 2, 2017, an Insured named RA was involved in a minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that RA was not seriously injured in the accident, RA did not visit any hospital following the accident. To the extent that RA suffered any health problems at all as the result of her minor accident, they were of low severity at the outset, and had resolved within a few weeks of the accident. Even so, following purported follow-up examinations of RA on July 17, 2017, August 17, 2017, and September 29, 2017, Beacon, Herrera, and Formisano billed GEICO for the follow-up examinations using CPT code 99214 and thereby falsely represented that RA presented with problems of moderate to high severity. In keeping with the fact that RA had no presenting problems of moderate to high severity, Beacon and Formisano actually stopped treating RA after the purported September 29, 2017 follow-up examination.

640.    In all of the claims for follow-up examinations identified in Exhibit "3", Beacon, Herrera, and Formisano falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

641.    In the claims for follow-up examinations identified in Exhibit "3", Beacon, Herrera, and Formisano routinely falsely represented that the Insureds presented with problems

183

of either low to moderate severity or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99213 and 99214, because follow-up examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

642.    In the claims for follow-up examinations identified in Exhibit "3", Beacon, Herrera, and Formisano also routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to create a false basis for the other Fraudulent Services that the Beacon Defendants purported to provide to the Insureds, including additional, medically unnecessary follow-up examinations and physical therapy.

b.      **Misrepresentations Regarding the Results of the Follow-Up Examinations**

643.    What is more, pursuant to the CPT Assistant, when Beacon, Herrera, and Formisano billed for their putative follow-up examinations under CPT code 99214, they represented that Formisano performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

644.    Similarly, pursuant to the CPT Assistant, when Beacon, Herrera, and Formisano billed for their putative follow-up examinations under CPT code 99213, they represented that Formisano performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

645.    In actuality, however, in the claims for follow-up examinations identified in Exhibit "3", Formisano did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

646.    Rather, following their purported follow-up examinations, Beacon and Formisano – at the direction of Herrera – simply: (i) reiterated the false, boilerplate "diagnoses" they previously had provided to the Insureds; and either  (ii) referred the Insureds back to Beacon for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services from Beacon that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

647.    In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentment, Beacon and Formisano – at the direction of Herrera – recommended a substantially identical course of medically unnecessary "treatment" to virtually every one of the Insureds identified in Exhibit "3", irrespective of the Insureds' actual presenting problems, to the extent the Insureds suffered any legitimate injuries at all.

648.    Specifically, Beacon and Formisano – at the direction of Herrera – directed virtually every Insured to receive two to four months of purported "physical therapy" treatments, typically consisting of daily physical therapy for the first three weeks of treatment, followed by physical therapy four times per week for the subsequent four weeks, followed by physical therapy three times a week for the final four weeks.

649.     In addition, Beacon and Formisano – at the direction of Herrera – directed virtually every Insured to receive substantially identical types of physical therapy services, including: (i) cold/hot packs; (ii) therapeutic exercises and activities; (iii) mechanical traction; (iv) paraffin baths; (v) infrared treatment; (vi) contrast baths; (vii) ultrasound; (viii) neuromuscular reeducation; and (ix) manual therapy. See Exhibit "3".

650.     As set forth above, in a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentment.

651.     In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

652.     By contrast, at Beacon, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentment, or progress through the Defendants' fraudulent treatment and billing protocol.

653.     The phony "follow-up examinations" that Beacon, Herrera, and Formisano purported to provide the Insureds in the claims identified in Exhibit "3" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Beacon's offices.

654.    In the claims for follow-up examinations identified in Exhibit "3", Beacon, Herrera, and Formisano routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentment;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   Beacon never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it unlawfully was operated without a legitimate medical director.

655.    In this context, Formisano – who at all relevant times purported to serve as the "medical director" at Beacon – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." See Fla. Stat. § 400.9935(1).

656.    Had Formisano actually fulfilled his statutory role as medical director at Beacon, he would have noted – among other things – that the Beacon Defendants routinely fraudulently represented in Beacon's billing that the putative follow-up examinations were legitimately and lawfully performed and billed.

657.    Formisano failed to do so, because he never actually served as a legitimate medical director at Beacon in the first instance.

**(iii)   The Fraudulent Charges for Physical Therapy at Beacon**

658.    In addition to the fraudulent initial examinations and follow-up examinations, the Beacon Defendants virtually always purported to subject each of the Insureds in the claims

identified in Exhibit "3" to between two and four months of medically unnecessary physical therapy.

659.   As set forth above, though Formisano falsely purported to personally perform virtually all of the physical therapy services in the claims identified in Exhibit "3", the physical therapy services actually were performed by Guerra or other massage therapists associated with Beacon, including Fernandez and Ramirez, to the extent that they were even provided at all.

660.   As set forth in Exhibit "3", the Beacon Defendants then billed the purported physical therapy services to GEICO under:

(i)    CPT code 97010 for putative hot/cold pack treatments, resulting in a charge of $50.00 for each round of hot/cold pack treatments they purported to provide;

(ii)   CPT code 97012, for putative mechanical traction therapy, resulting in a charge of $75.00 for each round of mechanical traction therapy they purported to provide;

(iii)  HCPCS code G0283, for putative electrical stimulation, resulting in a charge of $55.00 for each round of electrical stimulation they purported to provide;

(iv)   CPT code 97026, for putative infrared therapy, resulting in a charge of $38.34 for each round of infrared therapy they purported to provide;

(v)    CPT code 97034, for putative contrast bath therapy, resulting in a charge of $55.00 for each round of contrast bath therapy they purported to provide;

(vi)   CPT code 97035, for putative ultrasound, resulting in a charge of $55.00 for each round of ultrasound they purported to provide;

(vii)  CPT code 97039, for putative "vital wrap" treatments, resulting in a charge of $55.00 for each round of "vital wrap" treatments they purported to provide;

(viii) CPT code 97110, for putative therapeutic exercises, resulting in a charge of $90.00 for each round of therapeutic exercises they purported to provide;

(ix)   CPT code 97112, for putative neuromuscular reeducation, resulting in a charge of $65.00 for each round of neuromuscular reeducation they purported to provide; and

(x)    CPT code 97140, for putative manual therapy, resulting in a charge of $80.00 for each round of manual therapy they purported to provide.

661.    In the claims for physical therapy services identified in Exhibit "3", the charges for the physical therapy services were fraudulent in that they misrepresented Beacon's eligibility to collect PIP Benefits in the first instance.

662.    In fact, and as set forth above, Beacon never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act.

663.    What is more, and as set forth above, in the claims for physical therapy services identified in Exhibit "3", the Beacon Defendants falsely represented that the physical therapy services lawfully had been performed by Formisano, when in fact they were unlawfully performed by Guerra or other massage therapists associated with Beacon, including Fernandez and Ramirez, who are not and never have been licensed as physical therapists.

664.    Additionally, neither Guerra, nor any of the other massage therapists associated with Beacon, were directly supervised by Formisano, or by any other licensed physician associated with Beacon, when performing the physical therapy services identified in Exhibit "3".

665.    As set forth above, prior to January 1, 2013, the No-Fault Law permitted health care services providers to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

666.    However – and again, as set forth above – in response to rampant PIP fraud involving massage therapists and massage, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for services provided by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5).

667.     What is more, pursuant to Florida law, massage therapists cannot lawfully perform physical therapy services unless they also are licensed as physical therapists. See Fla. Stat. § 486.028.

668.     As a result, beginning in early 2017, the Beacon Defendants began to falsely list Formisano as the treating provider on almost every single bill for almost every single service that they purported to provide through Beacon, including almost every individual physical therapy service that was billed through Beacon to GEICO.

669.     In fact, and as set forth above, Formisano did not perform any of the physical therapy services that were billed through Beacon to GEICO and other insurers, including but not limited to the services billed through Beacon between early 2017 and the present.

670.     Formisano was approximately 72 years old in 2016, approximately 73 years old in 2017, and was advanced in age during this period.

671.     What is more, and as set forth above, during his putative service as the phony "medical director" at Beacon, Formisano simultaneously was purporting to serve as "medical director" at a host of other clinics, including DG Esthetic, Delta, DA Health, Alternative Medical, and Omega Therapy, and was purporting to treat patients at numerous other practices, as well.

672.     Formisano could not physically have performed, or even supervised, the massive number of physical therapy services that were billed through Beacon to GEICO since early 2017.

673.     Even so, the Beacon Defendants routinely falsely represented in the billing they submitted through DG Esthetic to GEICO for physical therapy services after late 2013 that Formisano personally performed the underlying physical therapy services, when in fact the

services unlawfully had been performed by Mejias or other unsupervised massage therapists associated with DG Esthetic, to the extent that they were performed at all.

674.    As set forth above, in order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

675.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

676.    In each of the claims for physical therapy services identified in Exhibit "3", the Beacon Defendants falsely represented that the services were lawfully provided and eligible for PIP reimbursement.

677.    In fact, in the claims for physical therapy services identified in Exhibit "3", the services were not lawfully provided, inasmuch as: (i) the putative physical therapy services were performed – to the extent that they were performed at all – by Guerra or other unsupervised massage therapists associated with Beacon, who were individuals who were not licensed to practice physical therapy; and (ii) the Beacon Defendants deliberately misrepresented the identities of the individuals who purported to perform the physical therapy services in their billing for the physical therapy services, in a calculated attempt to induce GEICO to pay the unreimbursable charges.

**III.    The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO**

678.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms and treatment reports through the Clinic

Defendants to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

679.    The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Clinic Defendants were in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance. In fact, the Clinic Defendants never were in compliance with the Clinic Act, and never were eligible to collect PIP Benefits, because they were operated without legitimate medical directors who legitimately fulfilled the statutory requirements applicable to clinic medical directors.

(ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because: (a) they were medically unnecessary and provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (b) in the case of the physical therapy services, because they were provided by unsupervised massage therapists in contravention of Florida law.

(iii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

IV.     **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

680.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

681.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants have systemically concealed their fraud and have gone to great lengths to accomplish this concealment.

682.    For instance, the Defendants knowingly misrepresented and concealed facts related to the Clinic Defendants in an effort to prevent discovery that the Clinic Defendants lacked legitimate medical directors, and therefore were ineligible to collect PIP Benefits in the first instance.

683.    What is more, the Defendants knowingly misrepresented and concealed facts related to the Fraudulent Services in an effort to prevent discovery that the Fraudulent Services were being provided – to the extent that they were provided at all – by unsupervised massage therapists in contravention of Florida law.

684.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

685.    Moreover, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

686.    The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

687.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $1,500,000.00.

688.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against DA Health, DG Esthetic, and Beacon
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

689.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-688 above.

690.    There is an actual case in controversy between GEICO and the Clinic Defendants regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

691.    The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because they unlawfully were operated in violation of the Clinic Act's medical director and licensing requirements.

692.    The Clinic Defendants have no right to receive payment for any pending bills

submitted to GEICO because the underlying Fraudulent Services were not lawfully provided.

693.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

694.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

695.     The Clinic Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

696.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that DA Health, DG Esthetic, and Beacon have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Alfonso and Formisano**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

697.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-66, 98-143, 236-240, 244-391, and 678-688, above.

698.     DA Health is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

699.     Alfonso and Formisano knowingly have conducted and/or participated, directly or

indirectly, in the conduct of DA Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that DA Health was not eligible to receive under the No-Fault Law because: (i) DA Health unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the DA Health Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

700. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

701. DA Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Alfonso and Formisano operated DA Health, inasmuch as DA Health was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for DA Health to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as

does the fact that the DA Health Defendants continue to attempt collection on the fraudulent billing submitted through DA Health to the present day.

702.    DA Health is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by DA Health in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

703.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $790,000.00 pursuant to the fraudulent bills submitted through the DA Health enterprise.

704.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Alfonso, Formisano, and Mejias**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

705.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-66, 98-143, 236-240, 244-391, and 678-688, above.

706.    DA Health is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

707.    Alfonso, Formisano, and Mejias are employed by or associated with the DA Health enterprise.

708.    Alfonso, Formisano, and Mejias knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of DA Health's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud

statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that DA Health was not eligible to receive under the No-Fault Law because: (i) DA Health unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the DA Health Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

709.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

710.    Alfonso, Formisano, and Mejias knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

711.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $790,000.00 pursuant to the fraudulent bills submitted through the DA Health enterprise.

712.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against the DA Health Defendants
### (Under Fla. Stat. 501.201 et. seq.)

713.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-66, 98-143, 236-240, 244-391, and 678-688, above.

714.     The DA Health Defendants are actively engaged in trade and commerce in the State of Florida.

715.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

716.     The DA Health Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

717.     The bills and supporting documents submitted or caused to be submitted by the DA Health Defendants to GEICO were fraudulent in that they misrepresented: (i) DA Health's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

718.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the DA Health Defendants has been materially injurious to GEICO and its Insureds.

719.     The conduct of the DA Health Defendants was the actual and proximate cause of the damages sustained by GEICO.

720.     The DA Health Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $790,000.00.

721.     By reason of the DA Health Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**FIFTH CAUSE OF ACTION**
**Against Alfonso, Formisano, and Mejias**
**(Under Fla. Stat. 772.103 <u>et</u>. <u>seq</u>.)**

722.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-66, 98-143, 236-240, 244-391, and 678-688, above.

723.     In furtherance of the fraudulent scheme, Alfonso, Formisano, and Mejias submitted or caused to be submitted thousands of fraudulent charges through the DA Health enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

724.     When the billing was submitted, Alfonso, Formisano, and Mejias knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) DA Health unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the DA Health Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying

200

Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

725.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

726.    This pattern of criminal activity resulted in Alfonso, Formisano, and Mejias receiving more than $790,000.00 in PIP Benefits to which they were not entitled.

727.    Alfonso, Formisano, and Mejias's pattern of criminal activity has caused GEICO to sustain damages of at least $790,000.00.

728.    By reason of Alfonso, Formisano, and Mejias's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

## SIXTH CAUSE OF ACTION
### Against the DA Health Defendants
### (Common Law Fraud)

729.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-66, 98-143, 236-240, 244-391, and 678-688, above.

730.    The DA Health Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through DA Health for the Fraudulent Services.

341.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that DA Health was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact DA Health never was in compliance with the Clinic Act, and never was eligible to collect

PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

731.    The DA Health Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through DA Health that were not reimbursable.

732.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $790,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the DA Health Defendants through DA Health.

733.    The DA Health Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

734.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against the DA Health Defendants**
**(Unjust Enrichment)**

735.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-66, 98-143, 236-240, 244-391, and 678-688, above.

736.     As set forth above, the DA Health Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

737.     When GEICO paid the bills and charges submitted or caused to be submitted by the DA Health Defendants through DA Health, it reasonably believed that it was legally obligated to make such payments based on the DA Health Defendants' improper, unlawful, and/or unjust acts.

738.     The DA Health Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the DA Health Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

739.     The DA Health Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

740.     By reason of the above, the DA Health Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $790,000.00.

### EIGHTH CAUSE OF ACTION
**Against Lima and Formisano**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

741.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-44, 67-81, 98, 144-188, 236-251, 392-531, and 678-688, above.

742.     DG Esthetic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

743.    Lima and Formisano knowingly have conducted and/or participated, directly or indirectly, in the conduct of DG Esthetic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that DG Esthetic was not eligible to receive under the No-Fault Law because: (i) DG Esthetic unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the DG Esthetic Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

744.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

745.    DG Esthetic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Lima and Formisano operated DG Esthetic, inasmuch as DG Esthetic was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for DG Esthetic to function. Furthermore, the intricate planning required to

carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the DG Esthetic Defendants continue to attempt collection on the fraudulent billing submitted through DG Esthetic to the present day.

746.    DG Esthetic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by DG Esthetic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

747.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $750,000.00 pursuant to the fraudulent bills submitted through the DG Esthetic enterprise.

748.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against Lima, Formisano, and Mejias**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

749.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-44, 67-81, 98, 144-188, 236-251, 392-531, and 678-688, above.

750.    DG Esthetic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

751.    Lima, Formisano, and Mejias are employed by or associated with the DG Esthetic enterprise.

752.    Lima, Formisano, and Mejias knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of DG Esthetic's affairs through

a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that DG Esthetic was not eligible to receive under the No-Fault Law because: (i) DG Esthetic unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the DG Esthetic Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

753.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

754.    Lima, Formisano, and Mejias knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

755.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $750,000.00 pursuant to the fraudulent bills submitted through the DG Esthetic enterprise.

756.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TENTH CAUSE OF ACTION
**Against the DG Esthetic Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

757.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-44, 67-81, 98, 144-188, 236-251, 392-531, and 678-688, above.

758.    The DG Esthetic Defendants are actively engaged in trade and commerce in the State of Florida.

759.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

760.    The DG Esthetic Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

761.    The bills and supporting documents submitted or caused to be submitted by the DG Esthetic Defendants to GEICO were fraudulent in that they misrepresented: (i) DG Esthetic's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

762.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the DG Esthetic Defendants has been materially injurious to GEICO and its Insureds.

763.    The conduct of the DG Esthetic Defendants was the actual and proximate cause of the damages sustained by GEICO.

764.    The DG Esthetic Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $750,000.00.

765.    By reason of the DG Esthetic Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## ELEVENTH CAUSE OF ACTION
### Against Lima, Formisano, and Mejias
### (Under Fla. Stat. 772.103 et. seq.)

766.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-44, 67-81, 98, 144-188, 236-251, 392-531, and 678-688, above.

767.    In furtherance of the fraudulent scheme, Lima, Formisano, and Mejias submitted or caused to be submitted thousands of fraudulent charges through the DG Esthetic enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

768.    When the billing was submitted, Lima, Formisano, and Mejias knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) DG Esthetic unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the DG Esthetic Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying

Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

769.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

770.    This pattern of criminal activity resulted in Lima, Formisano, and Mejias receiving more than $750,000.00 in PIP Benefits to which they were not entitled.

771.    Lima, Formisano, and Mejias's pattern of criminal activity has caused GEICO to sustain damages of at least $750,000.00.

772.    By reason of Lima, Formisano, and Mejias's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

**TWELFTH CAUSE OF ACTION**
**Against the DG Esthetic Defendants**
**(Common Law Fraud)**

773.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-44, 67-81, 98, 144-188, 236-251, 392-531, and 678-688, above.

774.    The DG Esthetic Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through DG Esthetic for the Fraudulent Services.

341.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that DG Esthetic was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact DG Esthetic never was in compliance with the Clinic Act, and never was eligible to collect

PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

775.    The DG Esthetic Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through DG Esthetic that were not reimbursable.

776.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $750,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the DG Esthetic Defendants through DG Esthetic.

777.    The DG Esthetic Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

778.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTEENTH CAUSE OF ACTION**
**Against the DG Esthetic Defendants**
**(Unjust Enrichment)**

779.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-44, 67-81, 98, 144-188, 236-251, 392-531, and 678-688, above.

780.    As set forth above, the DG Esthetic Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

781.    When GEICO paid the bills and charges submitted or caused to be submitted by the DG Esthetic Defendants through DG Esthetic, it reasonably believed that it was legally obligated to make such payments based on the DG Esthetic Defendants' improper, unlawful, and/or unjust acts.

782.    The DG Esthetic Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the DG Esthetic Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

783.    The DG Esthetic Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

784.    By reason of the above, the DG Esthetic Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $750,000.00.

**FOURTEENTH CAUSE OF ACTION**
**Against Herrera and Formisano**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

785.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-44, 82-98, 189-240, 244-251, and 532-688, above.

786.    Beacon is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

787.    Herrera and Formisano knowingly have conducted and/or participated, directly or indirectly, in the conduct of Beacon's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over one and a half years seeking payments that Beacon was not eligible to receive under the No-Fault Law because: (i) Beacon unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Beacon Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

788.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

789.    Beacon's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Herrera and Formisano operated Beacon, inasmuch as Beacon was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Beacon to function. Furthermore, the intricate planning required to carry out and

conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Beacon Defendants continue to attempt collection on the fraudulent billing submitted through Beacon to the present day.

790.    Beacon is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Beacon in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

791.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $50,000.00 pursuant to the fraudulent bills submitted through the Beacon enterprise.

792.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FIFTEENTH CAUSE OF ACTION
**Against Herrera, Formisano, and Guerra**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

793.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-44, 82-98, 189-240, 244-251, and 532-688, above.

794.    Beacon is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

795.    Herrera, Formisano, and Guerra are employed by or associated with the Beacon enterprise.

796.    Herrera, Formisano, and Guerra knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Beacon's affairs through a

pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over one and a half years seeking payments that Beacon was not eligible to receive under the No-Fault Law because: (i) Beacon unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Beacon Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

797.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

798.    Herrera, Formisano, and Guerra knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

799.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $50,000.00 pursuant to the fraudulent bills submitted through the Beacon enterprise.

800.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SIXTEENTH CAUSE OF ACTION**
**Against the Beacon Defendants**
**(Under Fla. Stat. 501.201 et. seq.)**

801.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-44, 82-98, 189-240, 244-251, and 532-688, above.

802.     The Beacon Defendants are actively engaged in trade and commerce in the State of Florida.

803.     GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

804.     The Beacon Defendants engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

805.     The bills and supporting documents submitted or caused to be submitted by the Beacon Defendants to GEICO were fraudulent in that they misrepresented: (i) Beacon's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

806.     Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of the Beacon Defendants has been materially injurious to GEICO and its Insureds.

807.     The conduct of the DA Health Defendants was the actual and proximate cause of the damages sustained by GEICO.

808.    The Beacon Defendants' unfair and deceptive acts have caused GEICO to sustain damages of at least $50,000.00.

809.    By reason of the Beacon Defendants' conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**SEVENTEENTH CAUSE OF ACTION**
**Against Herrera, Formisano, and Guerra**
**(Under Fla. Stat. 772.103 et. seq.)**

810.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-44, 82-98, 189-240, 244-251, and 532-688, above.

811.    In furtherance of the fraudulent scheme, Herrera, Formisano, and Guerra submitted or caused to be submitted hundreds of fraudulent charges through the Beacon enterprise to GEICO seeking payment pursuant under automobile insurance policies issued by GEICO to Florida Insureds.

812.    When the billing was submitted, Herrera, Formisano, and Guerra knew that the billing contained false and misleading information concerning facts material to the claims for which reimbursement was being sought in that: (i) Beacon unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements, and therefore was not eligible to collect PIP Benefits in the first instance; (ii) the underlying Fraudulent Services were not lawfully provided, and therefore were not eligible for PIP reimbursement in the first instance; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Beacon Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent

216

Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

813.    These knowing and intentional acts constitute a pattern of criminal activity, in that said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

814.    This pattern of criminal activity resulted in Herrera, Formisano, and Guerra receiving more than $50,000.00 in PIP Benefits to which they were not entitled.

815.    Herrera, Formisano, and Guerra's pattern of criminal activity has caused GEICO to sustain damages of at least $50,000.00.

816.    By reason of Herrera, Formisano, and Guerra's conduct, GEICO is also entitled to recover threefold the actual damages it actually sustained, reasonable attorney's fees, and court costs pursuant to Fla. Stat. § 772.104.

### EIGHTEENTH CAUSE OF ACTION
**Against the Beacon Defendants**
**(Common Law Fraud)**

817.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-44, 82-98, 189-240, 244-251, and 532-688, above.

818.    The Beacon Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, hundreds of fraudulent charges through Beacon for the Fraudulent Services.

341.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Beacon was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Beacon never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits,

because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

819.    The Beacon Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Beacon that were not reimbursable.

820.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $50,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Beacon Defendants through Beacon.

821.    The Beacon Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

822.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
### Against the Beacon Defendants
### (Unjust Enrichment)

823.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-44, 82-98, 189-240, 244-251, and 532-688, above.

824.    As set forth above, the Beacon Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

825.    When GEICO paid the bills and charges submitted or caused to be submitted by the Beacon Defendants through Beacon, it reasonably believed that it was legally obligated to make such payments based on the Beacon Defendants' improper, unlawful, and/or unjust acts.

826.    The Beacon Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Beacon Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

827.    The Beacon Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

828.    By reason of the above, the Beacon Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $50,000.00.

## JURY DEMAND

829.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against DA Health, DG Esthetic, and Beacon, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that DA Health, DG Esthetic, and Beacon have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Alfonso and Formisano, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $790,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Alfonso, Formisano, and Mejias, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $790,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against DA Health, Alfonso, Formisano, and Mejias, compensatory damages in an amount to be determined at trial but in excess of $790,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.      On the Fifth Cause of Action against Alfonso, Formisano, and Mejias, compensatory damages in an amount to be determined at trial but in excess of $790,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

F.      On the Sixth Cause of Action against DA Health, Alfonso, Formisano, and Mejias, compensatory damages in an amount to be determined at trial but in excess of $790,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.     On the Seventh Cause of Action against DA Health, Alfonso, Formisano, and Mejias, more than $790,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

H.     On the Eighth Cause of Action against Lima and Formisano, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $750,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.     On the Ninth Cause of Action against Lima, Formisano, and Mejias, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $750,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.     On the Tenth Cause of Action against DG Esthetic, Lima, Formisano, and Mejias, compensatory damages in an amount to be determined at trial but in excess of $750,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

K.     On the Eleventh Cause of Action against Lima, Formisano, and Mejias, compensatory damages in an amount to be determined at trial but in excess of $750,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

L.     On the Twelfth Cause of Action against DG Esthetic, Lima, Formisano, and Mejias, compensatory damages in an amount to be determined at trial but in excess of $750,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against DG Esthetic, Lima, Formisano, and Mejias, more than $750,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Herrera and Formisano, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $50,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against Herrera, Formisano, and Guerra, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $50,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.      On the Sixteenth Cause of Action against Beacon, Herrera, Formisano, and Guerra, compensatory damages in an amount to be determined at trial but in excess of $50,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

Q.      On the Seventeenth Cause of Action against Herrera, Formisano, and Guerra, compensatory damages in an amount to be determined at trial but in excess of $50,000.00, together with treble damages, reasonable attorney's fees, and court costs pursuant to Fla. Stat. 772.104;

R.      On the Eighteenth Cause of Action against Beacon, Herrera, Formisano, and Guerra, compensatory damages in an amount to be determined at trial but in excess of $50,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

S.      On the Nineteenth Cause of Action against Beacon, Herrera, Formisano, and Guerra,  more than $50,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:          March 12, 2018

> */s/ John P. Marino*
> John P. Marino (FBN 814539)
> Lindsey R. Trowell (FBN 678783)
> Kristen W. Bracken (FBN 92136)
> SMITH, GAMBRELL & RUSSELL, LLP
> 50 North Laura Street, Suite 2600
> Jacksonville, Florida 32202
> Phone:  (904) 598-6100
> Facsimile:  (904) 598-6204
> ltrowell@sgrlaw.com
> jmarino@sgrlaw.com
> kbracken @sgrlaw.com
>
> Barry I. Levy (pro hac vice pending)
> Michael Vanunu (pro hac vice pending)
> RIVKIN RADLER LLP
> 926 RXR Plaza
> Uniondale, New York 11550
> Phone:  (516) 357-3000
> Facsimile:  (516) 357-3333
> barry.levy@rivkin.com
> michael.vanunu@rivkin.com
>
> *Attorneys for Plaintiffs*